# In the United States Court of Appeals for the Tenth Circuit

CHASE MANUFACTURING INC. D/B/A THERMAL PIPE SHIELDS,

*Plaintiff-Appellant,*

v.

JOHNS MANVILLE CORPORATION,

*Defendant-Appellee.*

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
NO. 1:19-CV-00872-MEH
The Honorable Michael E. Hegarty

## APPELLANT'S OPENING BRIEF

ALEXANDRA SHEAR
LUKE HASSKAMP
JAROD M. BONA
BONA LAW PC
4275 Executive Square, Suite 200
La Jolla, CA 92037
858-964-4589
*Counsel for Appellant*
  *Chase Manufacturing Inc.*
  *d/b/a Thermal Pipe Shields*
ORAL ARGUMENT REQUESTED

# CORPORATE DISCLOSURE STATEMENT

Appellant states that there is no parent corporation or any publicly held corporation that owns 10% or more of its stock.

Date: October 4, 2022

BONA LAW PC

*s/ Alexandra Shear*
Alexandra Shear

*Counsel for Appellant*
Chase Manufacturing Inc. d/b/a
Thermal Pipe Shields

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................. i

TABLE OF AUTHORITIES ..................................................... v

STATEMENT OF PRIOR OR RELATED CASES ................................. ix

GLOSSARY ................................................................. x

JURISDICTIONAL STATEMENT ........................................... 1

INTRODUCTION ........................................................... 1

STATEMENT OF ISSUES PRESENTED FOR REVIEW ...................... 4

STATEMENT OF THE CASE................................................ 4

I.     FACTUAL BACKGROUND ............................................. 4

II.    PROCEDURAL HISTORY ........................................... 19

SUMMARY OF THE ARGUMENT ...................................... 20

STANDARD OF REVIEW ................................................ 23

ARGUMENT ................................................................ 23

I.     TPS PRESENTED EVIDENCE RAISING GENUINE
       DISPUTES OF MATERIAL FACT ON ALL ELEMENTS
       OF ITS CLAIMS ................................................ 23

       A.    TPS Presented Evidence of Harm to Competition and
             Antitrust Injury ...................................... 24

       B.    TPS Presented Evidence on All Elements of
             Monopolization........................................ 26

             1.    Monopoly Power in the Relevant Market ...................... 27

             2.    Exclusionary Conduct..................................... 30

       C.    TPS Presented Evidence on All Elements of Tying .............. 39

             1.    The Sale of the Tying Product(s) Conditioned on the
                   Purchase of the Tied Product ......................... 40

             2.    Sufficient Economic Power in the Tying Product(s)....... 42

       D.    Applying a More Stringent Standard, the Court Already
             Found Much of TPS's Evidence Sufficient............................. 46

II.  IN ANSWERING FACTUAL QUESTIONS, THE COURT
     EVALUATED THE EVIDENCE IMPROPERLY .......................... 46

     A.   Usurping the Jury's Function Was Legal Error ................... 47

          1.   The Court Should Not Have Weighed TPS's Evidence
               Particularly on Severity and Causation ......................... 47

     B.   The District Court Ignored Key Evidence .............................. 50

     C.   The Court Did Not Consider the Evidence in Its
          Entire Context ......................................................................... 51

     D.   The Court Made Improper Inferences in JM's Favor ........... 52

III. THE COURT REQUIRED HEIGHTENED SHOWINGS
     THAT DO NOT CORRESPOND TO TPS'S CLAIMS .................. 55

     A.   The Court Required TPS to Show More Than Is Necessary
          for Exclusionary Conduct by Incorrectly Applying
          Heightened Legal Standards ................................................. 55

          1.   Tying as Exclusionary Conduct ....................................... 56

          2.   Refusal to Supply Customers as Exclusionary Conduct ..58

          3.   Exclusive Dealing as Exclusionary Conduct ................... 62

          4.   Disparagement as Exclusionary Conduct ........................ 66

     B.   The Court Neglected to Consider the Composite Effect
          of These Four Types of Conduct ............................................ 66

CONCLUSION ........................................................................................ 69

STATEMENT REGARDING ORAL ARGUMENT ................................ 70

CERTIFICATE OF COMPLIANCE ....................................................... 71

CERTIFICATE OF DIGITAL SUBMISSION ....................................... 72

CERTIFICATE OF SERVICE ................................................................ 73

ADDENDUM TO APPELLANT'S BRIEF INDEX ................................ 74

ATTACHMENT 1: DISTRICT COURT ORDER FILED MARCH
     23, 2020 ....................................................................................... 75

ATTACHMENT 2: DISTRICT COURT ORDER FILED
     NOVEMBER12, 2020 ................................................................ 115

ATTACHMENT 3: DISTRICT COURT ORDER FILED
     JANUARY 6, 2021 ........................................................ 128

ATTACHMENT 4: DISTRICT COURT AMENDED ORDER
     FILED JANUARY 6, 2021............................................. 135

ATTACHMENT 5: DISTRICT COURT ORDER FILED
     FEBRUARY 22, 2022 .................................................. 147

ATTACHMENT 6: DISTRICT COURT ORDER FILED
     APRIL 26, 2022.......................................................... 174

ATTACHMENT 7: DISTRICT COURT ORDER FILED
     APRIL 26, 2022 (PROVISIONALLY SEALED) ........................ 206

ATTACHMENT 8: JUDGMENT ........................................................ 219

# TABLE OF AUTHORITIES

**Cases**                                                      **Page(s)**

*In re Actos End-Payor Antitrust Litig.*,
848 F.3d 89 (2d Cir. 2017) ................................................. 49

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)................................................ 47, 49, 52

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
472 U.S. 585 (1985)................................................ 64-65, 68

*Bacchus Indus., Inc. v. Arvin Indus., Inc.*,
939 F.2d 887 (10th Cir. 1991) .......................................... 27

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
429 U.S. 477 (1977)..................................................... 25

*Caldera, Inc. v. Microsoft Corp.*,
72 F. Supp. 2d 1295 (D. Utah 1999) ............................... 30, 68

*City of Anaheim v. S. Cal. Edison Co.*,
955 F.2d 1373 (9th Cir. 1992)......................................... 50

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
504 U.S. 451 (1992)..................................................... 27

*In re EpiPen Mktg., Sales Practices & Antitrust Litig.*,
507 F. Supp. 3d 1289 (D. Kan. 2020)................................. 66

*In re EpiPen Mktg., Sales Practices & Antitrust Litig.*,
No. 21-3005, 2022 U.S. App. LEXIS 20998 (10th
Cir. July 29, 2022)................................ 23, 25, 34, 58, 62-68

*Fortner Enters. v. U.S. Steel Corp.*,
394 U.S. 495 (1969)................................................. 56-57

*Jefferson Par. Hosp. Dist. No. 2 v. Hyde*,
466 U.S. 2 (1984)................................................... 27, 58

*Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*,
762 F.3d 1114 (10th Cir. 2014)........................ 24, 26, 30, 47

*LePage's Inc. v. 3M*,
324 F.3d 141 (3d Cir. 2003) (en banc) ........................ 26, 68

*Lorain Journal Co. v. United States*,
342 U.S. 143 (1951)........................................................60-61

*McWane, Inc. v. FTC*,
783 F.3d 814 (11th Cir. 2015) ....................................... 63, 65

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
465 U.S. 752 (1984).......................................................51, 54

*Multistate Legal Stud. v. Harcourt Brace Jovanovich Legal
& Pro. Publ'ns*,
63 F.3d 1540 (10th Cir. 1995) ............................................ 23

*NCAA v. Bd. of Regents*,
468 U.S. 85 (1984).......................................................24-25

*N.M. Oncology & Hematology Consultants, Ltd. v.
Presbyterian Healthcare Servs.*,
994 F.3d 1166 (10th Cir. 2021) ......................................... 59

*N. Pac. Ry. v. United States*,
356 U.S. 1 (1958)........................................................44, 56-57

*Neumann v. Reinforced Earth Co.*,
786 F.2d 424 (D.C. Cir. 1986) ........................................... 62

*Novell, Inc. v. Microsoft Corp.*,
731 F.3d 1064 (10th Cir. 2013) .....................26-27, 60, 67-68

*Reazin v. Blue Cross & Blue Shield, Inc.*,
899 F.2d 951 (10th Cir. 1990) ........................................... 29

*Rebel Oil Co. v. Atl. Richfield Co.*,
51 F.3d 1421 (9th Cir. 1995)............................................9, 24

*SolidFX, LLC v. Jeppesen Sanderson, Inc.*,
　　935 F. Supp. 2d 1069 (D. Colo. 2013), *aff'd*, 841 F.3d 827
　　(10th Cir. 2016) ..................................................................... 40

*In re Solodyn Antitrust Litig.*,
　　No. 14-md-02503, 2018 U.S. Dist. LEXIS 11921 (D. Mass.
　　Jan. 25, 2018) ....................................................................... 49

*Soucy v. Nova Guides, Inc.*,
　　No. 14-cv-01766-MEH, 2015 U.S. Dist. LEXIS 125947 (D.
　　Colo. Sept. 21, 2015) ............................................................ 48

*Suture Express, Inc. v. Owens & Minor Distrib., Inc.*,
　　851 F.3d 1029 (10th Cir. 2017) ...................................... 39, 56

*Tampa Elec. Co. v. Nashville Coal Co.*,
　　365 U.S. 320 (1961) ............................................................... 63

*United States v. Colgate & Co.*,
　　250 U.S. 300 (1919) ............................................................... 59

*United States v. Dentsply Int'l, Inc.*,
　　399 F.3d 181 (3d Cir. 2005) ................................... 27, 36, 65

*United States v. E.I. du Pont de Nemours & Co.*,
　　351 U.S. 377 (1956) ........................................................ 26, 29

*United States v. Grinnell Corp.*,
　　384 U.S. 563 (1966) ......................................... 26-27, 65

*United States v. Microsoft*,
　　253 F.3d 34 (D.C. Cir. 2001) .............................. 27, 54, 62

*Viamedia, Inc. v. Comcast Corp.*,
　　951 F.3d 429 .......................................................................... 68

*In re Wholesale Grocery Prods. Antitrust Litig.*,
　　752 F.3d 728 (8th Cir. 2014) ......................................... 47-48

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*,
　　395 U.S. 100 (1969) ............................................................... 49

*ZF Meritor, LLC v. Eaton Corp.*,
  696 F.3d 254 (3d Cir. 2012) ................................................ 63

## Statutes and Rules

15 U.S.C. § 1 ............................................................ 48, 60

15 U.S.C. § 2 ............................................................ 27, 61

15 U.S.C. § 15 ................................................................ 1

28 U.S.C. § 1291 ............................................................... 1

28 U.S.C. § 1331 ............................................................... 1

10th Cir. R. 25.5 ............................................................ 72

10th Cir. R. 28.2 ............................................................ 70

10th Cir. R. 32 .............................................................. 71

Fed. R. App. P. 4 .............................................................. 1

Fed. R. App. P. 32 ........................................................... 71

Fed. R. Civ. P. 56 ................................................... 21, 22, 47

## Other Authorities

Phillip E. Areeda (late) & Herbert Hovenkamp,
  *Antitrust Law: An Analysis of Antitrust Principles
  and Their Application* ¶ 768e3 (5th ed. 2022 Cum.
  Supp. 2015-2021) ........................................................ 61

## STATEMENT OF PRIOR OR RELATED CASES

Under Tenth Circuit Rule 28.2(C)(1), Appellant states that there are no prior or related cases.

# GLOSSARY

Under Tenth Circuit Rule 28.2(C)(4), the following acronyms and abbreviations are used in this brief:

| Acronym or Abbreviation | Full Term |
|---|---|
| **4State** | Non-party distributor 4 State Supply.<br><br>4State provided written and document discovery and produced a witness, Mr. Joseph Guest, to testify in this case. |
| **APi** | Non-party distributor APi Distribution.[1]<br><br>APi did not produce written or document discovery, nor did it give testimony. |
| **Bay** | Non-party distributor Bay Insulation Supply Incorporated.<br><br>Bay provided written and document discovery but did not give testimony. |
| **Calsil** | Hydrous calcium silicate thermal insulation that is factory-formed into flat blocks or curved sections designed to encapsulate pipes, equipment, or tanks, mainly in industrial facilities. It is manufactured in accordance with the material standard ASTM C533, Type I and sold by two suppliers in the U.S.: TPS and JM. TPS sells calsil under the brand name "TPSX-12" and JM uses the brand name "Thermo-1200." |

---

1.    APi is properly spelled "APi," but is sometimes mislabeled as "API." To be consistent, we correctly refer to "APi" in all instances, even when quoting a document that mistakenly uses "API."

| | |
|---|---|
| | Calsil is unique among industrial insulations because it can withstand significant physical abuse and extremely high temperatures (up to 1200° Fahrenheit). |
| **DI** | Non-party distributor Distribution International, Incorporated.<br><br>DI provided document discovery and produced a witness, Mr. Robert Hlavenka, to testify in this case. |
| **Fiberglass** | Fiberglass pipe insulation manufactured in accordance with the material standards ASTM C547, Types I and IV. Fiberglass is used mainly in commercial, not industrial settings. It is more commonly used than any other mechanical insulation product. JM sells fiberglass using the brand name "Micro-Lok." |
| **GI** | Non-party distributor General Insulation Company, Incorporated.<br><br>GI did not produce written or document discovery, nor did it give testimony. |
| **Industrial Insulation** | Mechanical insulation used mainly in industrial, rather than commercial, applications. |
| **InsulThin** | InsulThin HT was a JM product manufactured in accordance with ASTM C1676 Type II. JM promoted InsulThin as a competing product to aerogel thin blanket (ASTM C1728 type III), but has since discontinued it. |
| **JM** | Johns Manville Corporation, Defendant-Appellee. JM manufactures and sells calsil in the U.S. |
| **MacArthur** | Non-party distributor MacArthur Company.<br><br>MacArthur did not produce written or |

| | |
|---|---|
| | document discovery, nor did it give testimony. |
| **Mechanical Insulation** | A category of thermal insulation products used to provide an insulating physical barrier to protect pipes, tanks, and equipment in industrial or commercial facilities. |
| **Mineral Wool** | Mandrel-wound mineral wool pipe insulation manufactured in accordance with the material standard ASTM C547, Type II. JM sells mineral wool using the brand name "Minwool-1200." |
| **Perlite** | Expanded perlite pipe and block insulation manufactured in accordance with the material standard ASTM C610. TPS sells perlite that it imports from the Philippines using the brand name, "TPS EP-12." JM sells perlite under the brand name "Sproule WR-1200." |
| **SPI** | Non-party distributor Specialty Products & Insulation Company.<br><br>SPI provided document discovery but did not give testimony. |
| **SMUF** | The district court's confidential Order, docketed as ECF 226, containing its Statement of Material Undisputed Facts. |
| **TPS** | Chase Manufacturing, Inc., doing business as Thermal Pipe Shields, Plaintiff-Appellant. TPS purchases calsil that is made in China and sells it in the U.S. Although TPS does not manufacture the calsil that it sells, it competes with JM for sales and operates as a manufacturer in the chain of commerce. More precisely, TPS and JM are both suppliers or sellers of calsil in the U.S., but TPS is generally considered to function as a manufacturer. |

# JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction under 28 U.S.C. § 1331 and 15 U.S.C. § 15(a). The court entered its order, granting summary judgment and dismissing TPS's claims with prejudice, and its final judgment on April 26, 2022. App.Vol.V, 3-34. TPS filed its notice of appeal on May 20, 2022, App.Vol.V, 35, which was timely under Federal Rule of Appellate Procedure 4(a)(1)(A). This Court has jurisdiction under 28 U.S.C. § 1291.

# INTRODUCTION

For nearly twenty years, JM had a monopoly in the market for calsil, a unique pipe insulation material used in industrial facilities throughout the country. In 2018, TPS put JM's monopoly at risk by introducing higher quality, lower priced calsil sourced from China. Instead of responding appropriately to the competitive threat TPS posed—such as by lowering its prices or improving its product quality—JM employed anticompetitive tactics to keep TPS from penetrating the market.

Most significantly, JM threatened to retaliate against customers who bought TPS calsil. Indeed, just days after TPS's entry, JM

determined to warn customers that it would ██████████" against them if it had to: "███████████████████████████ ████████████████████████████████████████ ██████████████████████████████ App.Vol.VII, 277. And, indeed, JM did bring that "██████" threatening to cut off any customer who bought TPS calsil. App.Vol.VII, 277. JM's internal emails, JM employees, and third-party witnesses all confirmed this.

JM also improperly tied the sale of its other must-have insulation products to the purchase of its calsil, falsely disparaged TPS's calsil and service, and required customers to enter into exclusive deals that locked up most of the concentrated distributor market—a necessary customer base. Evidence confirmed this as well.

Unfortunately, these tactics were effective, because, as customers testified, they depend on supply from JM for their survival. As a result, they had no choice but to pay higher prices for JM's lower quality calsil and JM quickly succeeded in foreclosing a lower priced competitor from the market. Indeed, while JM internally projected that TPS would capture approximately ████████ of the calsil market and that JM would have to offer "████████████████████████████," JM

retained 90-95% of the market and continually raised its prices. App.Vol.VII, 109; App.Vol.VIII, 58; App.Vol.VI, 148.

TPS's economics expert offered evidence showing precisely how JM's conduct harmed competition: by maintaining calsil prices at approximately 25% above the competitive level for years after TPS's entry. JM's conduct harmed TPS as well, causing TPS damages of nearly $12 million. App.Vol.VI, 136-41, App.Vol.VI, 145-46, 212.

Despite this evidence, the district court granted JM's motion for summary judgment, dismissing TPS's monopolization and tying claims. That decision conflicts with relevant precedent, the substantial evidentiary record, and even the court's own prior decisions. In reaching its conclusions, the court applied incorrect legal standards, resolved factual questions that belonged to a jury, ignored key evidence, drew inferences against TPS and in favor of JM, and failed to consider the evidence in its full context. Given the errors of the court's legal and factual analyses, this Court should reverse summary judgment and allow TPS to try its monopolization and tying claims to a jury.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.    Did the district court err in granting summary judgment to JM, where TPS offered admissible expert and fact evidence showing genuine disputes of material fact on all elements of its claims?

2.    Did the district court err in resolving genuine disputes of material fact which should have been decided by a jury, and by doing so without making all inferences in TPS's favor or considering all the evidence in its full context?

3.    Did the district court err by applying incorrect legal standards to evaluate the various conduct comprising the exclusionary conduct element of TPS's monopolization claim, and by failing to consider the combined anticompetitive effect of JM's conduct?

## STATEMENT OF THE CASE

## I.    FACTUAL BACKGROUND

Calsil is an important industrial insulation product with a unique combination of durability, high-temperature tolerance, integral corrosion inhibiting chemistry, and inherent non-combustibility. App.Vol.I, 222, 224. These traits make it an essential insulator for most large industrial construction projects, such as oil refineries, power

plants, and paper mills. App.Vol.I, 222. While other insulators have some of calsil's advantages, none has them all.

For nearly twenty years, JM was the only supplier in the U.S. calsil market. App.Vol.IX, 33. In 2018, having identified a higher quality calsil that it could import from China and sell at a significantly lower price than JM's, TPS challenged JM's calsil monopoly. App.Vol.IX, 33-34. Some TPS calsil ships directly from China, but TPS also stores significant quantities in two U.S. warehouses. As planned, TPS sells calsil at a substantial discount off JM's price.

JM was familiar with the high quality and low cost of TPS calsil because JM imported and resold calsil from the same Chinese factory that supplies TPS. Accordingly, internal analysis showed that JM feared competition and anticipated losing substantial market share— more than ███%. *See* App.Vol.VII, 94-95, 109. ("████████████ ████████████████████████████████████ ████████████████████████████████████ ███████████████████████████████████").

Manufacturers (and other suppliers, like TPS) sell insulation, including calsil, to distributors who resell it (and ancillary products and

accessories) to contractors who install those products on pipes. Because contractors need varying volumes of bulky (sometimes fragile) materials shipped to job sites at different times during construction, they purchase insulation almost exclusively from distributors, who manage these challenging logistics. This makes distributors an essential valve in the commercial chain. Access to stocking positions with them is necessary for a brand's success. Distributors keep some material in stock—which they ship from their own storage facilities—and purchase some that the distributor's supplier ships directly to the distributor's customer. Insulation distribution is heavily concentrated; five distributors account for the vast majority of insulation purchases. App.Vol.VI, 211. This concentration amplified the effects of JM's actions: well-placed threats, exclusive dealing agreements, and disparaging comments infected much of the tightly-knit market.

JM has long been a dominant insulation supplier, not just of calsil but of many other insulation products, including fiberglass, expanded perlite, and mineral wool. JM accounted for 100% of calsil sales until TPS's entry in 2018, and more than 90% since. *See* App.Vol.VIII, 58 ("[O]ur market share is probably 95 percent, between 90 and 95

percent. I believe TPS has got 5 percent or maybe a little bit more of the market."). Additionally, JM sells a broad range of insulation products—with large market shares for some—while most other manufacturers have more limited offerings of one or a few types.

Thus, distributors understood that access to JM's products is critical to their remaining viable options for supplying their own, downstream customers. *See, e.g.*, App.Vol.IX, 33 ("As for all those products—calsil, perlite, fiberglass, and mineral wool—DI regards Defendant as an important supplier upon which it depends to operate."); App.Vol.VIII, 109, 118-21 (DI could not "do without JM"); App.Vol.III, 162 (DI could not meet customers' needs without JM perlite); App.Vol.VIII, 91-94 (███████████████████████████████████ ████████████████).

As a result, even though DI believes that TPS calsil "superior," and roughly 20% less expensive, DI continues to buy 99% of its calsil from JM. App.Vol.VIII, 110-14; 132. Similarly, 4State prefers TPS calsil but allocates its purchases evenly among both suppliers. App.Vol.VIII, 88.

TPS retained economics expert Dr. Frederick R. Warren-Boulton to opine on market definition, JM's monopoly and economic power, harm to competition, and TPS's damages from JM's anticompetitive conduct. After analyzing extensive evidence, including both parties' sales data, Dr. Warren-Boulton reached, among others not now at issue, these conclusions:

- JM had "monopoly power in the market for the sale of calsil in the US, as evidenced by its ability to set prices for calsil in the US well above the competitive level," creating "an economic incentive to exclude or hinder [TPS] from selling calsil in the US." *See, e.g.*, App.Vol.VI, 129, 131, 136, 140.

- JM had "sufficient economic power" in the sale of its non-calsil products to distributors to enable JM "to limit or even exclude [TPS] from making sales of calsil to those distributors." App.Vol.VI, 129, 141-44.

- TPS's entry into the calsil market "benefited customers" who have purchased calsil—from either supplier—and TPS's "exit or exclusion from the market for calsil would benefit [JM] while

harming [TPS] and calsil customers and consumers." App.Vol.VI, 129, 141.

- JM's anticompetitive conduct caused damages to TPS of nearly $12 million. App.Vol.VI, 145-46, 212.

Dr. Warren-Boulton found both direct and indirect evidence of JM's monopoly power. The most compelling direct evidence was that JM charged supracompetitive prices for calsil, even after TPS's entry. App.Vol.V, 129, 134-41.[2] Because competitive market conditions have not existed during JM's monopoly tenure (both lawful, before TPS's entry, and unlawful, since), it is impossible to identify a competitive calsil price level with certainty. To remedy the absence of this necessary benchmark, Dr. Warren-Boulton constructed four relevant benchmarks, each functioning as a "proxy" for the competitive price level for calsil, and used these with JM's data to conduct four tests for monopoly power. These tests include:

- Comparing JM's calsil prices with TPS's, which showed that TPS profitably sold its calsil at a discount of approximately 25% off

---

2.    Supracompetitive prices are prices above the level that prevails in a competitive market (the competitive price level). *See Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995).

JM's price. App.Vol.VI, 136-37. Because nothing suggested that JM's calsil selling costs were higher than TPS's, JM should have been able to lower its price by at least this much and still sell its own calsil profitably.

- . App.Vol.VI, 137, 182-83, 209.

  - JM's gross margins for calsil averaged ██%, exceeding its other margins by: ██% (InsulThin); ██% (fiberglass); ██% (perlite); and ██% (mineral wool). App.Vol.VI, 137, 182-83, 209.

  - JM's contribution margins for calsil averaged ██%, exceeding the others by: ██% (InsulThin); ██% (fiberglass); ██% (perlite); and ██% (mineral wool). App.Vol.VI, 137, 182-83, 209.

- Analyzing the same margins—gross and contribution—for each of these products by calculating the Lerner Index, the "standard

measure in economics of market or monopoly power." App.Vol.VI, 135-36, 138-140, 186-197, 209.

- Comparing JM's U.S. calsil margins with those on its Canadian sales, where JM was not the sole supplier and forced to compete against Chinese calsil for decades.

    o JM's average gross margin on domestic sales was ███%, which exceeded the gross margin on Canadian sales by ██%. App.Vol.VI, 135-36, 138-40, 186-97, 209.

    o JM's average contribution margin on domestic calsil sales was ███%, which was ██% higher than its contribution margin on Canadian sales. App.Vol.VI, 139-40, 210.

    o . App.Vol.VI, 139-40, 210.

Indirect (structural) evidence was consistent with this direct evidence of supracompetitive pricing. App.Vol.VI, 134-35. Finally, Dr. Warren-Boulton estimated TPS's damages from JM's anticompetitive conduct, determining them to be about $12 million. App.Vol.VI, 145-146, 212.

Dr. Warren-Boulton did not attempt to show what JM did to achieve these anticompetitive effects. *See* App.Vol.VI, 142-43 ("TPS will provide evidence of JM's actions"). Instead, TPS presented fact evidence to show that JM engaged in a multifaceted scheme to exclude TPS from the market. This included: (1) threatening to withhold—and actually withholding—its own calsil and other products from disloyal customers; (2) falsely claiming TPS calsil falls below quality and safety standards; and (3) requiring—at least implicitly—exclusivity from distributors, capturing roughly three quarters of the concentrated customer base.

JM's primary tactic was to threaten customers who bought from TPS. Within days of TPS's launch announcement, JM's policy was to punish customers who bought TPS calsil. JM's "█████████████████" made clear: "████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████" App.Vol.VII, 277. JM ███████████████████

████████████████████████████████████████████

████████████████████████████████████" App.Vol.VII, 277.

JM made sure its customers understood that ████████████████

████████████████████████████████████████████████████████

████████ *See* App.Vol.VIII, 89-91, 104, 93-94. JM repeatedly threatened

that it would be ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████ any customers who bought TPS calsil. App.Vol.VII, 116, 167-68,

114, 120, 139, 262, 162. Indeed, JM followed through on these threats at

least once.

JM stopped selling to 4State's Wichita location, imposing the

promised sanction: that branch "would no longer be able to purchase

[JM] Calsil." App.Vol.VIII, 89-90; *see also* App.Vol.VII, 168("████████

████████████████████) App.Vol.VIII, 97-99; App.Vol.VIII, 4-54. Other

distributors noticed. *See, e.g.*, App.Vol.IV, 130 ("They are taking a hard

line against selling anyone who is stocking a 'different' brand."). This

obviated the need for JM to follow through on other threats: afterwards,

customers fell in line. App.Vol.V, 17-18 ("There is no evidence that

Defendant actually cut APi off, although apparently APi ceased buying

from Plaintiff anyway from which it could be inferred that Defendant's threat was effective.") (citations omitted).

And there were plenty of other threats. JM threatened:

- DI, warning that "the breadth and terms of our partnership could , 272-73.potentially change with your promotion and distribution of such imported product." App.Vol.VII, 162.

- DI again, threatening to stop supporting DI in Houston altogether, instead switching support to DI's competitor, GI. App.Vol.VIII, 123-24, 130-31.

- Bay, reporting internally that " App.Vol.VII, 135.

  - But "after getting Bay's assurance [that it did not purchase TPS calsil]," JM processed a calsil order Bay requested. App.Vol.IX, 40.

- APi, commenting internally "████████████████ ████████████████████████████████ ████████████████████████████" App.Vol.VII, 167.

14

○ This followed JM's meeting with APi, where JM " ████████ ████████████████████████████████████████████████ " if APi continued to buy from TPS. App.Vol.VIII, 70-72; *accord* App.Vol.VII, 114 ("████████████████████████ ████████████████████████████████████ ████████████ ).

JM also ensured distributors SPI and Macarthur fell in line, noting that they may have been the purchasers of one of the TPS calsil import shipments that JM routinely tracked. *See* App.Vol.VII, 132 ("████████████████████████████████████ ████████████████████████████████████ ████████ "); App.Vol.VII, 125 ("████████████████ ████████████████████████████████████ ████████████████████████████████████ ").

These threats mattered. Bay, for one example, understood that even limited dealings with TPS might sever the JM relationship. *See* App.Vol.IV, 131 ("I hope TPS plans on supporting Bay at any location since it sounds pretty likely that JM will be cutting us off from calsil.").

And distributors feared for their existence if JM cut them off. 4State expressed alarm because " █████████████████████████████████████████ █████████████████████████████████████████ █████████████████████████████████████████ ███████████ " App.Vol.VIII, 91-94. 4State testified ████████████████ ███████ █████ ███████████ . App.Vol.VIII, 91-94. DI—the largest distributor—testified that "we didn't want to get on JM's bad side either, by stocking TPS." App.Vol.VIII, 128-29. DI also could not "do without JM" because it needed JM's products to compete against other distributors. App.Vol.VIII, 118.

JM recognized its customers' vulnerable position. Following the APi meeting, JM projected: █████████████████████████████████ █████████████████████████████████████████ App.Vol.VII, 114. That prediction materialized: "APi really didn't buy anything after those first two containers because of [JM's] threats after they received them." App.Vol.IV, 149.

Their dependence on JM explains why customers stuck with its calsil, despite TPS calsil's better quality, lower price, and equally quick

arrival. *See* App.Vol.VII, 91-112; App.Vol.VIII, 110-12; App.Vol.VIII, 88; 101-03; App.Vol.IV, 142-43; App.Vol.VII, 265-66.

To ensure its threats' efficacy, JM compounded them by disparaging TPS calsil. JM's salesforce led customers to believe that, because TPS calsil was manufactured in China, it would not meet safety and performance standards or necessary specifications. App.Vol.VII, 157. JM warned customers: "New materials, particularly those coming in from China, may not have been thoroughly vetted by the required testing. Do the products meet the appropriate standards and have authentic certifications and reliable testing data?" App.Vol.VII, 158.

Compliance with the standards prohibiting the use of asbestos is particularly important, making JM's suggestion that TPS calsil might contain these materials particularly incendiary. *See* App.Vol.VIII, 76-77 (JM admitted a conversation with 4State, "relay[ing] a story . . . that in the past there was a sample of CalSil that came in from China that may have contained trace amounts of asbestos").

JM similarly warned DI about another potential health hazard regarding free silica, claiming that "'you have to be real careful with

Chinese calsil because [of] the amount of free silica in their product,'" and reminding DI of "the potential dangers and liabilities you may face in selling this imported product . . . [given] the inherent product inequities." App.Vol.VIII, 126; App.Vol.VII, 16. JM's marketing materials perpetuated this false narrative. *See* App.Vol.VII, 186 ("Chinese imports failed several key ASTM tests.").

JM knew that TPS calsil never failed tests and meets all specifications, both because JM conducted its own testing and because customers reported TPS's higher quality. *See* App.Vol.VII, 147 ("█████████████████████████████████████████████████ ████████"); App.Vol.VII, 123 (████████████████████████████ █████████████████████████████████████████████████████ ███████████████████).

Distributors viewed JM as authoritative, giving its comments sway. App.Vol.VIII, 62-65. This is especially true concerning the brand selection criteria of quality and specification compliance. *See* App.Vol.VIII, 116 (the "most important factors" for customers include "quality" and "meeting a particular spec[ification]").

Because there are only two calsil suppliers, JM's exclusivity requirement—whether formal or informal—foreclosed not just TPS, but ***all competition***, from the market. Most significantly, because TPS calsil is less expensive, JM precluded TPS's entry from reducing prices marketwide. JM's "Annual Incentive Agreements" with three of the largest calsil distributors effectively required their exclusive purchase of JM calsil. *See* App.Vol.VII, 151-54, 272-74, 86-89, 254-56, 258-60, 268-70, 127-30. Those agreements' structure had the practical effect of requiring the purchase of JM calsil to qualify for increased rebates on other products, the value of which exceeded the potential savings from buying TPS calsil. App.Vol.VI, 144.

## II. PROCEDURAL HISTORY

TPS sued JM for monopolization and tying. App.Vol.I, 26-76. The court denied JM's motion to dismiss, App.Vol.I, 77-115, and TPS's claims proceeded through fact and expert discovery. Subsequently, JM sought to exclude all of Dr. Warren-Boulton's opinions. App.Vol.II, 3-62. Evaluating each one, the court denied JM's *Daubert* motion in its entirety. App.Vol.IV, 176-201. JM did not appeal that denial.

While the *Daubert* motion was pending, JM moved for summary judgment, arguing—in a mischaracterization of the record—that TPS lacked evidence of JM's anticompetitive conduct. App.Vol.III, 51-109. TPS opposed, showing extensive evidence of anticompetitive conduct and resulting harm—principally, in the form of higher prices. App.Vol.VII, 3-83. Nonetheless, the court, erroneously, granted JM's motion. App.Vol.V, 3-33; App.Vol.IX, 31-42. To reach its conclusions, the court had to—and did—ignore or downplay evidence, including some it had acknowledged in its *Daubert* ruling. The court also improperly drew inferences against TPS and in favor of JM, and misapplied legal standards. The court entered final judgment on April 26, 2022. App.Vol.V, 34. TPS filed its notice of appeal on May 20, 2022. App.Vol.V, 35.

## SUMMARY OF THE ARGUMENT

In granting JM's motion, the district court made at least three critical errors, all resulting in reversible prejudice to TPS:

**1. The court did not recognize that TPS presented evidence raising genuine disputes of material fact on every necessary element of its claims.** Dr. Warren-Boulton's report raises a genuine

factual dispute on many of these elements. Yet the court ignored much of that evidence, despite having acknowledged it in denying JM's *Daubert* motion to exclude Dr. Warren-Boulton's opinions. On summary judgment, had the court considered the opinions it had already held sufficient under *Daubert*'s more stringent expert admissibility standard, it should have found that they also raise genuine disputes of material fact under Rule 56.

TPS presented additional evidence to bolster Dr. Warren-Boulton's opinions on the required elements that he addressed and to address the remaining elements falling outside his purview. The court was wrong to find that this evidence, collectively, fails to raise factual disputes on all elements of TPS's claims. On de novo review, this Court should reverse that finding.

**2. The court answered factual questions that a jury should have resolved.** In doing so, it: ignored evidence; failed to draw reasonable inferences favoring TPS, even making some in JM's favor; and isolated evidence from its context. It also improperly weighed conflicting evidence. The court should not, for example, have weighed evidence to conclude, incorrectly, that TPS's expert "falls short of

presenting a compelling argument" about how JM harmed competition and consumers. The court's task is to determine whether factual disputes exist, not to resolve them. Moreover, the court did not view the evidence in the light most favorable to the non-moving party. On de novo review, this Court should review all of TPS's evidence, in context, and draw all—and only—favorable inferences from the evidence. This will show that TPS raised genuine disputes of material fact.

**3. The court applied inapplicable legal standards, which led it to conclude, incorrectly, that TPS did not raise genuine disputes of material fact on JM's anticompetitive conduct. The court also failed to consider the combined effect of all such conduct.** The court's failure to recognize that TPS raised genuine disputes of material fact on each type of JM's exclusionary conduct results from its evaluating TPS's showing against unduly stringent legal standards and by refusing to consider the impact of JM's conduct in the aggregate. Applying the relevant law correctly and considering the total effect on competition of JM's conduct are both necessary to determine whether TPS has shown the exclusionary conduct that its monopolization claim requires. On de novo review, this Court should

apply the correct legal standards to evaluate JM's conduct, which will show that TPS raised genuine factual disputes on each of the elements actually required of it.

## STANDARD OF REVIEW

This Court "review[s] the grant of summary judgment de novo, applying the same legal standard used by the district court under Fed. R. Civ. P. 56." *Multistate Legal Stud. v. Harcourt Brace Jovanovich Legal & Pro. Publ'ns*, 63 F.3d 1540, 1545 (10th Cir. 1995); *see also In re EpiPen Mktg., Sales Practices & Antitrust Litig.*, No. 21-3005, 2022 U.S. App. LEXIS 20998, at *44-45 (10th Cir. July 29, 2022).

## ARGUMENT

## I. TPS PRESENTED EVIDENCE RAISING GENUINE DISPUTES OF MATERIAL FACT ON ALL ELEMENTS OF ITS CLAIMS

TPS presented expert opinions and fact evidence raising genuine disputes of material fact on all elements of its claims. Evidence shows JM had monopoly and economic power, engaged in anticompetitive conduct, and harmed consumers and TPS. The court's conclusions otherwise are inconsistent with the evidentiary record. Reviewing de novo, this Court should reverse the grant of summary judgment,

allowing TPS's claims to proceed to trial. *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 762 F.3d 1114, 1116 (10th Cir. 2014) (reversing summary judgment for defendant, finding factual disputes on, among other issues, monopoly power, exclusionary conduct, and harm to competition).

## A. TPS Presented Evidence of Harm to Competition and Antitrust Injury

TPS presented evidence showing that JM's conduct harmed competition, most notably, by maintaining calsil prices at a supracompetitive level. "[E]vidence of [] supracompetitive prices, [] is direct proof of the injury to competition which a competitor with market power may inflict, and thus, of the actual exercise of market power." *Rebel Oil*, 51 F.3d at 1434 (citation omitted). Dr. Warren-Boulton concluded that JM "has monopoly power in the market for the sale of calsil in the US, as evidenced by its ability to set prices for calsil in the US well above the competitive level." App.Vol.VI, 129. His observation that JM *in fact did* set prices for calsil "well above the competitive level" necessarily incorporates the obvious conclusion that JM *had the ability to* do so. This showed *both* monopoly power *and* harm to competition. Increased prices and reduced output are the "hallmarks of

anticompetitive behavior." *NCAA v. Bd. of Regents*, 468 U.S. 85, 113 (1984); *accord EpiPen*, 2022 U.S. App. LEXIS 20998, at *54-56 (applying the consumer welfare standard to ascertain whether conduct harms competition by "hurt[ing] or threaten[ing] to hurt consumers through reduced output or increased prices") (citations omitted). Further, the court acknowledged harm to JM's customers resulting from JM's exercising its monopoly power. *See* App.Vol.IX, 33 ("DI can leverage a better price if it has a differentiated product offering and multiple supply channels for those products."). Yet it still held otherwise.

A plaintiff shows antitrust injury—injury "that flows from that which makes defendants' acts unlawful"—by presenting evidence that the conduct by which Defendant harmed competition also harmed the plaintiff. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 389 (1977). JM's conduct harmed competition and TPS in the same manner: by excluding a lower priced competitor offering a better product. Even though TPS eked out some sales, this does not mean that it was not excluded from the market or that it was unharmed. TPS was excluded, and thus harmed—along with consumers, who would have benefited

from the decrease in prices that TPS's unhindered entry would have prompted. *See Lenox*, 762 F.3d at 1129 (harm to competition could be inferred from evidence that "other [competitors] remained insubstantial"); *see also LePage's Inc. v. 3M*, 324 F.3d 141, 159 (3d Cir. 2003) (en banc) (foreclosing even a single competitor can increase prices and reduce output). Of course, excluding one competitor in a two-competitor market will even more significantly harm competition; indeed, it will eliminate all competition.

## B. TPS Presented Evidence on All Elements of Monopolization

A monopolization claim has two elements: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power." *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966). Monopoly power is "the power to control prices or exclude competition." *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956).

Some courts, including this Court, have expressed the requirement as market, rather than monopoly, power. *See, e.g., Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1070 (10th Cir. 2013). But the

distinction is one of degree. *See Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 894 (10th Cir. 1991) ("substantial market power").[3]

"The second element of a § 2 claim is the use of monopoly power 'to foreclose competition, to gain a competitive advantage, or to destroy a competitor." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 482-83 (1992) (citation omitted). Such improper use contrasts with legitimate bases for success, including "superior product, business acumen, or historic accident." *Grinnell*, 384 U.S. at 570–71.

### 1.    Monopoly Power in the Relevant Market

Proof that a defendant *did* control prices also proves the defendant *could* control prices. When possible, "a plaintiff will [] show market power . . . directly—by showing the defendant has actually raised prices substantially above a competitive level without sacrificing business." *Novell*, 731 F.3d at 1071 (citing *United States v. Microsoft*, 253 F.3d 34, 51 (D.C. Cir. 2001) and *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 190-91 (3d Cir. 2005)). This is what TPS showed.

---

3.    ***Economic power*** is the capacity to cause a customer to "do something that [they] would not do in a competitive market." *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 13-14 (1984) (citations omitted).

Dr. Warren-Boulton discussed at length the direct evidence showing JM's monopoly power; his opinions raise a factual dispute about whether JM had such power. The court cannot justify disregarding these opinions, then concluding that TPS's evidence fails to show what it ignored. The expert evidence showed:

- "JM has monopoly power in the market for U.S. calsil sales, and thus had an economic incentive to exclude or hinder TPS from entering the market." App.Vol.VI, 140.

- "The empirical determination of monopoly power, therefore, requires a showing that margins are higher than the margins that the firm would earn in a competitive (or more competitive) market. That showing requires identifying a reference or control for comparison, whether intertemporal, cross-sectional, or both. In this case, I have several cross-sectional comparisons . . . any one should suffice to establish that JM has monopoly power in the sale of calsil in the U.S." App.Vol.VI, 136.

- "[T]he direct evidence is more than sufficient to establish a clear presumption that [JM] has monopoly power in the sale of calsil in

the U.S." App.Vol.VI, 135 (also noting consistent indirect evidence).

The court failed to appreciate that Dr. Warren-Boulton's opinion was that JM's calsil prices are above the competitive level—not simply above TPS's prices. The court inaccurately characterized his analysis as merely comparing JM's price to TPS's, determining which was higher. *See* App.Vol.V, 12 ("Defendant charged twenty to twenty-five percent more for calsil than Plaintiff did . . . ***From this***, Plaintiff's expert witness, Dr. Warren-Boulton, infers [] that Defendant had a monopoly on calsil.") (emphasis added). *Compare* App.Vol.VI, 124-213, generally, (using "the competitive level" as a reference point).

Fact witnesses corroborated Dr. Warren-Boulton's findings, but the court did not infer monopoly power from this evidence, either. DI testified that there is no price at which it would stop buying JM calsil. App.Vol.IV, 280. 4State testified that ███████████████ ███████████████████████████████████ App.Vol.VIII, 93. This shows JM's "power to control [the] prices" of its calsil sales to distributors. *E.I. du Pont de Nemours*, 351 U.S. at 391.

TPS also offered evidence of JM's substantial market share, which supports the direct evidence of monopoly power that Dr. Warren-Boulton described. *See* App.Vol.VII, 58 ("[O]ur market share is probably 95 percent, between 90 and 95 percent. I believe TPS has got 5 percent or maybe a little bit more of the market."). Share of this magnitude—alone—creates a factual dispute on monopoly power. *Lenox*, 762 F.3d at 1124 ("A fact-finder could reasonably consider a 97-98% or 62% market share as evidence of monopoly power."); *Reazin v. Blue Cross & Blue Shield, Inc.*, 899 F.2d 951, 969-70 (10th Cir. 1990) (sufficient evidence of monopoly power from market share between 47% and 62%). On de novo review, this Court should find that this evidence is more than adequate to establish a genuine dispute of material fact on JM's monopoly power.

## 2. Exclusionary Conduct

Section 2 "prohibits a monopolist from engaging in anticompetitive practices that are designed to deter potential rivals from entering the market or from preventing existing rivals from increasing their output." *Caldera, Inc. v. Microsoft Corp.*, 72 F. Supp. 2d 1295, 1306 (D. Utah 1999). TPS presented evidence reflecting JM's threats—particularly, to

deny access to its products to distributors who bought TPS calsil—and the consequences of those threats. The evidence showed that JM told:

- DI:

    o They (JM) "don't sell [to DI's competitor,] General; but if somebody were to start stocking TPS, [JM] may have to relook at setting up General." App.Vol.VIII, 123-24; and

    o "'If you don't upset the apple cart, so to speak . . . we won't set up General'; right? That was the perceived threat back then." App.Vol.VIII, 130-31.

- 4State:

    o "[I]f [4State] continued to buy . . . TPS's Calsil, [4State] would no longer be able to purchase [JM] Calsil." App.Vol.VIII, 89-90.

    o JM "could see that [4State] had a container of Calsil coming in [and JM were] assuming it was from TPS . . . if [4State] continue[d] to buy TPS materials, [JM] would not – [JM] would no longer support [4State] in the Calsil market." App.Vol.VIII, 104.

JM witnesses corroborated these and other threats:



- ███████████████████████████████████████
  ██████ ███████ █ ████ █████ █████ ██ ████

App.Vol.VIII, 70-72. (By "██████████" product from JM, Mr. Meyer meant "███████████████████████ because JM knew the latter necessarily would result in the former.)

- ███████████████████████████████████████
  ██████ ████ █ ██ ████ █████ █ ██ ███████ █████

App.Vol.VII, 114.

- ███████████████████████████████████████
  ███████████████████████████████████████
  ████████████." App.Vol.VII, 167.

- "[T]he breadth and terms of our partnership could potentially change with your promotion and distribution of such imported product." App.Vol.VII, 162.

- ███████████████████████████████████████
  ████████████████ App.Vol.VII, 168.

- "███ █ █████ ████ ████ ████ ██████ ████ ████
  App.Vol.VII, 116.

- "████████████████████████████." App.Vol.VII, 139.[4]



- "████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████"

App.Vol.VII, 277.

But the court misconstrued much of this unambiguous evidence showing JM's anticompetitive conduct. For example, the court found:

> Mr. Meyer remembered informing APi that Defendant "may have to reevaluate our business relationship if [APi] stopped buying," but he did not recall going so far as to tell APi that Defendant "would not support them if they continued to buy [TPS calsil]."

App.Vol.IX, 38. This improperly infers that APi understood "reevaluate our business relationship" to mean something other than "would not support them" in the future. The latter interpretation is consistent with JM's own description of its comments, reflected in JM's recounting: "██

████████████████████████████████

---

4.     TPS mistakenly cited this document at ECF 204-1 at 55, rather than 56, in its briefing. *See* App.Vol.IX, 39, n.2.

██████████████████████████████." App.Vol.VII, 114. The court should not have inferred that the comment was understood differently by APi, when the record indicates otherwise.

Additionally, the court described JM's declaration that, "[i]f you choose **to buy material from [Plaintiff]**, then that will significantly alter your company's relationship with [Defendant]," as one that "stressed the advantages of **continued dealing with Defendant**." App.Vol.IX, 34 (emphasis added). That appraisal is incorrect, and inconsistent with the record. More accurately, JM stressed **the disadvantages of beginning to deal with TPS**.

Had the court made the correct inferences, it would have confronted the import of this evidence. This Court recently considered a manufacturer's use of loyalty discounts to reward customers who declined to switch to a new entrant. *EpiPen*, 2022 U.S. App. LEXIS 20998, at *94-98. JM's conduct, however, is distinguishable from the defendant's in that case in a key respect: JM did not **reward loyal** customers. JM **penalized disloyal** customers. In that distinction lies coercion.

Some of the court's inferences contradict its SMUF. *Compare* App.Vol.V, 17 ("DI did ***not necessarily*** perceive[] Defendant's threat as ***substantial or improper***.") *with* App.Vol.IX, 36-37 ("Mr. Hlavenka did regard [JM's threat] as [] conveying a threatening message. He perceived Mr. Shapiro as threatening to shift Defendant's business to another distributor in the Houston region—a market where DI faces competition from Bay, SPI, and General Insulation—if DI bought Plaintiff's calsil."); *see also* App.Vol.IX, 38 (failing to infer the efficacy of JM's threat to APi, which the SMUF acknowledges that JM itself presumed: "█████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████").

Moreover, TPS's evidence showed that locking up distributors harmed them and competition generally, but the court erroneously inferred that:

- "***[T]he adverse impact of that change was minimized*** by Defendant's [other actions]." App.Vol.V, 18.

- "[T]he subject statements were ***isolated and conditional*** . . . Nor does the evidence support Plaintiff's assertion that the

disparagement ***occurred over a prolonged period of time***." App.Vol.V, 26.

- "The ***record does not go so far*** as to permit the finding that the statements about asbestos and free silica content likewise ***were clearly false***." App.Vol.V, 24-25.

- "Plaintiff fails to show a resulting anticompetitive effect ***of sufficient degree***." App.Vol.V, 21.

- "Even construing the record in Plaintiff's favor on this particular point, it still shows ***insufficient coercive effect***." App.Vol.V, 22.

It was not for the court to infer that the degree of JM's transgressions was minor enough to be forgiven. Such a judgment conflicts with the wisdom of the Third Circuit's holding—considering quite similar facts—that the defendant "had supremacy over the dealer network and ***it was at that crucial point in the distribution chain*** that monopoly power [] was established." *Dentsply*, 399 F.3d at 190 (emphasis added). This Court should make the reasonable inference that the impact of JM's conduct was similarly significant.

Beyond the straightforward conclusions that the evidence requires and which preclude some of the court's inferences, there are additional

inferences the court did not make. In considering evidence that JM immediately adopted a policy of punishing customers who bought TPS calsil, the court held that:

- "Defendant tried to leverage distributors' dependence on it to discourage them from doing business with Plaintiff. However, there is no evidence that Defendant **went so far as to fully withhold the product** being sold." App.Vol.V, 19.

- "Defendant **only endeavored to dissuade** distributors from buying Plaintiff's calsil." App.Vol.V, 14.

- "[T]here were **few instances of concrete** threats articulated to distributors, and **little, if any, harm suffered** by any of them. Plaintiff does not demonstrate how such **isolated and insignificant coercive acts** rise to the level of an antitrust violation." App.Vol.V, 18.

These holdings fail to infer, as the court should have and this Court should in its review, that JM's misconduct merit TPS's characterizations—as both over the line and effective.

In considering evidence that JM's threats to customers had the desired effect of keeping customers captive, and explain distributors' decisions not to buy TPS calsil, the court held that:

- "[T]here is no evidence that the subject statements **played a significant role** in dissuading a distributor from buying Plaintiff's calsil." App.Vol.V, 26.

- "Plaintiff does not explain how **mere threats** (whether as vague changes to the business relationship generally or refusals to supply calsil or other products specifically) prove its antitrust claim, even if Defendant made them with the intent to preserve its calsil monopoly." App.Vol.V, 17.

- "There is little evidence of how Defendant **successfully interfered** with distributors' ability to buy calsil from Plaintiff. Of what evidence there is or may be inferred from it, there is **no indication that the effect was either substantial in degree or prolonged in duration**." App.Vol.V, 32.

- "There is no evidence that Defendant **actually cut APi off**." App.Vol.V, 17-18.[5]

- "Defendant **never actually declined to supply** Bay, although it did hold up one particular order while it investigated the amount of business it was doing with Plaintiff." App.Vol.V, 18.

These holdings all fail to make the reasonable inference, which this Court should make, that JM's conduct had its intended effect.

## C. TPS Presented Evidence on All Elements of Tying

The elements of a tying claim are: (1) two separate products are involved; (2) the sale or agreement to sell one product is conditioned on the purchase of the other; (3) the seller has sufficient economic power in the tying product market to enable it to restrain trade in the tied product market; and (4) a 'not insubstantial' amount of interstate commerce in the tied product is affected. *Suture Express, Inc. v. Owens & Minor Distrib., Inc.*, 851 F.3d 1029, 1037 (10th Cir. 2017) (citation omitted).

---

5. Here, the court even identifies an inference it failed to make: "APi ceased buying from Plaintiff anyway from which it could be inferred that Defendant's threat was effective." App.Vol.V, 17-18.

The court only decided the second and third elements: whether JM required the purchase of its calsil (or refraining from buying TPS calsil) as a condition for the continued ability to buy JM's other products; and whether JM has sufficient economic power over distributors to compel them to buy JM calsil. TPS presented evidence on both elements.

### 1.    The Sale of the Tying Product(s) Conditioned on the Purchase of the Tied Product

A tying arrangement "is an agreement by a party to sell one product—the 'tying product'—only on condition that the buyer also purchase a second product—the 'tied product'—or at least agree not to buy that product from another supplier." *SolidFX, LLC v. Jeppesen Sanderson, Inc.*, 935 F. Supp. 2d 1069, 1078 (D. Colo. 2013), *aff'd*, 841 F.3d 827 (10th Cir. 2016) (citations omitted).

TPS presented evidence showing JM conditioned customers' access to its non-calsil products on their not buying TPS calsil, which necessarily meant buying JM calsil instead. JM told DI that, "if DI were to start stocking TPS [calsil], [JM] may have to relook at setting up General" (referring to DI's Houston-area competitor, GI). Thus, DI feared JM would transfer ***all*** the business it was doing there with DI away from it if DI stocked TPS calsil. App.Vol.VIII, 123-24.

This threat explicitly conditioned the continued sale of its other insulation products on DI's abstention from buying TPS calsil. The court dismissed the evidence of it, finding instead that, while "Defendant **was able to influence** distributors to act favorably toward it, there is **insufficient evidence that it went so far as to create an actually tied purchase**." App.Vol.V, 31 (emphasis added). The evidence compels a different conclusion, which this Court should draw in its review.

JM's rebate structure had the same effect. *See, e.g.*, App.Vol.VIII, 121 (rebates for purchases of both perlite and calsil exceed the sum of individual rebates for each). Dr. Warren-Boulton noted this "penalty to distributors for purchasing calsil from [TPS]." App.Vol.VI, 144.



App.Vol.VI, 144 (citations omitted) (emphasis added). But the court held that the agreements:

> "*[D]o not appear to be mandatory; they were something each distributor chose to accept*. Even if [they] were *de facto* mandatory, the size of the rebate reward *did not create an insurmountable burden*. Plaintiff fails to show how the resulting discount offered by the rebates . . . was enough to offset the savings from its cheaper calsil price.").

App.Vol.V, 21-22 (emphasis added). The court's conclusion that JM's rebate structure did not impose buying JM calsil as a condition for distributors' continued access to JM's other products cannot be squared with the evidence. The court should have inferred that these agreements operated as an effective tie, and this Court, in its review, should find that they do.

### 2. Sufficient Economic Power in the Tying Product(s)

The evidence also shows that JM derived sufficient economic power from its other insulation products to leave distributors no choice but to accept the condition to buy JM calsil. Dr. Warren-Boulton explained:

> Establishing the potential for harm to competition and consumers does not require that [JM] have any defined measure or amount of market power in the market for each of these products. Rather, what is needed is that a sufficient

> number of distributors or other customers value access to
> [JM]'s products (as opposed to the product generally) at
> [JM]'s current terms such that a revision of those terms or
> reduction in access could impose significant costs on those
> distributors. For the threat of such a revision or reduction to
> be effective, all that is necessary is that the resultant
> additional costs on the [JM] products would exceed the
> distributor's likely cost savings from purchasing some of its
> calsil requirements from [TPS].

App.Vol.VI, 142.

Distributors testified that TPS calsil is superior in quality and lower priced but, nevertheless, they do not buy most of their calsil from TPS. *See* App.Vol.VIII, 88; App.Vol.VIII, 110-12; (TPS calsil is better and cheaper) App.Vol.VI, 142, 211. (4State buys about 55% of its calsil from JM); App.Vol.VIII, 114 (DI purchases 99% of its calsil from JM and 1% from TPS). When considered in light of distributors' dependence on JM as a supplier, this reflects JM's economic power to force those distributors to make this seemingly irrational choice.

Witnesses confirmed that their dependence on JM explains their decision. ████████████████████████████████████████ ████████████████████████ *See* App.Vol.VIII, 93; App.Vol.VIII, 118. DI also testified that calsil accounts for a small proportion of its purchases from JM. App.Vol.VIII, 113-115. JM's sales data show that ████████████

██████████████████████████████████████

█████████████████████████████ App.Vol.VI, 211. Moreover, DI

doubted its ability to obtain adequate supply of some products from

alternate suppliers. *See, e.g.*, App.Vol.III, 162.

This testimony supports the inference that JM's coercion accounts

for distributors' decision to buy a more expensive, inferior product in

greater quantities than a less expensive, superior product. *See*

App.Vol.VI, 142 ("Even a small change to the terms of sale or threat to

the availability of [JM's] non-calsil products would provide a strong

incentive to distributors to continue purchasing all or substantially all

of their calsil from [JM].") (citations omitted). And it shows that JM's

economic power over its line of products is sufficient to compel

customers to make calsil purchasing decisions that are only rational

because they preserve access to JM's must-have non-calsil products. *See*

*N. Pac. Ry. v. United States*, 356 U.S. 1, 11 (1958) ("[T]he vice of tying

arrangements lies in the use of economic power in one market to

restrict competition on the merits in another.").

With this evidence, TPS raised a genuine dispute of fact on

whether JM "has sufficient economic power over its distributors in the

US from its control over the supply of its calsil and its other products to those distributors to be able to limit or even exclude [TPS] from making sales of calsil to those distributors." App.Vol.VI, 129; 141-144; *cf.* App.Vol.V, 17 (merely noting that distributors' assurances "that they were not buying from Plaintiff [] permits the inference that they *perceived the need to keep Defendant happy*"); App.Vol.V, 30 (noting evidence of how *distributors generally preferred maintaining their relationship with Defendant* and even felt dependent upon it, but in the overall context, *the inference of market power that can be drawn from that evidence is weak*.") (citations omitted) (emphasis added). TPS's assertion is more consistent than the court's ruling with the court's own finding that "DI regards Defendant as an important supplier *upon which it depends to operate*," and with DI's testimony that purchasing TPS calsil was "relatively low risk" "with the exception of how it was going to affect our relationship with JM." App.Vol.IX, 33-34 (emphasis added); App.Vol.II, 167. On de novo review, this Court should make the more logical inference.

### D. Applying a More Stringent Standard, the Court Already Found Much of TPS's Evidence Sufficient

Although JM sought to "exclude any and all expert opinions from economist [Dr.] Frederick Warren-Boulton," App.Vol.II, 11, the court examined each opinion and did not "find any opinion that should be excluded as a matter of law." App.Vol.IV, 196. For the same reasons that these opinions, as the court rightly held, will help the trier of fact, they also create genuine disputes on the pertinent factual questions. No logic explains why the court considered the same opinions twice, yet reached inconsistent—indeed, opposite—conclusions about their evidentiary value. The court should have found—and this Court should find—genuine disputes of material fact to exist concerning all the elements of TPS's claims that Dr. Warren-Boulton's opinions addressed.

On de novo review, this Court should reverse the finding, at App.Vol.V, 12, that TPS does not raise a genuine dispute of material fact as to all elements of its claims.

### II. IN ANSWERING FACTUAL QUESTIONS, THE COURT EVALUATED THE EVIDENCE IMPROPERLY

In assessing the evidence, the court invaded the jury's province to settle factual disputes. Further, it did so without considering the evidence properly: examining all of it, in context, and drawing all

reasonable inferences in TPS's favor. Even more problematic is that the court drew inferences in JM's favor.

The SMUF reveals some of the deficiencies of the court's examination of the evidence. Certain findings are plainly unsupported, while some directly contradict others in another paragraph. Other findings are defensible and correct, but the court's analysis does not account for them.

## A.  Usurping the Jury's Function Was Legal Error

Rule 56 makes it the ***movant's*** burden to show that no dispute exists on any material fact. Fed. R. Civ. P. 56(a); *Lenox*, 762 F.3d at 1118. When a court resolves rather than identifies factual disputes, it strays beyond its authority. That is what the court did here: dismissing conduct it viewed as only mildly illegal and supplying its own answers to factual questions about causation. Without having done so, the court could not have found that JM carried its burden.

### 1.  The Court Should Not Have Weighed TPS's Evidence, Particularly on Severity and Causation

TPS raised factual questions about JM's conduct that required a jury's resolution. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of the evidence, and

the drawing of legitimate inferences from the facts are jury functions, not those of a judge."); *In re Wholesale Grocery Prods. Antitrust Litig.*, 752 F.3d 728, 735 (8th Cir. 2014) (same). Here, the court weighed TPS's evidence against JM's competing evidence to eliminate all factual disputes, when it should have given them to a jury. "[S]ummary judgment serves the purpose of testing whether a trial is required." *Soucy v. Nova Guides, Inc.*, No. 14-cv-01766-MEH, 2015 U.S. Dist. LEXIS 125947, at *7 (D. Colo. Sept. 21, 2015) (citation omitted). Rather than conducting that test, the court foreordained the outcome.

The court's findings that JM's conduct was not egregious enough to warrant imposing liability reflect its treatment of the evidence: "It is not ***readily apparent on the face of the evidence*** that its efforts ***were effective*** in achieving that goal ***to a significant degree***." App.Vol.V, 14*; see also* App.Vol.V, 19 (finding evidence lacking "that Defendant's alleged scheme ***went so far*** or ***was as effective***") (emphasis added in both). Factual conclusions need not be "readily apparent on the face" of evidence. Inferences favoring TPS were not only permitted; they were required. Rather than make them, the court simply determined that JM's conduct could have been worse, ignoring

that the Sherman Act forbids *all* conduct that harms competition, irrespective of its extent. It need not be of "a significant degree."

It is also not for the court to answer the factual questions of causation or efficacy. *Anderson*, 477 U.S. at 255. "[C]ausation is generally a question best left for the jury to decide." *In re Solodyn Antitrust Litig.*, No. 14-md-02503, 2018 U.S. Dist. LEXIS 11921, at *13 (D. Mass. Jan. 25, 2018) (citation omitted). The court's finding that JM did not cause any distributor's decision not to buy TPS calsil is neither accurate, nor a proper basis to grant summary judgment. *See Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 114 n.9 (1969) ("[A] plaintiff need not exhaust all possible alternative sources of injury in fulfilling his burden.") (citation omitted).

To the contrary, the extensive evidence of JM's conduct entitled TPS to a presumption of causation at this stage. *In re Actos End-Payor Antitrust Litig.*, 848 F.3d 89, 101 (2d Cir. 2017) ("[E]ven at summary judgment, an antitrust plaintiff may be entitled to a presumption of causation where the anticompetitive conduct . . . 'is believed significantly to increase the risk of a particular injury' and that injury occurred."). In reviewing, this Court should infer a causal relationship

between JM's conduct and customers' subsequent conduct—especially when JM specifically sought to induce that exact reaction.

## B.  The District Court Ignored Key Evidence

The court ignored—without explanation—certain evidence that TPS presented, leading to its conclusion that TPS presented insufficient evidence to defeat JM's motion. Among this evidence is JM's prediction that TPS would capture a significant share of the calsil market because JM's product "████████████████████████████████████" App.Vol.VII, 107, 109. Another important example concerns Dr. Warren-Boulton's work. The court fails to acknowledge three of four tests for monopoly power that he performed. App.Vol.VI, 136 (describing the four tests, concluding, "The combined results of all four are compelling.").

Each ignored test—like the one the court did consider (but misinterpreted)— showed that JM had monopoly power in the calsil market *and* maintained calsil prices above the competitive level. App.Vol.VI, 136-141 (explaining the results of all four tests). The court cannot ignore three of four tests and conclude that one, alone, "falls short of presenting a compelling argument." App.Vol.V, 31. This

conclusion is especially problematic because it directly contradicts Dr. Warren-Boulton's expert opinion, with which it was not the court's role to agree or disagree. App.Vol.VI, 136 ("[T]he results from any one should suffice to establish that [JM] has monopoly power in the sale of calsil in the US.").

## C. The Court Did Not Consider the Evidence in Its Entire Context

Within discrete categories of exclusionary conduct, the court parsed JM's individual actions in isolation from similar ones and determined each to be innocuous. It is improper "to focus on specific individual acts of an accused monopolist while refusing to consider their overall combined effect." *City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373, 1376 (9th Cir. 1992). To properly consider conduct, a court must account for a demonstrated pattern, rather than evaluate a series of individual acts that might be received differently if perceived to be a one-time offense, rather than part of a conscious campaign.

Evidence showed that JM employed recurrent anticompetitive tactics in its effort to preserve its monopoly. This permits the inference, which the court did not make, that the consistency of JM's conduct would signal to the insular marketplace that it understood JM correctly.

*See Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 767 (1984) (terminating one distributor can act as a deterrent to others). On de novo review, this Court should make the inference that the district court failed to make.

### D. The Court Made Improper Inferences in JM's Favor

The requirement to make all "justifiable inferences" in the non-moving party's favor means not abstaining from any reasonable inference, and also not making any favoring the moving party. *Anderson*, 477 U.S. at 255. Even worse than the court's repeated failure to make inferences favorable to TPS (including some which it noted were possible), the court made inferences favoring JM.

Often, the court accepted at face value JM's argument that distributors need not have worried about its threats to cut them off. JM threatened distributor DI: "You and your team are free to promote and sell any products you wish; however, the breadth and terms of our partnership could potentially change with your promotion and distribution of such imported product." App.Vol.VII, 161-62. From this, the court should have inferred that DI found what it labelled a "tirade of threats" troubling. App.Vol.VII, 161. But it inferred the opposite: that

DI dismissed the threat, neutralizing its effect. App.Vol.V, 17 ("Defendant apologized for its aggressive tone.") (citations omitted). But because JM, not DI, deemed its apology to have negated any ill-will engendered by its threat, the record does not support finding that "the rift was repaired." App.Vol.IX, 37.

Similarly, in holding that "Bay was dismissive towards Defendant's expressions of displeasure," App.Vol.V, 18, the court fails to infer that Bay took JM's threats seriously, an inference which internal Bay emails compel. *See* App.Vol.IV, 131 ("[I]t sounds pretty likely that [Defendant] will be cutting us off from cal sil.").

Similarly, a faulty premise underlies many of the court's findings: that a monopolist's threat to a customer only harms competition if the customer defies the threat and retaliation ensues. App.Vol.V, 17 (questioning "whether Defendant followed through on those threats . . . Plaintiff must show that a distributor suffered actual negative repercussions and harm as a result of a purchase of Plaintiff's calsil."). This overlooks the likelier outcome that a threat harms competition by inducing submission, obviating the need to "follow through." The most sinister aspect of JM's threats is that they **succeeded** in preventing

customers' defection. This is how customers "suffered actual negative repercussions and harm." App.Vol.V, 17.

There is no support for the proposition that JM's threats are legally irrelevant except where JM actually imposed punishment. App.Vol.V, 16-18. To the contrary, courts repeated recognized that, on their own, threats to customers are anticompetitive. *See, e.g., Microsoft*, 253 F.3d at 77-78 (threats of retaliation were "direct proof" of monopoly power). No customer dared test whether JM was serious about its clear message that it might withhold its calsil or other products from disloyal customers. *See* App.Vol.VII, 114; App.Vol.VIII, 89-90. It would be illogical to require innocent customers to take this daring step for a culpable supplier to be liable.

Further, other distributors understood JM's cutting off 4State's Wichita location as a signal to the marketplace and reacted accordingly. *Cf. Monsanto*, 465 U.S. at 767. Thus, JM coerced their compliance without needing to make "[additional] more direct threats" or impose additional sanctions. App.Vol.V, 17. In its review, this Court should discard these improper factual and legal propositions, which will reveal the existence of factual disputes on all elements of TPS's claims.

On de novo review, this Court should reverse the finding, at App.Vol.V, 12, that TPS does not raise a genuine dispute of material fact as to all elements of its claims.

## III. THE COURT REQUIRED HEIGHTENED SHOWINGS THAT DO NOT CORRESPOND TO TPS'S CLAIMS

TPS alleged four types of exclusionary conduct supporting its monopolization claim and raised factual disputes on all required elements for each one. The court should have recognized this, and also that all of this conduct, taken together, harmed consumers by excluding TPS from the market. Most importantly, the court's application of the wrong legal standards to TPS's claims distorted its analysis of whether factual disputes exist under the right ones.

### A. The Court Required TPS to Show More Than Is Necessary for Exclusionary Conduct by Incorrectly Applying Heightened Legal Standards

TPS analogized JM's exclusionary conduct to separate antitrust violations which are, themselves, not necessary components of that element of a monopolization claim. The four categories of JM's exclusionary conduct are: tying; refusing to sell JM calsil to punish disloyal customers; exclusive dealing; and falsely disparaging TPS calsil. The court's analysis of each was flawed.

### 1. Tying as Exclusionary Conduct

TPS's evidentiary showing that raised genuine factual disputes as to the pertinent elements of its tying claim, *see* Section I.C., supra, also satisfied its burden for the exclusionary conduct element of monopolization. But the court applied the wrong legal standard to evaluate JM's influence over distributors deriving from its sale of its other insulation products, leading, unsurprisingly, to an incorrect conclusion.

Tying requires "sufficient economic power in the tying product market[(s)]" enabling the seller to restrain trade in the tied product market. *Suture Express*, 851 F.3d at 1037. Although it exists here, market or monopoly power is not required.

> '[S]ufficient economic power' does not, as the District Court held, require that the defendant have a monopoly or even a dominant position throughout the market for the tying product. Our tie-in cases have made unmistakably clear that the economic power over the tying product can be sufficient even though the power falls far short of dominance and even though the power exists only with respect to some of the buyers in the market.

*Fortner Enters. v. U.S. Steel Corp.*, 394 U.S. 495, 502-03 (1969) (citations omitted); *see also N. Pac. Ry.*, 356 U.S. at 11 (economic power may be sufficient for tying "regardless of the source from which the

power is derived and whether the power takes the form of a monopoly or not"); *accord* App.Vol.VI, 142 ("There is no need, however, to establish that any of these must-have products is a relevant market . . . or that [JM] has market or monopoly power in any of those markets.").

The court correctly recited the requirement of "sufficient" "economic power," App.Vol.V, 28 (quotation omitted), but nonetheless held that TPS needed to show JM's "market power." App.Vol.V, 29. The court required TPS to show:

> [H]ow Defendant wielded **market power** over these other materials. In other words, Plaintiff must show how Defendant could have **raised those products' prices or restrict[ed] their output** as an alternative to using them for a tie-in. Plaintiff leaves unclear how the evidence, even with the inclusion of Dr. Warren-Boulton's report, reveals such power in the tying product market.

App.Vol.V, 30 (emphasis added). This is the same error that the Supreme Court criticized in *Fortner Enterprises. Cf. N. Pac. Ry.*, 356 U.S. at 11 (tying requires only "sufficient economic power to impose an appreciable restraint on free competition in the tied product," thus rejecting 'monopoly power' or 'dominance' over the "tying product as a necessary precondition" for a per se tying claim) (citation omitted).

If customers view JM's products as "must-haves," or access to them as necessary, JM's economic power is sufficient to force those customers to purchase its calsil. *Jefferson Par.*, 466 U.S. at 14 ("When 'forcing' occurs, our cases have found the tying arrangement to be unlawful."). On de novo review under the correct standard, this Court should find that TPS raised a factual dispute on whether JM has the ability to do this.

### 2. Refusal to Supply Customers as Exclusionary Conduct

TPS raised a factual dispute on whether JM's threatened—and actual—refusal to sell its own calsil to any customer who purchased TPS calsil constituted coercion. Here, too, the court applied the wrong legal standard to evaluate the conduct, leading it again to the wrong conclusion. This Court recently observed that "the presence of coercion [] casts doubt on the assumption that the [arrangements] are naturally procompetitive." *EpiPen*, 2022 U.S. App. LEXIS 20998, at *83 (citation omitted). This is correct—even outside of exclusive dealing—because markets depend on consumers exercising their best purchasing judgment to their advantage. Conduct that bullies them into a

particular choice is inherently suspect; if it compels a choice contrary to the consumer's own welfare, it is anticompetitive.

Evidence showed that JM threatened to withhold its calsil from any **customer** who bought TPS calsil. App.Vol.VII, 276-277; 116; 167-168; 114; 120-21; 139; 262-63; 160-63; App.Vol.IV, 130-31; App.Vol.VIII, 70-72; App.Vol.VIII, 89-91, 93-94, 104; App.Vol.VIII, 123-24, 130-31. This is prototypical coercion and unlikely to yield a procompetitive benefit. Indeed, the record reflects none.

"***In the absence of any purpose to create or maintain a monopoly***, the act does not restrict the long recognized right . . . freely to exercise his own independent discretion as to parties with whom he will deal." *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919) (emphasis added); *see also N.M. Oncology & Hematology Consultants, Ltd. v. Presbyterian Healthcare Servs.*, 994 F.3d 1166, 1172 (10th Cir. 2021) ("liability can sometimes be assigned" based on "unilateral conduct") (citation omitted). Imposing anticompetitive conditions on a customer—like JM's demanding loyalty when its distributors finally had the choice to purchase better, lower priced calsil—is a classic strategy reflecting a "purpose to create or maintain a monopoly."

*Colgate*, 250 U.S. at 307. Thus, it is precisely the type of unilateral conduct for which "'liability can [] be assigned." *N.M. Oncology*, 994 F.3d at 1172.

By contrast, a refusal to sell to a rival or competitor is rarely anticompetitive and the Sherman Act does not generally require a supplier to aid their competitors to compete against them. Consequently, liability for this conduct is imposed sparingly and a higher standard governs. *See Novell*, 731 F.3d at 1074-76 (identifying "a discrete category of section 2 cases" in which there may be liability, nothing that they do not "seek to displace doctrines that address a monopolist's more direct interference with rivals."

Inexplicably, the court applied this onerous standard for a refusal to deal with a rival to JM's refusal to deal with disobedient customers. App.Vol.V, 16 (although "the refusal to supply a rival or competitor [] is not the situation presented here . . . the same general principles apply") (citing *Lorain Journal Co. v. United States*, 342 U.S. 143, 155 (1951)). But no logic supports applying the same standards to entirely dissimilar conduct. Accordingly, it is irrelevant that:

> The Court does not doubt Plaintiff's ability to establish at
> trial the first element regarding a preexisting profitable

> relationship. What is lacking is probative evidence that
> Defendant willingly inflicted upon itself harm in the short
> run in order to thwart Plaintiff's entry into the U.S. calsil
> market.

App.Vol.V, 16. TPS need not have presented any such evidence to support its claim. Applying the more stringent standard for a refusal to deal with a ***rival supplier*** when analyzing JM's refusal to supply its ***disloyal customers***, reflects that the court incorrectly assessed the fundamental nature of JM's conduct: "holding its products ransom" to compel loyalty. App.Vol.I, 100.

JM's conduct is more similar to the "conditional dealing" which generally violates Section 2 than it is to refusing to "lend a helping hand" to a competitor. In *Lorain Journal*, which the court cites, the Supreme Court ***did*** impose antitrust liability for unilateral conduct like JM's. When a monopolist "uses its monopoly to destroy threatened competition," it violates Section 2. 342 U.S. at 154; *accord* Phillip E. Areeda (late) & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 768e3 (5th ed. 2022 Cum. Supp. 2015-2021) ("A supplier's requirement that a customer not deal with a particular rival seems particularly hard to justify.") (citation omitted).

No case—even one permitting a seller to refuse to supply its rival—has overturned or limited *Lorain Journal* on this point. *See also Microsoft*, 253 F.3d at 70-71 (Microsoft's conditions "have a significant effect in preserving its monopoly; they help keep usage of [a competitor's product] below the critical level necessary for [that competitor] or any other rival to pose a real threat to Microsoft's monopoly," thus harming competition.); *Neumann v. Reinforced Earth Co.*, 786 F.2d 424, 427 (D.C. Cir. 1986) (when a monopolist's "rivals will be chastened sufficiently to abandon competitive behavior," its conduct violates Section 2). Had the court evaluated JM's conduct within the correct paradigm, it would have found a factual dispute to exist. This Court should apply the relevant standard to reach the correct conclusion.

### 3. Exclusive Dealing as Exclusionary Conduct

"The primary antitrust concern with exclusive dealing arrangements is that they may be used by a monopolist to strengthen its position, which may ultimately harm competition." *EpiPen*, 2022 U.S. App. LEXIS 20998, at *51 (citations omitted). The key question for exclusive dealing is whether "the practical effect" is to harm a customer

by preventing it from using a competitor's products. *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 326 (1961); *see also ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 270 (3d Cir. 2012) (same).

> [A] dominant firm can impose exclusive deals on downstream dealers to 'strengthen or prolong its market position.' Thus, [] such arrangements . . . can run afoul of antitrust laws as 'an improper means of maintaining a monopoly.'

*McWane, Inc. v. FTC*, 783 F.3d 814, 827-28 (11th Cir. 2015) (citation omitted).

Although evidence showed that JM's anticompetitive conduct foreclosed TPS almost entirely from the calsil market, to customers' detriment, the court held that TPS did not raise factual disputes on all elements of exclusive dealing. *Compare* App.Vol.VI, 129, 141 *with* App.Vol.V, 21. In explaining the possible procompetitive benefits of exclusive dealing arrangements—though citing none resulting from JM's conduct—the court overlooked considerations that this Court discussed at length in *EpiPen*. First, JM, not its customers, insisted on exclusivity. Second, the exclusivity resulted in higher, not lower, prices. *Contrast EpiPen*, 2022 U.S. App. LEXIS 20998, at *57-58 ("In a case

like this where **buyers instigated exclusivity to obtain lower prices** . . . .") (emphasis added).

The potential for competitive harm is drastically different when a **supplier requires exclusivity** from customers in order **to foreclose a lower priced competitor**—the case here—than when a **customer demands exclusivity** in order to **preserve access to a lower priced supplier**—as in *EpiPen*. Additionally, whether customers have buying power and whether they are end-users both distinguish pernicious exclusive deals like JM's from those which may be procompetitive. *Id.* at *80-81; 85-86 (factual circumstances in that case did not indicate coercion or harm to competition).

It is unsurprising that this Court found that the *EpiPen* plaintiff "failed to marshal sufficient evidence suggesting that [the defendant] engaged in any coercion." *Id.* There, the defendant competed successfully on price, leading customers logically to prefer it to the higher priced new entrant. This is precisely the "superior product, business acumen, or historic accident" that the Court encouraged in *Grinnell*; the opposite of conduct that attempts "to exclude rivals on

some basis other than efficiency." *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 (1985); *Grinnell*, 384 U.S. at 570-71.

JM, by contrast, engaged in the latter. Its conduct is quite like that condemned in *Dentsply* and *McWane*, both of which this Court distinguishes in *EpiPen*. *EpiPen*, 2022 U.S. App. LEXIS 20998, at *84 (discussing *Dentsply*, holding that, although exclusive deals are presumed to be procompetitive, "this assumption is thrown out the window when record evidence suggests coercion by the monopolist"); *see also EpiPen*, 2022 U.S. App. LEXIS 20998, at *51, 59-65, 85-87 ("in the absence of any coercion [] we are left with the firm and singular conclusion that [the plaintiff] 'need only offer a better product or a better deal' to reverse, and possibly wield, exclusivity"). TPS offered **both** a better product **and** a better deal, yet it failed to gain traction in the market. Evidence showed that coercion is the explanation.

Applying the consumer welfare standard, this Court should find that JM's near-total foreclosure of TPS, which permitted JM to maintain supracompetitive prices, means that JM's coerced exclusive deals harm competition. *Id*. at *54; *cf. id*. at *56-57 ("[W]e can broadly

state that an exclusive dealing contract is anticompetitive under the consumer welfare standard if it harms consumers by excluding rivals.").

### 4. Disparagement as Exclusionary Conduct

The district court also held that TPS failed to raise a genuine factual dispute about JM's anticompetitive disparagement. App.Vol.V, 25. It noted that, "[t]his type of antitrust claim more likely will succeed when combined with other anticompetitive acts." App.Vol.V, 27 (citing *In re EpiPen Mktg., Sales Practices & Antitrust Litig.*, 507 F. Supp. 3d 1289, 1362 (D. Kan. 2020)). But the court concluded that, "there is insufficient evidence to establish the other forms of antitrust behavior that Plaintiff raises. That makes it more difficult for Plaintiff to prevail on its disparagement antitrust theory." App.Vol.V, 27. This improper conclusion established a false context for its disparagement analysis.

### B. The Court Neglected to Consider the Composite Effect of These Four Types of Conduct

As this Court held, the next step after disaggregating and evaluating JM's exclusionary conduct is to "evaluate the evidence in totality to see if any 'synergistic effect'" indicates anticompetitive harm. *EpiPen*, 2022 U.S. App. LEXIS 20998, at *50. The court did not do so, and thus failed to appreciate the scope of JM's efforts to thwart

competition from TPS. (And, of course, the separate evaluations must entail application of the appropriate law.)

This Court recently considered allegations similar to TPS's, holding that:

> Real-world monopolists may engage in allegedly exclusionary conduct which does not fit within a single paradigm, instead exhibiting characteristics of several common forms of alleged misconduct. In these situations, the courts disaggregate the exclusionary conduct into its component parts before applying the relevant law.

*EpiPen*, 2022 U.S. App. LEXIS 20998, at *49. The plaintiff there complained that this "'balkanized view . . . missed the forest for the trees.'" *Id*. at *49-50. In rejecting that argument, however, this Court did not go so far as to sanction the district court's error here: declining, entirely, to consider the evidence together. *Id*. at *50. This Court held that that analysis is required; just *after* separately evaluating the exclusionary conduct. *Id*. at *49-50 ("[W]e must evaluate [the defendant's] allegedly exclusionary conduct separately. Only then can we evaluate the evidence in totality to see if any 'synergistic effect' saves [the plaintiff's] case.") (citations omitted).

"The relevant inquiry is the anticompetitive effect of [defendant's] exclusionary practices considered together . . . courts must look to the

monopolist's conduct taken as a whole rather than considering each aspect in isolation." *LePage's*, 324 F.3d at 162. *Caldera* is on point: "Plaintiff's entire case is based on the synergy of all of this conduct to demonstrate anticompetitive intent and effect." 72 F. Supp. 2d at 1309.

JM's relentless efforts to capture distributors are precisely the sort of "assay by the monopolist into the marketplace" that this Court has condemned. *Novell*, 731 F.3d at 1072; *see also Viamedia, Inc. v. Comcast Corp.,* 951 F.3d 429, 462-63 (7th Cir. 2020) (citing *Novell*); *Aspen Skiing*, 472 U.S. at 605, 608. The *Novell* inquiry—whether JM's conduct was "irrational but for its anticompetitive effect"—is the one which the court was obligated, but neglected, to perform if it did not find exclusionary conduct under any preceding analysis. *Novell*, 731 F.3d at 1075; *EpiPen*, 2022 U.S. App. LEXIS 20998, at *49-50. In its review, this Court should apply the *Novell* standard to confirm the results of four independent analyses: JM's exclusionary conducted harmed consumers by denying them a lower cost calsil alternative, solely to preserve JM's ability to charge them supracompetitive prices for its own calsil.

On de novo review, this Court should reverse the finding, at App.Vol.V, 12, that TPS does not raise a genuine dispute of material fact as to all elements of its claims.

## CONCLUSION

For these reasons, this Court should reverse the district court's order granting summary judgment and remand the case for trial because that order: failed to recognize that TPS raised a genuine dispute of material fact on all elements of its claims, incorrectly analyzed the facts, and misapplied the law.

Date:     October 4, 2022            Respectfully submitted,

BONA LAW PC

*s/ Alexandra Shear*
Alexandra Shear

*Counsel for Appellant*
*Chase Manufacturing Inc. d/b/a*
*Thermal Pipe Shields*

## STATEMENT REGARDING ORAL ARGUMENT

Under 10th Circuit Rule 28.2(C)(2), Appellant respectfully requests oral argument. The issues presented for review in this appeal are complex, and the summary judgment record is detailed and extensive. Appellant thus believes that oral argument will ensure that this Court has before it all of the underlying factual evidence and legal arguments necessary to aid this Court's decisional process.

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), I certify that:

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a) (7) (B) because this brief contains 12,647 words (based on the Microsoft Word word-count function), excluding the parts of the brief exempted by Fed. R. App. P. 32(a) (7)(B)(i ii) and 10th Cir. R. 32(B).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and 10th Cir. R. 32(A) and the type and style requirements of Fed. R. App. P. 32(a) (6) because this brief has been prepared in a proportionately spaced typeface using Word 2016, Century Schoolbook 14-point font.

Date: October 4, 2022

BONA LAW PC

*s/ Alexandra Shear*
Alexandra Shear

*Counsel for Appellant*
*Chase Manufacturing Inc. d/b/a*
*Thermal Pipe Shields*

# CERTIFICATE OF DIGITAL SUBMISSION

For this brief, I certify that:

(1) all required privacy redactions have been made per 10th Circuit Rule 25.5;

(2) the version of this brief submitted electronically to this Court via its CM/ECF system is an exact copy of the hard copies of this brief to be submitted to the Court; and

(3) the version of this brief submitted electronically to this Court via its CM/ECF system was scanned for viruses with the most recent version of a commercial virus scanning program, and is free of viruses.

Date:    October 4, 2022

BONA LAW PC

*s/ Alexandra Shear*
Alexandra Shear

*Counsel for Appellant*
*Chase Manufacturing Inc. d/b/a*
*Thermal Pipe Shields*

# CERTIFICATE OF SERVICE

I hereby certify that on October 4, 2022, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Date:    October 4, 2022

> BONA LAW PC
>
> *s/ Alexandra Shear*
> Alexandra Shear
>
> *Counsel for Appellant*
> *Chase Manufacturing Inc. d/b/a*
> *Thermal Pipe Shields*

# ADDENDUM TO APPELLANT'S BRIEF

## INDEX

| ECF NO. | FILED DATE | DESCRIPTION | PAGE NO. |
|---------|-----------|-------------|----------|
| 50 | 3/23/20 | Order re: Defendant's Motion to Dismiss Plaintiff's First Amended Complaint | 76 |
| 101 | 11/12/20 | Order re: Denial of Defendant's Motion for Partial Summary Judgment | 116 |
| 108 | 1/6/21 | Order granting in part Defendant's Motion to Correct | 129 |
| 109 | 1/6/21 | Amended Order re: Denial of Defendant's Motion for Partial Summary Judgment | 136 |
| 205 | 2/22/22 | Order re: Parties' Motions to Exclude Expert Testimony and Defendant's Motion to Strike | 148 |
| 225 | 4/26/22 | Order re: granting Motion for Summary Judgment and denying Motion to Strike | 175 |
| 226 | 4/26/22 | Order and Statement of Material Undisputed Facts by Magistrate Judge Michael E. Hegarty | 206 |
| 227 | 4/26/22 | Judgment | 220 |

# ATTACHMENT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-00872-MEH

CHASE MANUFACTURING, INC., d/b/a Thermal Pipe Shields,

      Plaintiff,

v.

JOHNS MANVILLE CORPORATION,

      Defendant.

---

## ORDER

---

**Michael E. Hegarty, United States Magistrate Judge**

      Before the Court is Defendant's Motion to Dismiss Plaintiff's First Amended Complaint ("FAC") (ECF 36).  Defendant seeks dismissal of the FAC for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6).  For the following reasons, the Court will grant in part and deny in part Defendant's motion.

## <u>BACKGROUND</u>

### I.    Procedural History

      Plaintiff filed its original Complaint on March 22, 2019, asserting five claims for relief against Defendants Industrial Insulation Group, LLC and Johns Manville Corporation for alleged violations of the Sherman Act, the Lanham Act, and the common law.  On May 15, 2019, Defendants filed a motion to dismiss all of Plaintiff's claims under Fed. R. Civ. P. 12(b)(6).  Plaintiff filed its response on June 5, 2019, in which it voluntarily withdrew its two common law claims but contested the dismissal of its three statutory claims.  The Court held a hearing on the motion on June 18, 2019.

On July 3, 2019, the Court granted the motion to dismiss without prejudice and with leave to refile finding one or more of Plaintiff's claims may be stated with sufficient particularity that justice required leave to amend.  Plaintiff filed its FAC on July 24, 2019, dropping Industrial Insulation Group, LLC but reasserting its three statutory claims against Defendant Johns Manville Corporation for: (1) tying in violation Sections 1 and 2 of the Sherman Act; (2) monopolization in violation of Section 2 of the Sherman Act; and (3) false advertising in violation of Section 43(a) of the Lanham Act.  Defendant filed the present motion to dismiss on August 21, 2019.  After the matter was fully briefed, Defendant filed a notice of supplemental authority in support of its motion on November 12, 2019 and the Court held oral argument on November 19, 2019.

## II.      Statement of Facts

The following are relevant factual allegations (as opposed to legal conclusions, bare assertions, or merely conclusory allegations) made by Plaintiff in the Complaint, which are taken as true for analysis under Fed. R. Civ. P. 12(b)(6) pursuant to *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Defendant manufactures and sells construction products, including mechanical insulation products.  Plaintiff is a mechanical insulation supplier.  Both Defendant and Plaintiff sell calcium silicate thermal insulation, referred to as "calsil," which is designed to encapsulate pipes, tanks, and other equipment in industrial facilities.  Defendant has at least a 98% share of the domestic calsil market, which is approximately $50 million in sales per year.  This accounts for only approximately 2% of Defendant's $3 billion annual sales for all products.

Because of calsil's unique characteristics and uses, customers who purchase it demand that the product meet or exceed the requirements set forth in ASTM C533 Type I, a standard developed by an international standards organization that publishes material specifications relied on by

engineers to qualify generic product types.  Only three factories in the world produce calsil that meets the ASTM C533 Type I standard and fits North American sizing norms: two in the United States owned and operated by Defendant, and one in Shanghai, China.  The Shanghai factory, now known as BEC Industrial (Shanghai) Co., Ltd. ("BEC"), previously produced calsil for Defendant but now sells its calsil in North America exclusively through Plaintiff.

In 2017, BEC approached Plaintiff and offered it the opportunity to be the exclusive United States importer of BEC calsil.  At the time, Defendant was the sole supplier of calsil in the United States and was also trying to persuade Plaintiff to purchase its calsil.  To win Plaintiff's business, Defendant offered to test the BEC calsil against Defendant's calsil to determine which product was superior.  The test results showed that BEC's calsil met or exceeded the ASTM allowable thresholds.  Based on these results and other independent tests, Plaintiff and BEC signed an exclusive agreement in March 2018.

Plaintiff began marketing BEC's calsil under the brand-name TPSX-12™.  As part of its marketing strategy, Plaintiff arranged for its calsil to be tested side-by-side with Defendant's calsil. Those results indicated that BEC's calsil met or exceeded the requirements of ASTM C533 Type I, never contained asbestos, and outperformed Defendant's calsil in several categories.

Both Defendant and Plaintiff sell their mechanical insulation products, including calsil, almost exclusively to distributors who, in turn, resell those products to industrial customers or plant operators.  A limited, and decreasing, portion of Defendant's sales is direct to customers. There are five major mechanical insulation distributors that dominate the country, operating in at least twenty-eight, and as many as sixty-six, different locations across the United States.  The five largest distributors are: Distribution International, Inc. ("DI"); Specialty Products & Insulation Co. ("SPI"); General Insulation Company, Inc. ("GI"); MacArthur Co. ("MacArthur"); and Bay

Insulation Supply Inc. ("Bay Insulation").  Between them, they operate in 218 locations nationwide and account for approximately 85% of calsil sales.  Plaintiff estimates that "approximately ten or fewer" smaller, independent distributors account for the remaining 15% of the calsil market.

Customers require the distributors to carry other construction products made by Defendant, including, as relevant to this case, Defendant's fiberglass pipe insulation and expanded perlite products.  Defendant is one of only three fiberglass pipe insulation manufacturers in the United States, and Plaintiff alleges it has at least a 60% share of that market.  Defendant is also one of only two North American suppliers of expanded perlite pipe and block insulation, and Plaintiff alleges it has not less than a 50% share of that market.

According to Plaintiff, Defendant has threatened to cut off sales, extend lead times, or alter rebate programs for fiberglass pipe insulation and/or expanded perlite as punitive measures to both large and small distributors who buy calsil from Plaintiff.  It has also threatened to refuse to supply its own calsil to both large and small distributors who purchase calsil from Plaintiff.  Plaintiff further alleges that Defendant has made comments to its customers regarding the quality and safety of Plaintiff's calsil.  As stated in the FAC, Defendant's sales managers told customers that Plaintiff's calsil was "poor quality" and "cannot be trusted to meet 'specifications,'" "'may have asbestos,'" and was "Chinese," referring to where it was produced.  The "Frequently Asked Questions" page on Defendant's website states, in part: "[Defendant] is the only insulation manufacturer in North America to produce water resistant calcium silicate.  While we are aware of one other manufacturer in Asia that produces [calsil], it is an expensive, custom-order product that is not readily available."

According to Plaintiff, because TPSX-12™ is of equal, if not superior, quality to Defendant's calsil but is priced lower, Plaintiff should have a "sizeable" share of the calsil market.

Plaintiff has approximately 2% of the calsil market and sold less than $1 million of TPSX-12™

from March 2018 through March 2019.  Only two of the largest distributor's 218 locations

purchase calsil from Plaintiff.  Plaintiff claims that it would have sold substantially more but for

Defendant's threats and other anti-competitive conduct, and that Defendant's actions were

intended to perpetuate their monopoly and to eliminate the only competitor in the domestic calsil

market.

## LEGAL STANDARDS

The purpose of a motion to dismiss under Fed. R. Civ. P. 12(b)(6) is to test the sufficiency

of the plaintiff's complaint.  *Sutton v. Utah State Sch. For the Deaf & Blind*, 173 F.3d 1226, 1236

(10th Cir. 2008).  "To survive a motion to dismiss, a complaint must contain sufficient factual

matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at

678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Plausibility, in the context

of a motion to dismiss, means that the plaintiff pled facts which allow "the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged."  *Id. Twombly* requires

a two-prong analysis.  First, a court must identify "the allegations in the complaint that are not

entitled to the assumption of truth," that is, those allegations which are legal conclusions, bare

assertions, or merely conclusory.  *Id.* at 680.  Second, the Court must consider the factual

allegations "to determine if they plausibly suggest an entitlement to relief."  *Id.* at 681.  If the

allegations state a plausible claim for relief, such claim survives the motion to dismiss.  *Id.* at 679.

Plausibility refers "'to the scope of the allegations in a complaint: if they are so general

that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not

nudged their claims across the line from conceivable to plausible.'"  *Khalik v. United Air Lines*,

671 F.3d 1188, 1191 (10th Cir. 2012) (quoting *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th

Cir. 2008)).  "The nature and specificity of the allegations required to state a plausible claim will vary based on context." *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1215 (10th Cir. 2011). Thus, while the Rule 12(b)(6) standard does not require that a plaintiff establish a prima facie case in a complaint, the elements of each alleged cause of action may help to determine whether the plaintiff has set forth a plausible claim.  *Khalik*, 671 F.3d at 1192.

However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.  The complaint must provide "more than labels and conclusions" or merely "a formulaic recitation of the elements of a cause of action," so that "courts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint has made an allegation, "but it has not shown that the pleader is entitled to relief." *Id.* (quotation marks and citation omitted).

## DISCUSSION

In its FAC, Plaintiff reasserts three statutory claims against Defendant: (1) tying and (2) monopolization in violation of the Sherman Act, and (3) false advertising in violation of the Lanham Act.  Defendant contends the FAC fails to address the deficiencies of the original Complaint and argues that dismissal of all of Plaintiffs claims is warranted because: (1) Plaintiff has not alleged facts sufficient to support three of the necessary elements of a per se tying claim; (2) Plaintiff fails to state a tying claim under the rule of reason; (3) Plaintiff fails to allege actionable exclusionary conduct or injury in support of its monopolization claim; and (4) Plaintiff

fails to allege facts to support a false advertising claim. The Court will discuss each of Plaintiff's claims in turn.

## I.        Tying

A tying arrangement under the Sherman Act "is an agreement by a party to sell one product—the 'tying product'—only on condition that the buyer also purchase a second product—the 'tied product'—or at least agree not to buy that product from another supplier." *SolidFX, LLC v. Jeppesen Sanderson, Inc.*, 935 F. Supp. 2d 1069, 1078 (D. Colo. 2013) (quoting *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 461-62 (1992)), *aff'd*, 841 F.3d 827 (10th Cir. 2016). Tying arrangements can be analyzed using a per se rule or a rule of reason. *Suture Express, Inc. v. Owens & Minor Distrib., Inc.*, 851 F.3d 1029, 1037 (10th Cir. 2017). In the Tenth Circuit, to succeed on a per se tying claim a plaintiff must show that "(1) two separate products are involved; (2) the sale or agreement to sell one product is conditioned on the purchase of the other; (3) the seller has sufficient economic power in the tying product market to enable it to restrain trade in the tied product market; and (4) a 'not insubstantial' amount of interstate commerce in the tied product is affected." *Id.* (quoting *Sports Racing Servs., Inc. v. Sports Car Club of Am., Inc.*, 131 F.3d 874, 886 (10th Cir. 1997)). "If a plaintiff fails to prove an element, the court will not apply the per se rule to the tie, but then may choose to analyze the merits of the claim under the rule of reason." *In re: Cox Enterprises, Inc.*, 871 F.3d 1093, 1098 (10th Cir. 2017). Under the rule of reason, a plaintiff must prove "the actual effect of the [tying arrangement] on competition." *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 29 (1984), a*brogated on other grounds by Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006).

A.    Plaintiff's Original and Amended Tying Claims

Plaintiff's original tying claim alleged that "Johns Manville has economic power in the market for fiberglass and expanded perlite (the tying products), and it consistently used that power to coerce customers to buy [its] calsil (the tied product), even though customers wanted to buy TPSX-12™ from [Plaintiff] instead."  Compl. ¶ 135, ECF 1.  In ruling on the first motion to dismiss, the Court noted that under either a per se or rule of reason analysis, "the market power of the tying product is important," and "[e]valuating the relevant tying market requires an appropriate product market and geographic market."  *Chase Mfg., Inc. v. Johns Manville Corp.* (*First Order*), No. 19-CV-00872-MEH, 2019 WL 2866700, at *5 (D. Colo. July 3, 2019).  The Court found that "[t]he Complaint sufficiently alleges two product markets—the markets for fiberglass and expanded perlite—but does not adequately allege a geographic market" for those products.  *First Order* at *6.  Accordingly, the Court held that Plaintiff failed to adequately state either a monopoly claim based on tying or a stand-alone tying claim under the Sherman Act.  *Id*. at *7.

Generally, the FAC  reasserts the same tying claim as in the original Complaint: that Defendant unlawfully tied sales of calsil to sales of fiberglass pipe insulation and expanded perlite. FAC ¶¶ 193, 196, ECF 30.  As in the original tying claim, fiberglass pipe insulation and expanded perlite are the tying products and calsil is the tied product in Plaintiff's amended claim.  Plaintiff alleges that fiberglass pipe insulation and expanded perlite are "must-have" products for distributors, *id*. at ¶¶ 89, 100, and that Defendant uses its economic power in those product markets to "coerce" customers to buy its calsil by threatening to cut off sales and actually refusing to sell those "must-have" products to customers who bought calsil from Plaintiff.  *Id*. at ¶ 93, 107, 110.

Defendant argues the FAC fails to adequately plead the second, third, and fourth elements of a per se tying claim and does not state a tying claim under the rule of reason.  For the reasons

83

discussed below, the Court finds Plaintiff plausibly alleged a per se tying claim and, therefore, does not analyze the merits of Plaintiff's claim under the rule of reason.

> **B.**      Sale or Agreement to Sell One Product Is Conditioned on Purchase of Another

The second element of a per se tying claim is "the sale or agreement to sell one product or service is conditioned on the purchase of another." *Sports Racing Servs., Inc.*, 131 F.3d at 886. Defendant argues Plaintiff's allegations—that it threatened, or actually engaged in, tying with respect to three distributors—are ambiguous, pertain to actions Defendant *might* take rather than actions Defendant was actually taking, and fail to show that any distributor refused to purchase Plaintiff's calsil because of Defendant's threats. Defendant contends that the Court "previously dismissed nearly identical allegations due to a lack of 'specificity, because it [was] unclear whether the customer declined to purchase Plaintiff's calsil for fear of losing the ability to buy the tying products or any one of Defendants' other products." Mot. 7 (quoting *First Order* at *7). Plaintiff responds that its allegation that Defendant told a distributor it would risk losing its ability to buy any of Defendant's products if it bought calsil from Plaintiff is enough to defeat Defendant's argument, because "this is a clear-cut allegation that the sale of [Defendant's] other products is conditioned on the purchase of calsil." Resp. 7, ECF 38. Plaintiff also argues that an outright refusal to sell is not necessary to state a claim. *Id.*

The FAC includes three specific instances when a sale or potential calsil sale was affected by Defendant's alleged tying conduct. First, Plaintiff alleges that Defendant's sales manager "did in fact refuse to sell both [Defendant's] calsil and expanded perlite to distributor 4 State Supply's Wichita, Kansas location after 4 State Supply purchased TPSX-12™." FAC ¶ 108. Second, Plaintiff alleges that,

> Mark Hernandez, the El Paso, Texas Business Manager of the largest national distributor, DI, called his district manager, for 'permission' to seek a price quote for TPSX-12™. Mr. Hernandez was told that if he bought calsil from [Plaintiff], then DI would risk losing their ability to buy any products (including fiberglass pipe insulation and expanded perlite) from [Defendant], who had threatened it. Consequently, Mr. Hernandez was told he was not allowed to quote or sell TPSX-12™ because DI did not feel it was worth losing [Defendant]'s entire vast product line just to be able to save money on its calsil orders. As a result of this threat, DI's El Paso branch did not purchase any calsil from [Plaintiff].

*Id.* at ¶¶ 113-14. Third, in mid-January 2019, Plaintiff learned that two of Defendant's sales leaders "told Kirk Chalmers, Operations Leader at APi Distribution (APi) in Minnesota, that if they continued to buy calsil from [Plaintiff], it would endanger their ability to purchase any [of Defendant's] products—including, most notably, fiberglass pipe insulation and expanded perlite . . . APi had purchased two containers of TPSX-12™ for their branches in Billings, Montana and Arden Hills, Minnesota but has not purchased any more calsil from [Plaintiff] because of this threat from [Defendant]." *Id.* at ¶¶ 116-17. In addition to these three specific allegations, Plaintiff generally alleges that Defendant threatened to cut off sales of fiberglass insulation and expanded perlite "to distributors (both large or small)" or "to any distributor" that bought calsil from Plaintiff. FAC ¶¶ 93, 107, 110.

Plaintiff's allegations plausibly allege the second element of a tying claim. The Court disagrees with Defendant that Plaintiff's allegations are ambiguous. Plaintiff alleges three specific instances in which Defendant threatened to refuse, or did in fact refuse, to sell fiberglass pipe insulation or expanded perlite to distributors that purchased calsil from Plaintiff. Plaintiff further alleges these instances are exemplary of a broader pattern of behavior and conduct, Resp. 5, and that such threats were made to any distributor that bought calsil from Plaintiff, not just the three distributors identified in its examples, FAC ¶¶ 93, 107, 110. Defendant mistakenly relies on the First Order's reasoning regarding whether Defendant "actually exerted the power to coerce

customers into not buying from [Plaintiff]," which is not a component of the second element of Plaintiff's tying claim.   Considering both the specific and general allegations regarding Defendant's agreement to sell fiberglass pipe insulation or expanded perlite only if a distributor does not purchase calsil from Plaintiff—and thus purchases calsil from the only other supplier, itself—Plaintiff plausibly alleges the second element of a tying claim.

C.    Defendant's Economic Power in the Tying Product Markets

The third element of a per se tying claim is that the seller has sufficient economic power in the tying product market to enable it to restrain trade in the tied product market.   *Suture Express, Inc.*, 851 F.3d at 1037.   Evaluating the relevant tying market requires an appropriate product market and geographic market.   *Lantec, Inc. v. Novell, Inc.*, 306 F.3d 1003, 1024 (10th Cir. 2002); *Auraria Student Hous. at the Regency, LLC v. Campus Vill. Apartments, LLC*, No. 10-cv-02516-WJM-KLM, 2014 WL 4412529, at *3 (D. Colo. Sept. 8, 2014).

In the first motion to dismiss, the Defendants argued Plaintiff had failed to allege a valid tying claim because it had not alleged their market power in the tying products.   ECF 18 at 13. Elaborating on this argument in their reply, Defendants contended Plaintiff's allegations provided only "guesses about market share for an undefined, unexplained product market" and "unsupported attempts at asserting market share for the tying products, using undefined products and geographic areas."   ECF 25 at 4.   Defendants further proffered that Plaintiff's references to "unspecific 'fiberglass products' are insufficient."   *Id*. at 5.   In the First Order, the Court found that "[t]he Complaint sufficiently alleges two product markets—the markets for fiberglass and expanded perlite—but does not adequately allege a geographic market." ECF 28 at 11.   The Court understood Plaintiff's allegations as arguing the geographic markets for fiberglass insulation and expanded perlite products are regional but determined the appropriate geographic market is national.   *Id*. at

12.   Accordingly, the Court held that Plaintiff failed to adequately state either a monopoly claim based on tying or a stand-alone tying claim under the Sherman Act. *Id*. at 14.

In the FAC, Plaintiff identifies the fiberglass pipe insulation and expanded perlite markets as the tying product markets for its reasserted tying claim and alleges that the geographic scope for these markets is national.  FAC ¶¶ 85, 103.  In the current motion, Defendant raises no issues with the Plaintiff's allegations as to geographic scope; rather, Defendant turns it attention to the other components of the third element, product market and market power.

Defendant argues that Plaintiff fails to adequately define the relevant product markets for either tying product—fiberglass pipe insulation or expanded perlite—because Plaintiff did not allege economic substitutes for the products.  Defendant notes the FAC "contains no allegations whatsoever regarding the unique characteristics of fiberglass pipe insulation . . .  or whether there are any other insulation products that can be used as substitutes," Mot. 8, and "does not allege any facts suggesting that there are not close or reasonable substitutes for expanded perlite generally, or that expanded perlite demand and/or pricing is not impacted and constrained by the pricing for other types of industrial insulation," *id*. at 8-9.

Plaintiff responds that "this Court found [its] product market allegations sufficient even before the FAC, which expanded on those allegations."  Resp. 8.  It continues that Defendant's argument regarding Plaintiff's failure to allege a lack of reasonable substitutes for the tying products "is neither correct nor relevant," and concludes that because market definition is fact-bound and often requires expert testimony, it is ill-suited for resolution on a motion to dismiss.  *Id*.

The Court understands Plaintiff as asserting the "law of the case" doctrine and agrees on the effect of the First Order on product market definition.  Under the law of the case doctrine, when a court rules on an issue, the ruling should continue to govern the same issues in subsequent stages

in the same case.  *Arizona v. California*, 460 U.S. 605, 618 (1983); *see also Entek GRB, LLC v. Stull Ranches, LLC*, 840 F.3d 1239, 1241 (10th Cir. 2016) ("Law of the case doctrine . . . preclude[es] the relitigation of issues either expressly or implicitly resolved in prior proceedings in the same court.").  While the decision whether to apply the law of the case doctrine remains a matter of judicial discretion, a court may "exercise the discretion to entertain relitigation of settled issues when the failure to do so would work 'a manifest injustice.'"  *Id*. at 1242 (quoting *White v. Murtha*, 377 F.2d 428, 431-32 (5th Cir. 1967)).   In this case, the Court found the original Complaint "sufficiently allege[d] two product markets—the markets for fiberglass and expanded perlite."  ECF 28 at 11.  The FAC reiterates the same two tying product markets and expands upon the allegations contained with the original Complaint.  Further, declining to relitigate this issue does not present a "manifest injustice," as Defendant can always revisit this issue at summary judgment, if necessary.  Accordingly, the Court finds Plaintiff sufficiently alleged tying markets for fiberglass pipe insulation and expanded perlite that are national in scope.

This determination does not end the inquiry as to the third element of Plaintiff's tying claim; the question now becomes whether Plaintiff sufficiently alleged Defendant's economic power in the identified tying markets, the national markets for fiberglass pipe insulation and expanded perlite.  "[I]n all cases involving a tying arrangement, the plaintiff must prove that the defendant has market power in the tying product."  *Ill. Tool Works*, 547 U.S. at 46.  Market power is the ability to force a purchaser to do something that he would not do in a competitive market, *Jefferson Par.*, 466 U.S. at 13-14, and "has been defined as 'the ability of a single seller to raise price and restrict output.'"  *Eastman Kodak Co.*, 504 U.S. at 464 (quoting *Fortner Enterprises, Inc. v. U.S. Steel Corp.*, 394 U.S. 495, 503 (1969)).

88

In determining the existence of market power, a court closely examines the economic reality of the market at issue. *Eastman Kodak Co.*, 504 U.S. at 467. While market share is relevant to the determination of the existence of market or monopoly power, market share alone is not dispositive to establish market power. *Reazin v. Blue Cross & Blue Shield of Kan., Inc.*, 899 F.2d 951, 968 (10th Cir. 1990) ("[M]arket share percentages may give rise to presumptions, but will rarely conclusively establish or eliminate market or monopoly power."); *see also Fortner*, 394 U.S. at 502-03 ("The standard of 'sufficient economic power' does not . . . require that the defendant have a monopoly or even a dominant position throughout the market for the tying product. Our tie-in cases have made unmistakably clear that the economic power over the tying product can be sufficient even though the power falls far short of dominance and even though the power exists only with respect to some of the buyers in the market."). "Even absent a showing of market dominance, the crucial economic power may be inferred from the tying product's desirability to consumers or from uniqueness in its attributes." *Fortner*, 394 U.S. at 503 (internal quotation omitted).

"To demonstrate market power, a plaintiff 'may show evidence of either power to control prices or the power to exclude competition.'" *Suture Express, Inc.*, 851 F.3d at 1039 (quoting *Reazin*, 899 F.2d at 966). Power over price and power over competition may depend on various market characteristics, including the existence and intensity of entry barriers, elasticity of supply and demand, the number of firms in the market, and market trends. *Reazin*, 899 F.2d at 967. "[P]ower over price can take the form of a tying arrangement if the price could have been raised but the tie was demanded instead." *Suture Express, Inc.*, 851 F.3d at 1039.

Defendant argues Plaintiff's bare allegations regarding Defendant's percentage share of the fiber glass pipe insulation and expanded perlite markets are conclusory and are insufficient to

establish market power.  Mot. 9.  Plaintiff responds that its allegations present an "entirely plausible" scenario of unlawful tying.  Resp. 10.  It notes it alleged that the markets for both fiberglass pipe insulation and expanded perlite are capacity constrained, with few other competitors besides Defendant, and that it is "essential" that distributors can offer their customers Defendant's products in order to service demand.  *Id.* at 10-11.  Plaintiff further notes that it alleged at least one instance in which Defendant refused to sell calsil and expanded perlite to a small distributer who had purchased calsil from Plaintiff.  *Id.* at 11 (citing FAC ¶ 108).  Finally, Plaintiff emphasizes that it alleged Defendant has a predominant share of both the fiberglass pipe insulation and expanded perlite markets.  Defendant replies that Plaintiff's assertions of percentages of market share and the claim that carrying Defendant's products is "essential" for distributors are conclusory and without factual support.  Reply 9 n.6, ECF 41.

The Court agrees with Defendant that Plaintiff's bare assertions regarding Defendant's market share are conclusory.  Plaintiff states, "[Defendant] is one of only three manufacturers of fiberglass pipe insulation in the United States and *it is believed to have* at least a 60% share of the fiberglass pipe insulation market."  FAC ¶ 85 (emphasis added).  As to Defendant's market share percentage in expanded perlite, Plaintiff states, "[Defendant] has a share of the perlite market *which is believed to be* not less than 50%, which is above the standard threshold for market power."  *Id.* at ¶ 97 (emphasis added).  Plaintiff provides no further information as to how it came to form these beliefs, which could be simply Plaintiff's best guesses and far from Defendant's actual market share.

Even without considering Plaintiff's allegations as to Defendant's market share in the tying product markets, however, Plaintiff's other allegations plausibly allege Defendant has market power in the fiberglass pipe insulation and expanded perlite markets.  Plaintiff alleges Defendant

**90**

is one of only three manufacturers of fiberglass pipe insulation in the United States and is one of only two North American suppliers of expanded perlite pipe and block insulation. FAC ¶¶ 85, 101. It further alleges that both markets are capacity constrained, with end-user demand for both exceeding suppliers' capacity to produce it, *id*. at ¶¶ 90, 104, and that distributors must be able to carry Defendant's products in order to meet their customers' needs. *Id.* at ¶¶ 82, 91 ("Distributors constantly struggle to procure adequate supply of fiberglass pipe insulation to meet customers' demand and distributors' survival depends on manufacturers' ability and willingness to supply it to them."), ¶ 95 ("[I]f [Defendant] withholds its product from a distributor, that distributor will not be able to meet the volume needs of its customers as it is not able to obtain enough product (or be able to buy at all) from other manufacturers in sufficient time to satisfy demand from its customers."), ¶ 105 ("At least three different distributors have reported to [Plaintiff] that they risk losing sales of expanded perlite to their customers if [Defendant] cuts off their supply."). In addition to these allegations, Plaintiff notes that "neither is it easy or practical for a new manufacturer to enter the market due to the high costs associated with, and technical expertise required for, building a plant, manufacturing product, establishing relationships with customers, and shipping product." *Id*. at ¶ 92. Even if a new manufacturer could start production, "because of marketplace dynamics and the important role of manufacturer-distributor relationships, it is not easy for distributors to commence purchases from a new manufacturer quickly or efficiently." *Id*. at ¶ 91.

Taken together, the Court agrees with Plaintiff that it presents an "entirely plausible" scenario. Given the high demand for fiberglass pipe insulation and expanded perlite generally and Defendant's products specifically, the very limited number of suppliers, the high barriers to entry for new manufacturers, and the dynamics of the manufacturer-supplier-customer relationship, it is

plausible that Defendant has either power to control price, power to exclude competition, or both. Based on Plaintiff's allegations, rather than demand distributors purchase its calsil, Defendant could raise its prices for fiberglass pipe insulation or expanded perlite.  Given the dynamics of those markets,  distributors would have to pay the increase or loose sales from customers who demand those products.  *Suture Express, Inc.*, 851 F.3d at 1039 ("[P]ower over price can take the form of a tying arrangement if the price could have been raised but the tie was demanded instead."). Taking all reasonable inferences in Plaintiff's favor, Plaintiff has plausibly alleged that Defendant has the ability to force distributors to do something they would not do in a competitive market and, thus, sufficiently alleges Defendant has market power.

D.       A Not Insubstantial Amount of Affected Commerce

The fourth element of a per se tying claim requires that "a not insubstantial amount of interstate commerce in the tied product is affected." *Sports Racing Servs., Inc.*, 131 F.3d at 886. "Normally the controlling consideration is simply whether a total amount of business, substantial enough in terms of dollar-volume so as not to be merely de minimis, is foreclosed to competitors by the tie." *Fortner*, 394 U.S. at 501.  In addition, the fourth element "requires proof of actual or potential anticompetitive effects in the tied-product market."  *In re: Cox Enterprises, Inc.*, 871 F.3d 1093, 1104 (10th Cir. 2017); *see also id.* at 1107 ("Because tying claims often present little or no potential to harm competition—and thus, no antitrust concerns—plaintiffs alleging per se unlawful tying arrangements must do more to meet the foreclosure element than point to a dollar amount.  They must show that the alleged tying arrangement had the potential to or actually did injure competition." (citation omitted)).

Defendant argues that Plaintiff has not alleged a dollar volume of calsil that was sold or foreclosed because of Defendant's alleged tying.  Mot. 10.  It notes that while Plaintiff alleged

sales to one of the five major distributors and two of the approximate ten "smaller" distributers were potently affected by tying conduct, Plaintiff does not define the scope of these sales. *Id*. at 10-11.  Plaintiff responds that "[f]rom a dollar and volume standpoint, [Defendant] has foreclosed nearly 100% of the market for calsil, alleged to be $50 million per year."  Resp. 14.  It continues that it "cites examples of conduct pertaining to DI, SPI, Bay Insulation, GI, Apes [sic], and 4 State Supply, but also specifically alleges that [Defendant] threatened all actual and potential calsil customers, including both larger, national distributors and smaller, independent ones."  *Id*. (emphasis added).  Defendant replies that it is insufficient for Plaintiff to merely allege the calsil market's total value and that Defendant controls it.  Reply 9.  It reiterated that the FAC includes no facts from which the Court could infer the volume of commerce foreclosed to rivals, including Plaintiff, by the alleged tying.  *Id*. at 10.

Although Plaintiff does not define the scope of the three specific calsil sales affected by Defendant's alleged tying, its allegations provide a sufficient basis from which the Court can reasonably infer that more than a "de minimis" amount of business in calsil was affected.  Plaintiff emphases that "[t]o accurately convey the realities of the calsil market . . . certain . . . allegations refer to specific locations or certain distributors.  But, . . . these specific allegations do not imply that they are the only instances in which [Defendant]'s conduct has foreclosed competition in the calsil market."  Resp. 16; *see also* ECF 45 at 21:22-22:2 ("Additionally, we specifically allege that the same conduct was addressed to both larger and smaller distributors.  So where we may give an instance of conduct that was addressed to a small distributor, it's not meant to suggest that . . . that conduct only was directed toward that distributor.").  Taken as a whole, Plaintiff alleges Defendant was threatening any and all distributors that they would be unable to acquire fiberglass pipe insulation and/or expanded perlite from Defendant if they bought calsil from Plaintiff and it

provides three specific examples of such conduct.   Taking reasonable inferences in Plaintiff's favor, it is reasonable to believe that not only was a "not insignificant" amount of commerce affected, but quite plausibly a significant amount of commerce was foreclosed.

In addition to alleging Plaintiff also plausibly alleges actual or potential anticompetitive effects in the calsil market.  *In re: Cox Enterprises, Inc.*, 871 F.3d at 1104.  Plaintiff contends that Defendant restrained competition with its tying conduct, resulting in limitation of customer choice of suppliers, increased prices, and reduction in calsil output.  FAC ¶¶ 115, 118, 125, 187, 189. Plaintiff also related Defendant's tying action to the sale of calsil by distributors, noting that Defendants threats to cut off sales of expanded perlite "has real consequences to distributors' abilities to compete." *Id*. at ¶ 108.  As an example, Plaintiff alleged that Defendant's refusal to sell 4 State Supply expanded perlite or calsil "destroyed 4 State Supply's ability to compete in the Wichita market (where demand is high), because it must pay additional costs and take additional time to obtain the products from one of its other two locations." *Id*.

Because Plaintiff plausibly alleges a per se tying claim, it should not be dismissed under Fed. R. Civ. P. 12(b)(6), and Defendant's motion as to Plaintiff's standalone tying claim is denied. The Court does not consider whether Plaintiff's allegations state a tying claim under the rule of reason.

## II.     Monopolization

Plaintiff asserts a monopolization claim under Section 2 of the Sherman Act, alleging Defendant created and maintains an unlawful monopoly in the calsil market.  There are three elements to a Section 2 monopolization claim: the first element is a "monopoly power in the relevant market"; the second is "willful acquisition or maintenance of this power through

exclusionary conduct"; and the final element is "harm to competition." *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.* (*Lenox I*), 762 F.3d 1114, 1119 (10th Cir. 2014).

Plaintiff's original monopolization claim alleged that then-Defendants created and maintained a monopoly in the calsil market through exclusionary conduct, including tying, exclusive dealing, refusal to deal, spying, and product disparagement. First Order *4. In the first motion to dismiss, Defendants argued Plaintiff failed to sufficiently plead both specific facts showing it acquired or maintained monopoly power through unlawful exclusionary conduct, the second element, and antitrust injury, the third element. ECF 18 at 4, 5 n.5. The Court found that Plaintiff's allegations of exclusionary conduct failed to support a monopolization claim and dismissed.

In its renewed monopolization claim Plaintiff alleges that Defendant possess and maintains monopoly power in the national calsil market through "a host of exclusionary tactics, including, among others, tying (as alleged above), refusals to supply customers who purchase from [Plaintiff], exclusive dealing, and product disparagement." FAC ¶ 204.[1] Defendant again moves to dismiss Plaintiff's amended monopolization claim on the basis that Plaintiff failed to sufficiently plead actionable exclusionary conduct or antitrust injury. The Court disagrees with Defendant and finds that Plaintiff has now pleaded a plausible monopolization claim based on tying, refusal to supply, exclusive dealing, and product disparagement.

---

[1] Plaintiff also alleges that "[Defendant]'s legal department threatened [Plaintiff] with phony charges of 'misappropriation,' which they knew were not true, and tried to get [Plaintiff] to agree not to compete for any [of Defendant's] customers who were not listed on [Plaintiff]'s own website." FAC ¶ 205. However, Plaintiff does not rely on either allegation in its response to Defendant's motion.

A.    <u>Defendant's Alleged Exclusionary Conduct</u>

Plaintiff alleges Defendant maintains an unlawful monopoly in the calsil market through the following forms of exclusionary conduct: (1) tying, (2) refusal to supply, (3) exclusive dealing, and (4) product disparagement.  Defendant argues that Plaintiff's allegations as to each category of exclusionary conduct "do not meet the applicable and well-established legal standards."  Mot. 12.  Plaintiff responds that each and all of the types of exclusionary conduct alleged, taken individually and together, constitute exclusionary conduct that demonstrate exclusionary intent. Resp. 14 n.7. As in the First Order, the Court will discuss each form of exclusionary conduct in turn.

1.    *Tying*

The parties do not distinguish between Plaintiff's tying allegations in support of its monopoly claim and Plaintiff's stand-alone tying claim.  *See* Mot. 12 n.5 ("In [FAC], [Plaintiff] does not distinguish between its tying allegations in support of its monopoly claim and its standalone tying claim.  Therefore, for all of the reasons stated in Section II.A., *supra*, [Plaintiff]'s tying allegations fail to support its monopolization claim."); Resp. 14.  Because Plaintiff plausibly states a stand-alone tying claim, Plaintiff plausibly alleges Defendant engaged in tying as exclusionary conduct in support of its monopolization claim.

2.    *Refusal to Supply*

Plaintiff next identifies Defendant's threats to refuse to sell its calsil to distributors who purchase calsil from Plaintiff, termed "refusal to supply," as exclusionary conduct supporting a monopolization claim.  FAC ¶¶ 121, 123-25.  Relevant to the parties' arguments on this category of alleged exclusionary conduct is the Plaintiff's previous allegations of "refusal to deal" as a category of exclusionary conduct in support of its original monopolization claim.

In the First Order, the Court noted that Plaintiff's refusal to deal allegations "could be read as advancing a refusal to deal theory on Defendants' threats to refuse to sell products to its customers if those customers purchased calsil from Plaintiff." *First Order* at *8. The Court determined, however, that Plaintiff distanced itself from this theory in its briefing and at oral argument. The Court found Plaintiff waived a monopoly claim based on Defendants' refusal to deal with its customers, because Plaintiff argued that refusals to deal only apply when a company refuses to deal with a competitor, not when a company refuses to deal with customers, and reiterated that this case did not involve Defendants' refusal to deal with Plaintiff. *Id*. at *8-9. The Court further noted that, even if Plaintiff had not waived, the Complaint would have failed to allege plausible exclusionary conduct based on the Defendants' alleged refusal to deal with its customers because businesses are free to choose whether or not to do business with others and the Complaint did not allege facts that Defendants threatened to discontinue preexisting courses of dealing or forsake short-term profits to achieve an anti-competitive end. *Id*. at *9 n.4.

In the current motion, Defendant argues that the Court's previous finding as to waiver and the inapplicability of the refusal to deal doctrine remains applicable because the FAC states, "[t]o be clear, [Plaintiff] is not alleging that [Defendant] refused to deal with [Plaintiff], which could invoke the refusal to deal with a rival antitrust doctrine." Mot. 12-13 (quoting FAC ¶ 125). It also contends that the FAC does not provide any facts indicating that Defendant's unilateral refusals to deal demonstrate a willingness to sacrifice short-term profits for an anticompetitive end. *Id*. at 13 n.8. Plaintiff responds that Defendant mischaracterizes its actual allegations and, thus, does not properly challenge them. Plaintiff continues that that the First Order is directed at an "inoperative pleading" and has no force on the FAC. Plaintiff further argues that the FAC "was filed afterward and clarifies the confusion—which [Defendant] exploits here—as to which theory is being

advanced." Resp. 16.  Defendant replies that Plaintiff's recasting of its allegations as "refusal to supply" is "inconsequential semantics" as it does not state any legal standard for its "refusal to supply" claim.  Reply 11.  Defendant continues that there is no difference between refusal to deal or exclusive dealing or "refusal to supply," and Plaintiff "does not contest that its [FAC] lacks facts alleging [Defendant]'s willingness to forsake short-term profits for an anticompetitive end." *Id*.

The Court agrees with Plaintiff that the First Order's finding of waiver has no force on the FAC.  In granting the first motion to dismiss, the Court found "one or more claims may be stated with sufficient particularity and, therefore, justice requires that leave to amend be granted to the Plaintiff."  *First Order* at *13.  Here, Plaintiff used the Court's leave to assert a new monopolization claim based on Defendant's refusal to sell or supply its calsil to customers with additional facts and a clarified the theory for the claim it is advancing.  Since the filing of the FAC, Plaintiff has done nothing to abandon this new claim and has only further clarified its position in its response brief and at oral argument.

"It's been said that anticompetitive conduct comes in too many forms and shapes to permit a comprehensive taxonomy."  *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1072 (10th Cir. 2013).  Although Plaintiff calls this category of exclusionary conduct "refusal to supply,"  it provides no case law about a separate or distinct category of exclusionary conduct about refusing to supply or sell to customers.  Because the alleged conduct appears as a variation on the traditional refusal to deal conduct, which entails an alleged monopolist's refusal to deal with its rivals, the Court borrows from traditional refusal to deal case law in evaluating Plaintiff's allegations.

"'[A]s a general rule . . . purely unilateral conduct' does not run afoul of section 2— 'businesses are free to choose' whether or not to do business with others and free to assign what

prices they hope to secure for their own products." *Novell, Inc.*, 731 F.3d at 1072 (quoting *Pac. Bell Tel. Co. v. Linkline Commc'ns*, 555 U.S. 438, 448 (2009)).  An exception to this "general rule of firm independence" occurs when there is a preexisting voluntary and presumably profitable course of dealing and the monopolist's discontinuation of the preexisting course of dealing "suggests a willingness to forsake short-term profits to achieve an anti-competitive end."  *Id.* at 1075-75 (quoting *Verizon Commc'ns v. Law Offices of Curtis v. Trinko*, 540 U.S. 398, 409 (2004)).

Plaintiff's allegations provide a plausible basis to infer Defendant's refusal to sell to customers runs afoul of Section 2 of the Sherman Act.  Plaintiff's allegations relating to Defendant's course of dealing with 4 State Supply suggest Defendant discontinued selling expanded perlite and calsil to that distributor to prevent future sales of Plaintiff's calsil.  FAC ¶¶ 108, 195 ("[Defendant] did in fact refuse to sell expanded perlite to at least one existing customer after that customer purchased TPSX-12™.").  Taken with Plaintiff's other allegations about Defendant's threats to distributors, *e.g., id.* at ¶ 146, a reasonable inference is that Defendant was willing to discontinue and did discontinue sales in order to prevent competition in calsil.

Defendant is free to provide a legitimate business justification for its refusals to sell its products to its customers.  However, at this stage Plaintiff has plausibly alleged Defendant's action, in effectively holding its products ransom from customers, constitutes a form of exclusionary conduct.  *See Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.*, 311 F. Supp. 2d 1048, 1105 (D. Colo. 2004) ("Anticompetitive or exclusionary conduct under section 2 is 'conduct constituting an abnormal response to market opportunities.'" (quoting *Multistate Legal Studies, Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publications, Inc.*, 63 F.3d 1540, 1550 (10th Cir. 1995))).

3.     *Exclusive Dealing*

The third type of exclusionary conduct Plaintiff alleges Defendant engaged in is exclusive dealing.  An exclusive dealing arrangement is an agreement in which a buyer agrees to purchase certain goods or services only from a particular seller for a certain period of time."  *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 270 (3d Cir. 2012).  Exclusive dealing arrangements are not unlawful in the absence of anticompetitive effects.  *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961).  To state a claim for unlawful use of exclusionary agreements under the Sherman Act, a plaintiff must show that a defendant's "exclusive dealing arrangements foreclose competition in a substantial share of the line of commerce affected." *Crocs, Inc. v. Effervescent, Inc.*, 248 F. Supp. 3d 1040, 1058 (D. Colo. 2017) (citing *Id.*).  A plaintiff must also show anticompetitive effects resulting from "a substantial foreclosure of their ability to compete in the relevant market." *Compliance Mktg., Inc. v. Drugtest, Inc.*, No. 09-cv-01241-JLK, 2010 WL 1416823, at *8 (D. Colo. Apr. 7, 2010) (citing *Tampa Elec. Co.*, 365 U.S. at 328).

In the First Order, the Court found that "[t]he Complaint does not allege sufficient facts suggesting that Defendants' actions have foreclosed a substantial share in the calsil market or Plaintiff's ability to compete in that market." *First Order* at *7.  The Court noted that the threats Plaintiff based its argument on were made to unidentified subjects in undefined areas of the country; therefore, it found, it could not determine the size of the allegedly foreclosed calsil markets or how much of the calsil market was involved in the exclusive dealing agreements.  *Id.*

Defendant contends that the FAC did not cure the deficiency of Plaintiff's original exclusive dealing allegations.  Specifically, Defendant argues that the FAC does not allege the broad foreclosure of calsil sales through implied or express exclusive dealing contracts.  Mot. 14. It continues that Plaintiff's allegation that Defendant has foreclosed nearly 100% of the calsil

**100**

market is conclusory and that the alleged threats were made to only certain locations of a small number of distributors.  Plaintiff responds that, "[t]o accurately convey the realities of the calsil market . . . certain of [its] exclusive dealing allegations refer to specific locations of certain distributors.  But, as with the tying allegations, these specific allegations do not imply that they are the only instances in which [Defendant]'s conduct has foreclosed competition in the calsil market."  Resp. 16.  Defendant replies that Plaintiff's "wholly conclusory" assertion of "near-total foreclosure" are not supported by the facts in the FAC.  Reply. 12

The Court disagrees with Defendant.  As noted in Section I.D., *supra*, while Plaintiff alleges a handful of specific instances when Defendant threatened distributors, it also alleges that those instances are exemplary of a broader pattern of conduct Defendant exhibited towards all distributors.  *See* Resp. 5; ECF 45 21:25-22:2 (Plaintiff noting that the specific examples are "not meant to suggest that . . . that conduct only was directed toward that distributor.")  Plaintiff alleges that

> "[Defendant]'s threats and other exclusionary conduct . . . have foreclosed [Plaintiff] and any other potential competitor from being able to sell calsil to otherwise willing customers throughout the country. Indeed, 216 of the five largest distributors' combined 218 locations nationwide do not purchase calsil from [Plaintiff] . . . . [Defendant] has engaged in the same conduct with respect to the smaller, independent distributors . . . and has likewise foreclosed [Plaintiff] from competing for calsil sales to those distributors."

FAC ¶¶ 158-59.  Examining Plaintiff's specific and general allegations together, and taking all reasonable inferences in Plaintiff's favor, the FAC plausibly alleges that Defendant's actions have foreclosed a substantial share of the calsil market or Plaintiff's ability to compete in that market.

### 4.   *Product Disparagement*

The final form of exclusionary conduct Plaintiff alleges Defendant engaged in is product disparagement.  "To prove that product disparagement rises to the level of exclusionary conduct,

the disparagement must overcome the presumption that the effect on competition is de minimis." *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 762 F.3d 1114, 1127 (10th Cir. 2014).  To rebut the de minimis presumption, Plaintiff must plausibly allege the disparagement was "(1) clearly false, (2) clearly material, (3) clearly likely to induce reasonable reliance, (4) made to buyers without knowledge of the subject matter, (5) continued for prolonged periods, and (6) not readily susceptible to neutralization or other offset by rivals."  *Id*.  The Court determined that Plaintiff's original product disparagement allegations failed to meet the third, fourth, fifth, and sixth factors.  *First Order* *10-11.

In the FAC, Plaintiff alleges product disparagement on four statement attributed Defendant's sales representatives.  First, in Spring 2018, a sales manager for Defendant and a manager at GI, told two Wyoming contractors that Plaintiff's calsil "may have asbestos and may put your customers and employees at risk."  FAC ¶ 164.  Next, in September 2018, Chad Meyer, a sales manager for Defendant, told the operations leader at APi that Plaintiff's calsil was "poor quality and cannot be trusted to meet 'specifications.'"  *Id*. at ¶ 163.  The third and fourth, at an unspecified times, Mr. Meyer told a branch manager for 4 State Supply that Plaintiff's calsil was "Chinese," asked why 4 State Supply "would want to 'risk buying an unproven product that may not meet the specifications.'"  *Id*. ¶ 173.  Plaintiff also alleges two of the five large distributors, GI and SPI, have heard Defendant's comments and "word gets around" a market with such concentrated buyers.  ECF 45 at 30:24-31:5 (citing FAC ¶¶ 164, 174).

Defendant contends that these are "essentially the same statements the Court rejected" in the First Order and argues that these renewed allegations again fail to meet the third, fourth, fifth, and sixth factors.  Mot. 16.  Plaintiff devotes only a single paragraph of its response to its disparagement allegations.  *See* Resp. 18.  It argues that it alleged the disparaging remarks had

more than a de minimis effect because it claimed, "that these comments were catastrophic to its business." *Id*.  It continues that "because many of the disparaging comments about [its] calsil were made directly to customers outside of [its] presence, [it] could not, at this stage, allege with specificity each disparaging statement." *Id*.  Defendant replies that Plaintiff has effectively conceded its disparagement claims because it made such a short response that did not address the six-factor test required to overcome the presumption that the effect of disparaging remarks on competition is de minimis.  Reply. 13.

Reviewing the FAC, the Court can reasonably infer that Plaintiff's allegations plausibly overcome the presumption that the effect on competition of Defendant's disparagement is de minimis.  As to the third factor,  Plaintiff alleges that Defendant "has a high degree of credibility in the industry," and notes Defendant's experience with asbestos liability.  FAC ¶¶ 166-169.  It is reasonable that Defendant's history with asbestos would give it credibility when discussing asbestos, products that could put buyers "at risk," or products fail to meet safety specifications.  Additionally, and importantly, given the scope of potential liability related to asbestos, buyers are very likely to rely on statements regarding its presence or related safety concerns rather than make a potentially business-ending purchase.  *See id*. at ¶ 166 (nothing Defendant's asbestos liabilities caused it to declare bankruptcy).

As to the fourth factor, Plaintiff alleges that Defendant targeted its disparagement to distributors that are its existing customers, all of whom but one have never purchased calsil from Plaintiff.  Because the vast majority of the audience were and are not present customers of Plaintiff, they do not have firsthand knowledge of Plaintiff's calsil.  As alleged misrepresentations bear on the quality and safety of Plaintiff's goods, firsthand knowledge is critical, particularly in a market where much of the sales and product information are conveyed through individualized

relationships with distributors.  Defendant cites the fact that Plaintiff included TPSX-12$^{TM}$ "test results" as part of its initial marketing materials to support the contention that the buyers who heard the remarks had knowledge of the subject matter.  Mot. 17 (citing FAC ¶ 42).  However, the test results Defendant refers to confirmed TPSX-12$^{TM}$ "meets or exceeds all physical property requirements of ASTM C533 Type I."  FAC ¶ 44.  It is not clear that that testing addressed asbestos or what specific information from the test results were included in the marketing materials.  It is also unclear how widely disseminated Plaintiff's marketing launch was.  Taking reasonable inference in Plaintiff's favor, it is reasonable the distributors that heard the disparaging remarks had no knowledge of TPSX-12$^{TM}$'s safety or quality.

As to the fifth factor, Plaintiff specifically alleges disparaging remarks were made throughout 2018.  Plaintiff alleges that in March of 2018, a sales representative for SPI stated, "that he believed 'Chinese' calsil could contain asbestos and SPI should not risk buying calsil from [Plaintiff]."  FAC ¶ 175.  Plaintiff continues that "these concerns no doubt originated from [Defendant's] false statements and it has been corroborated by other large Gulf Coast contractors that these statements were widely disseminated by [Defendant's] salespeople. *Id*.  It also provides examples from Spring 2018 and from September 2018.  *Id*. at ¶¶ 135, 164.  Nothing in the FAC indicates that these specific examples are the only instances of Defendant's disparaging remarks.  Plaintiff alleges that "[Defendant] disparaged TPSX-12™ to other individual customers at other times, but [it] would have no way to know of every such instance, especially before discovery." *Id*. at ¶ 174.  Limiting the assessment of Plaintiff's disparagement allegations to those few examples is inappropriate as a reasonable inference in Plaintiff's favor is that Defendant made disparaging remarks about Plaintiff's calsil throughout 2018, as Plaintiff was launching its calsil into the market.

Finally, Plaintiff plausibly alleges that Defendant's disparagement is not readily susceptible to neutralization or other offset by rivals.  Defendant's disparagement includes that Plaintiff's calsil "may have asbestos and may put [] customers and employees at risk."  *Id*. ¶ 164. Plaintiff claims that "[p]otential liability from possible asbestos exposure is so great that no reasonable customer would buy a product where there was any question about the presence of asbestos, no matter how much the seller assures them that the product does not contain asbestos." *Id*. at ¶ 171.  It also provides some context on asbestos liability, noting that asbestos products cause mesothelioma and other disease in workers and their families and that "[i]n 1982, [Defendant] declared bankruptcy to escape its asbestos liabilities.  A trust was established in 1988 to pay claims directly to asbestos victims and their families that is currently valued at $2.5 billion." *Id*. at ¶ 166.  Plaintiff also alleges a specific example of a "failed attempt" to assuage a potential buyer's asbestos concerns, that "[s]uch rumors, once started, are not easy to dispel," and that "it could take many years to do so."  *Id*. at ¶ 175.  Given the seriousness of allegations of asbestos, especially in the industrial insulation community, and the fact that all of Defendant's disparagement relates to the safety and quality of Plaintiff's calsil, it is more than plausible that such statements are not readily susceptible to neutralization.

Taking Plaintiff's allegations together, the Court finds that it plausibly pleads exclusionary conduct under theories of tying, refusal to supply, exclusive dealing, and product disparagement. Accordingly, Plaintiff has sufficiently supported the second element of its monopolization claim.

B.      Harm to Competition

Defendant also argues that Plaintiff's monopolization claims fails because Plaintiff does not plead an antitrust injury, which requires allegations of harm to competition, not just harm to a plaintiff competitor.  Mot. 12 n.7.  It contends that Plaintiff's alleged injury is that it failed to

quickly gain market share.   Defendant's minimal argument overlooks Plaintiff's numerous allegations of injury to competition alleged throughout the FAC.   As noted in Section I.D., *supra*, Plaintiff contends that Defendant's exclusionary and anticompetitive conduct caused limitation of customer choice of suppliers, increased prices, and reduction in calsil output.   FAC ¶¶ 115, 118. Plaintiff also alleged "consequences for distributors' abilities to compete."   *Id.* at ¶ 108.

Because Plaintiff sufficiently alleged exclusionary conduct and harm to competition as a result of Defendant's actions, Plaintiff states a plausible claim for monopolization.   Defendant's motion as to Plaintiff's monopolization claim is denied.

## III.    False Advertising

Finally, Plaintiff reasserts a claim for false advertising in violation of Section 43(a) of the Lanham Act.   To state a false advertising claim under this provision, a plaintiff must allege: "(1) that [the] defendant made material false or misleading representations of fact in connection with the commercial advertising or promotion of its product; (2) in commerce; (3) that are either likely to cause confusion or mistake as to (a) the origin, association or approval of the product with or by another, or (b) the characteristics of the goods or services; and (4) injure the plaintiff." *Intermountain Stroke Ctr., Inc. v. Intermountain Health Care, Inc.*, 638 F. App'x 778, 784 (10th Cir. 2016) (internal quotation marks omitted).   For misrepresentations to constitute "commercial advertising" or product promotion, the misrepresentations must, among other things, "be disseminated sufficiently to the relevant purchasing public to constitute 'advertising' or 'promotion' within that industry."   *Proctor & Gamble Co. v. Haugen* (*P & G*), 222 F.3d 1262, 1274 (10th Cir. 2000) (quoting *Gordon & Breach Science Publishers, S.A. v. Am. Inst. of Physics*, 859 F. Supp. 1521, 1535-36 (S.D.N.Y. 1994)).

A.      Dismissal of Plaintiff's Original Claim and Plaintiff's Amended Claim

Plaintiff relied on five alleged misrepresentations—mostly statements by Defendant's sales managers to unidentified calsil customers—to support its original false advertising claim.[2]  In the First Order, the Court found that Plaintiff failed to specifically allege that the representations were sufficiently disseminated to constitute commercial advertising or promotion.   The Court determined that, because Plaintiff did not specify the number of calsil purchasers in the market or the identity of the customers told the representations, Plaintiff's allegations required an unreasonable "double-layered" inference to reach the conclusion that the statements were sufficiently disseminated in the relevant market.

In its FAC, Plaintiff makes allegations that address both of the original claim's informational shortcomings identified by the Court.  As to the number of purchasers in the calsil market, Plaintiff alleges that five major distributors account for 85 percent of calsil sales, FAC ¶¶ 17-19, and estimates that "approximately ten or fewer" smaller, independent distributors account for the remaining 15 percent, *id.* at ¶¶ 87, 102.  Noted below, Plaintiff identifies APi and 4 State Supply, two of the smaller distributors, as the recipients of the alleged misrepresentations by Defendant's sales managers.

Plaintiff's current Lanham Act claim is based on six alleged misrepresentations,[3] the first four of which are the statements recounted in Section II.A.4., *supra*, that Plaintiff relies on for its

---

[2]  First, in Spring 2018, an unidentified sales representative told two Wyoming contractors that Plaintiff's calsil "'may have asbestos.'"  Compl. ¶ 89.  Second, in September 2018, Chad Meyer, a sales manager for Defendant, told an unidentified customer that Plaintiff's calsil was "poor quality and cannot be trusted to meet 'specifications.'"  *Id.* ¶¶ 85-88.  In October 2018, Mr. Meyer told a different customer that Plaintiff's calsil was "Chinese."  *Id.* ¶ 96.  He also asked that customer why it "would want to 'risk buying an unproven product that may not meet the specifications.'"  *Id.* ¶¶ 94-96.  Lastly, the fifth statement was that at some unspecified time to an unidentified entity, Defendants claimed TPSX-12™ was "substandard."  *Id.* ¶ 99.

[3] In addition to these six statements, Plaintiff also alleges that Defendant claimed Plaintiff's calsil was "substandard" and "an 'unknown' factor."  FAC ¶¶ 180, 182, 219, 220.  Neither party

product disparagement argument.  In addition to those four statements, at an unspecified time Mr.

Meyer represented to a branch manager for 4 State Supply that Defendant had never sold calsil

produced in China.  FAC ¶ 178.  Sixth, Plaintiff identifies a statement on the "Frequently Asked

Questions" ("FAQ") page of Defendant's website which reads:

> Does anyone else manufacture water resistant calcium silicate?
> Johns Manville Industrial Insulation Group is the only insulation manufacturer in North
> America to produce water resistant calcium silicate.  While we are aware of one other
> manufacturer in Asia that produces water resistant calcium silicate, it is an expensive,
> custom-order product that is not readily available.

*Id*. at ¶ 176.

In their briefing, the parties addressed the representations attributed to Defendant's sales

managers collectively, and separately addressed the representation on Defendant's FAQ webpage.

The Court, therefore, does the same.

> B.      Whether Plaintiff States a Claim Based on the Representations by Defendant's
>          Sales Managers

In its motion, Defendant only disputes the sufficiency of Plaintiff's allegations with regard

to the first element of its Lanham Act claim, that the Defendant made material false or misleading

representations of fact in connection with the commercial advertising or promotion of its product.

Specifically, Defendant contends that Plaintiff's renewed allegations regarding its sales managers'

misrepresentations still fail to show the disparaging comments were widely publicized within the

calsil industry to constitute commercial advertising or promotion.  Defendant makes no argument

that Plaintiff fails to plausibly allege the remaining three elements.

Defendant argues that Plaintiff alleges only two of an unspecified number of smaller

distributers were told disparaging remarks, and that Plaintiff does not specify how much of the

addresses these statements and Plaintiff does not rely on them in its response to Defendant's
motion.

calsil market is control by those two distributors.  Mot. 19-20.  Therefore, Defendant concludes, these allegations still fail to show the disparaging comments were widely publicized within the calsil industry.   Plaintiff responds that the sales managers' misrepresentations constitute commercial advertising or promotion because "informal" means of communication—like in-person meetings, social gatherings, social media, and email—as opposed to traditional media are the primary means of commercial promotion in the calsil market.  Resp. 19.  In support, Plaintiff relies on *Grubbs v. Sheakley Group, Inc.*, 807 F.3d 785, 801 (6th Cir. 2015), for the proposition that "commercial advertising" includes "targeted communications to a substantial portion of a company's existing . . . client base."  Plaintiff continues that because only five distributors account for 85 percent of sales, a relatively small number of comments can reach wide dissemination in the market.  Defendant replies that Plaintiff's argument that unidentified and informal private communications constitute commercial advertising is unsupported by case law.  Reply 14.  It further contends that *Grubbs* fails to support Plaintiff's argument because the facts in that case, in which an email sent to all twenty-three of the plaintiff's customers was deemed commercial promotion, "are nothing like" the facts alleged by Plaintiff here.  *Id*. at 14-15.

At oral argument, Defendant reiterated its contention that *Grubbs* does not support Plaintiff's position and stated that *Grubbs* requires alleged misrepresentations to be part of an organized campaign to penetrate the market in order to meet the public dissemination test for commercial advertising.  ECF 45 at 19:3-8.  Plaintiff responded that *Grubbs* is "squarely on point," *id*. at 30:13, and that the case "basically held for the proposition that . . . commercial advertising doesn't just look like TV ads . . . it's e-mail, it's in-person communication, and in this particular instance, personal contacts are the primary method of advertising," *id*. at 30:13-20.  As was noted above, Plaintiff also alleges GI and SPI have heard Defendant's comments and "word gets

around."  *Id*. at 30:24-31:5 (citing FAC ¶¶ 164, 174).  Plaintiff maintains that Defendant's comments were part of an organized campaign, "although it may look informal or behind the scenes." *Id*. at 31:11.

The Court agrees with Plaintiff and finds that, based on the allegations in the FAC, it can reasonably infer that the alleged misrepresentations attributed to Defendant's sales managers were sufficiently disseminated to the relevant purchasing public to constitute commercial advertising or promotion in the calsil market.  Therefore, as discussed below, Plaintiff states a plausible claim for false advertising under the Lanham Act based on the misrepresentations attributed to Defendant's sales managers.

First, the fact that Plaintiff alleges that the misrepresentations were made through "informal" means of communication, like in-person meetings and email, does not automatically defeat Plaintiff's claim.  Despite Defendant's contention that Plaintiff "attempts to redefine the meaning of commercial advertising or promotion," Reply 14, it has been long recognized that misrepresentations "need not be made in a 'classical advertising campaign'" to constitute commercial advertising or promotion under Section 43(a), "but may consist instead of more informal types of 'promotion.'" *Gordon & Breach Science Publishers, S.A.*, 859 F. Supp. at 1535-36; *P & G*, 222 F.3d 1262, 1273-74 (10th Cir. 2000); *Coastal Abstract Serv., Inc. v. First Am. Tit. Ins. Co.*, 173 F.3d 725, 734 (9th Cir. 1999); *Seven-Up Co. v. Coca-Cola Co.*, 86 F.3d 1379, 1384 (5th Cir. 1996).  Plaintiff's reliance on *Grubbs*, in which the Sixth Circuit held that the plaintiff stated a claim for false advertising based on an email sent to twenty-three customers, is justified in so far as that case also supports the proposition that informal means of communication can support a false advertising claim under the Lanham Act.

For purposes of the Lanham Act's definition of "commercial advertising or promotion," the level of circulation required for a misrepresentation to be sufficiently disseminated "will vary according to the specifics of the industry." *Seven-Up Co.*, 86 F.3d at 1385.  In a particularly small or concentrated market, a misrepresentation made to a single member of the relevant purchasing public could support a false advertising claim.  *See id.* at 1386 ("Where the potential purchasers in the market are relatively limited in number, even a single promotional presentation to an individual purchaser may be enough to trigger the protections of the Act."); *see also Coastal Abstract Serv., Inc.*, 173 F.3d 725, 735 (9th Cir. 1999) (concluding the district court was correct that a representation to a single institution was disseminated sufficiently that is could constitute a "promotion" when the evidence showed that there were only two or three institutions involved in the same kind of operation); *Porous Media Corp. v. Pall Corp.*, 173 F.3d 1109, 1121 (8th Cir. 1999) (affirming a jury verdict for the plaintiff when the facts showed defendant sent misrepresentations to "only five recipients" but the relevant market had a "concentrated structure" and was dominated by a small number of companies.); *Suntree Techs., Inc. v. Ecosense Int'l, Inc.*, 693 F.3d 1338, 1349 (11th Cir. 2012) ("We agree . . . that where the customer market is particularly small, courts may find a statement to be sufficiently disseminated to constitute 'commercial advertising or promotion,' even though only distributed to a few customers (or even one)." (internal quotations omitted)); *LidoChem, Inc. v. Stoller Enterprises, Inc.*, 500 F. App'x 373, 381 (6th Cir. 2012) (concluding a reasonable factfinder could determine that the defendant's statements to a single farmer and a single distributor were disseminated widely enough to the relevant purchasing public to constitute promotion within the "relatively small" western-Michigan farm-chemical industry).

In the FAC, Plaintiff alleges the purchasers in the calsil market are five large, national distributors and "approximately ten or fewer" smaller, independent distributors. Plaintiff explicitly alleges that Defendant's sales managers made misrepresentations to APi and 4 State Supply, two of the smaller calsil distributors. Plaintiff also mentions that two of the five larger distributors, GI and SI, have heard the misrepresentations regarding Plaintiff's calsil from Defendant's salespeople. FAC ¶¶ 164, 175. Plaintiff continues that "other Gulf Coast contractors" have corroborated the suspicion "that these statements were widely disseminated by Johns Manville salespeople." *Id*. at ¶ 175. This allegation comports with Plaintiff's contention that the efforts to spread these misrepresentations were part of an organized campaign by Defendant, despite the statements' informal or behind the scenes methods of communication. *See id*. at 174 ("[Defendant] also knew that like many industry communities, 'word gets around,' and making false statements to some distributors and end-users that [Plaintiff']'s calsil contains asbestos or is defective is an explosive enough claim that the vast majority of potential purchasers of calsil—both distribution and contractor—would hear of and believe these false claims.")

Taking all reasonable inferences in Plaintiff's favor, it is sufficiently plausible that the misrepresentations were effectively disseminated to the relevant purchasing public to constitute 'advertising' or 'promotion' within the calsil industry. The statements were conveyed to at least two large and two small distributors out of a population of only fifteen or so. The industry is structured around distributer-manufacturer relationships and relies on informal means of communication as the primary means of commercial promotion. While the Court is not saying these misrepresentations were sufficiently disseminated in fact, the operative question at this stage is whether Plaintiff plausibly alleges they were. The Court finds it has done this. Therefore,

Plaintiff states a plausible claim for false advertising under the Lanham Act based on misrepresentations attributed to Defendant's sales managers.

C.   <u>Whether Plaintiff States a Claim Based on Defendant's Frequently Asked Questions Webpage</u>

Defendant makes three arguments as to why Plaintiff fails to state a Lanham Act claim based on the representation on Defendant's FAQ webpage. First, Defendant notes that the FAQ statement does not refer to Plaintiff or Plaintiff's calsil by name. Second, Defendant continues that Plaintiff fails to provide any non-conclusory facts that the FAQ statement is false or material. Lastly, Defendant argues Plaintiff fails to allege that is has been injured by the state on the FAQ webpage. Plaintiff responds that Defendant's contention that the FAQ statement does not identify Plaintiff by name is "specious," because there is no other calsil in the market, so any visitor to the website would know the statement is referring to Plaintiff. Resp. 20. In reply, Defendant notes that Plaintiff does not respond to Defendant's arguments regarding the statement's falsity and materiality or Plaintiff's injury.

The Court agrees with Defendant that Plaintiff fails to plausibly allege the statement on Defendant's FAQ webpage caused Plaintiff injury, as required to state a false advertising claim. Plaintiff's sole allegation as to injury caused by the FAQ statement is that "[t]hese claims are literally false and important and material facts in the decision-making for contractors that *could* demand TPSX-12™ from their distributors that *could* supply the product." FAC ¶ 177 (emphasis added). Plaintiff does not allege, for example, that any of its customers or potential customers viewed this webpage or that Plaintiff lost sales because of the FAQ statement. This allegation is too speculative for the Court to reasonably infer the misrepresentation injured Plaintiff. Accordingly, the statement made on the FAQ webpage does not plausibly support a false advertising claim under the Lanham Act.

## CONCLUSION

In sum, after reviewing the Complaint, the parties' briefing, and the oral argument, the Court concludes that Plaintiff has stated plausible claims for tying and monopolization under the Sherman Act, and false advertising under the Lanham Act based on the alleged misrepresentations attributed to Defendant's sales agents. Accordingly, Defendants' Motion to Dismiss Plaintiff's First Amended Complaint [filed August 21, 2019; ECF 36] is **granted in part and denied in part**.

Dated at Denver, Colorado, this 23rd of March, 2020.

BY THE COURT:

Michael E. Hegarty
United States Magistrate Judge

114

# ATTACHMENT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-00872-MEH

CHASE MANUFACTURING, INC.,

      Plaintiff,

v.

JOHNS MANVILLE CORPORATION,

      Defendant.

_____

## ORDER
_____

**Michael E. Hegarty, United States Magistrate Judge.**

Before the Court is Defendant's Motion for Partial Summary Judgment. ECF 76. The matter is fully briefed, and the Court heard oral argument on November 9, 2020. For the following reasons and based on the submitted record, Defendant's motion is **denied**.

## BACKGROUND

### I.     Procedural History

In its First Amended Complaint ("FAC") (ECF 30), Plaintiff brings claims for tying and monopolization in violation of the Sherman Act, 15 U.S.C. § 2. The Court discussed Plaintiff's allegations of anticompetitive conduct in its Fed. R. Civ. P. 12(b)(6) ruling at *Chase Mfg., Inc. v. Johns Manville Corp.*, No. 19-cv-00872-MEH, 2020 WL 1433504 (D. Colo. 2020). In short, Plaintiff alleges that Defendant's conduct in the sale of the insulation product calsil violates the Sherman Act.

Defendant moves for summary judgment on the issue of how the relevant market for the subject product should be defined for purposes of resolving the antitrust claims. Plaintiff defines the relevant product market as all product sales by the product's manufacturers to the usual direct

**116**

purchasers who it contends are distributors and, to a lesser extent, contractors. Plaintiff thereby limits the relevant product market to the first link in the supply chain, *i.e.*, the upstream product market. Defendant argues that the relevant product market is broader and should also include the product's downstream end users, in which case certain substitutes for calsil would be included. Defendant contends that because Plaintiff has not properly defined the valid product market, its Sherman Act claims must be dismissed.

## II.     Material Undisputed Facts

Both parties present statements of material fact to describe the product, how it is used, and how it is bought and obtained. The parties rely primarily on their respective witness's declarations. Defendant relies on the declarations of David C. Skelly. ECF 76-1 and ECF 88-1. Mr. Skelly works for Defendant as its General Manager of Performance Materials and is familiar with its industrial insulation business. Plaintiff relies on the declaration of David Shong. ECF 87-1. Like Mr. Skelly, Mr. Shong has many years of experience with mechanical insulation. Mr. Shong once worked for Defendant. He now serves as Plaintiff's president. Also proffered into evidence is Plaintiff's press releases and marketing materials (ECF 76-4) as well as a document filed under seal (ECF 89). Most of the parties' objections consist of supplementing the other side's statements with additional or clarifying comments.

The Court finds the following material undisputed facts viewed in the light most favorable to the Plaintiff, who is the non-moving party in this matter.

1.      Defendant manufactures calsil. Skelly Decl., ¶ 1, ECF 76-1. Both Plaintiff and Defendant sell calsil in the United States. Shong Decl., ¶ 8, ECF 87-1; Skelly Decl., ¶ 1, ECF 76-1; TPS Calsil News Releases, ECF 76-4. The parties identify no other maker or seller of calsil presently

in the United States. Before Plaintiff began importing calsil from China in 2018, Defendant was the sole supplier of calsil in the United States. Shong Decl., ¶ 8, ECF 87-1.

2.      Calsil is a mechanical insulation material used in industrial or equivalent commercial settings where extreme temperatures are present. Shong Decl., ¶ 5, ECF 87-1; Skelly Decl., ¶ 2, ECF 76-1; Skelly Supplemental Decl., ¶¶ 6-7, ECF 88-1. It has other attributes that may cause it to be chosen for use in a particular setting. Shong Decl., ¶¶ 15-19, ECF 87-1.

3.      Calsil itself is a generic commodity. The type of calsil that is sold in North America must be of a specific grade as set by industry standards. Skelly Decl., ¶¶ 13, 15, ECF 76-1. For purposes of this ruling, the word "calsil" refers to ASTM C533 Type I, which is the kind that Plaintiff sells in the United States. Shong Decl., ¶ 6, ECF 87-1.

4.      There are some other materials that may be used as a mechanical insulator. Skelly Decl., ¶ 13, ECF 76-1. Ultimately, it is the engineer who decides what type of insulation, including calsil, is best suited for a particular function or need. Shong Decl., ¶¶ 12, 38, ECF 87-1; Skelly Decl., ¶ 8, ECF 76-1. Product price may play a role in the "value engineering" situation as an overall cost-saving strategy at the end of a project. Skelly Supplemental Decl., ¶ 13, ECF 88-1

5.      Often the engineer specifies the insulator by reference to its ASTM number. Shong Decl., ¶ 33, ECF 87-1.

6.      The contractor then obtains the specified insulating material from the distributor. Shong Decl., ¶¶ 29, 30, 39-44, ECF 87-1.

7.      The contractor installs the calsil at the project site in compliance with the engineer's specifications. Shong Decl., ¶ 31, ECF 87-1, Skelly Decl., ¶ 8, ECF 76-1.

8.      Distributors provide the primary conduit through which calsil moves from manufacturer to project site. Shong Decl., ¶¶ 9, 12, ECF 87-1.   Both Plaintiff and Defendant sell the majority of

their calsil to distributors, Skelly Decl., ¶ 6, ECF 76-1; ECF 89, although both sell to contractors

on occasion. Shong Decl., ¶¶ 7, 10, 11, ECF 87-1. *See* FAC ¶ 17, ECF 30 at 5. Distributors, in

turn, sell calsil to contractors. Skelly Decl., ¶ 7, ECF 76-1; Shong Decl., ¶ 11, ECF 87-1.[1]

9.      Distributors serve an important intermediary role in supplying calsil to contractors.

Distributors provide warehouse and logistics services. Skelly Decl., ¶¶ 8-9, 14, ECF 76-1. They

source the needed product, advise in the decision of which brand to obtain, and provide financing.

They provide complementary products and sometimes fabrication services. Shong Decl., ¶¶ 45,

50-55, ECF 87-1; Skelly Decl., ¶¶ 8-9, ECF 76-1. Contractors maintain relationships with

multiple distributors by which to hedge product availability and price. That dynamic serves to

lower product price. Skelly Supplemental Decl., ¶ 14, ECF 88-1.

10.     There are five major distributors of mechanical insulation. They—along with smaller

distributors—account for the large majority of total calsil sales. Shong Decl., ¶ 10, ECF 87-1.

11.     Defendant seeks to influence downstream actors' product choices. Shong Decl., ¶ 23, ECF

87-1; Skelly Decl., ¶¶ 4, 10, 12, ECF 76-1. Manufacturers also compete at the distributor level.

Skelly Decl., ¶ 12, ECF 76-1.

## LEGAL STANDARDS

A motion for summary judgment serves the purpose of testing whether a trial is required.

*Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1185 (10th Cir. 2003).   A court shall grant summary

judgment if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show

there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter

---

[1]  The Court notes here that Defendant alleges there are direct sales of "industrial insulation" from a distributor to a facility owner. Skelly Supplemental Decl., ¶ 9, ECF 88-1.   Mr. Skelly does not state that calsil is one such product, nor is this fact undisputed, because it was raised in the reply.

of law.   Fed. R. Civ. P. 56(c).   A fact is material if it might affect the outcome of the suit under the governing substantive law.   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The moving party bears the initial responsibility of providing to the court the factual basis for its motion.   *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).   "[W]here the moving party has the burden of proof—the plaintiff on a claim for relief or the defendant on an affirmative defense—the showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party."   *Leone v. Owsley*, 810 F.3d 1149, 1153 (10th Cir. 2015) (quoting *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986)).   "In other words, the evidence in the movant's favor must be so powerful that no reasonable jury would be free to disbelieve it. Anything less should result in denial of summary judgment."   *Id.* at 1154 (quoting 11 Moore's Federal Practice, § 56.40[1][c] (Matthew Bender 3d Ed. 2015)).   Only evidence for which the content and substance are admissible may be considered when ruling on a motion for summary judgment.   *Johnson v. Weld Cty., Colo.*, 594 F.3d 1202, 1210 (10th Cir. 2010).

If the movant properly supports a motion for summary judgment, the non-moving party has the burden of showing there are issues of material fact to be determined.   *Celotex*, 477 U.S. at 322.   That is, the opposing party may not rest on the allegations contained in its complaint but must respond with specific facts showing a genuine factual issue for trial.   Fed. R. Civ. P. 56(e); *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."); *see also Hysten v. Burlington N. & Santa Fe Ry.*, 296 F.3d 1177, 1180 (10th Cir. 2002).   These specific facts may be shown "'by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves.'"   *Pietrowski v. Town of Dibble*, 134 F.3d 1006, 1008 (10th Cir. 1998) (quoting

*Celotex*, 477 U.S. at 324); *see also Mountain Highlands, LLC v. Hendricks*, 616 F.3d 1167, 1170 (10th Cir. 2010) ("On those issues for which it bears the burden of proof at trial, the nonmovant "must go beyond the pleadings   and designate specific facts so as to make a showing sufficient to establish the existence of an element essential to [its] case in order to survive summary judgment.") (quoting *Cardoso v. Calbone*, 490 F.3d 1194, 1197 (10th Cir. 2007)).   "The court views the record and draws all inferences in the light most favorable to the non-moving party." *Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. Pepsico, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005).

## ANALYSIS

Defining the "relevant product market" is a threshold inquiry in an antitrust case. It helps to identify the framework within which the antitrust claims will be considered. *Auraria Student Hous. at the Regency, LLC v. Campus Village Apartments, LLC*, 843 F.3d 1225, 1244 (10th Cir. 2016);   *Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.*, 311 F. Supp. 2d 1048, 1074-75 (D. Colo. 2004) (citing *Telecor Commc'ns, Inc. v. Sw. Bell Tel. Co.*, 305 F.3d 1124 (10th Cir. 2002)). Product market definition is a question of fact for the factfinder; it also is an issue for which Plaintiff has the burden of proof. *Nobody*, 311 F. Supp. 2d at 1075. *See Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 762 F.3d 1114, 1120 (10th Cir. 2014) ("The differing definitions create a fact question on the product market, precluding summary judgment. "). Plaintiff must propose a relevant product market that comports with the legal standard and is supported by evidence. *Green Country Food Mkt., Inc. v. Bottling Grp., LLC*, 371 F.3d 1275 (10th Cir. 2004) (considering the issue under the Fed. R. Civ. P. 56(c) standard); *Campfield v. State Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111, 1118 (10th Cir. 2008) (considering the issue under the Fed. R. Civ. P. 12(b)(6) standard).

## I.       Concept of the "Relevant Product Market"

The "product market" consists of the full range of products that are reasonably interchangeable for the purpose for which they are produced in terms of price, use, and qualities. *Auraria*, 843 F.3d at 1245. It includes not only the product at issue in the case but also those products that are its equivalent. It means those products for which "cross-elasticity of demand" exists, that is, those products for which a change in price for one will affect the demand of the other. *Compliance Mktg., Inc. v. Drugtest, Inc.*, No. 09-cv-01241-JLK, 2010 WL 1416823, at *7 (D. Colo. Apr. 7, 2010). The focus of inquiry is on demand and thus the relevant set of customers. *Nobody*, 311 F. Supp. 2d at 1076. An antitrust plaintiff must define a product market that is broad enough to reflect the real economic market at issue. *Auraria*, 843 F.3d at 1245. The "relevant" product market, in turn, is the product market that is relevant to the antitrust claims. It may consist of a sub-market that focuses on the level of commerce where the anticompetitive practices allegedly occur. Therefore, it is possible that the relevant product market may exclude the end user[2] of the product. *Nobody*, 311 F. Supp. 2d at 1076.   Plaintiff does not seek to assert a sub-market here.

## II.      Competing Product Market Definitions

Defendant's motion makes good points.   Its briefing is persuasive but, ultimately in my view, not dispositive at the summary judgment stage.   Plaintiff has moved the needle sufficiently to create a fact issue for the jury, based on the following discussion

At the oral argument in this case, in response to the Court's inquiry, Plaintiff defined the relevant product market as all sales of calsil by calsil manufacturers (which in North America are

---

[2] An "end user" for this ruling is the owner of the industrial or commercial facility where the calsil will be installed. Shong Decl., ¶ 46, ECF 87-1; Skelly Decl., ¶ 8, ECF 76-1.

only Plaintiff and Defendant). Defendant argued that this definition is a modification of the FAC. Construing the record and drawing all inferences in the light most favorable to the non-moving party, here the Plaintiff, this market definition is supported by the FAC and the exhibits to the summary judgment briefing. The buyers in the proposed relevant product market are those who buy calsil from the manufacturers "directly," by which Plaintiff means the distributors (who are the predominate purchasers) and also contractors (to a lesser extent). Defendant argues that Plaintiff's proposed relevant product market is too narrowly defined as a matter of law.   At this summary judgment stage, the Court finds that the defined product market passes muster.

First, Defendant does not demonstrate the product market that is relevant to this case must include calsil's "end users." Defendant is correct that those end users are the ultimate destination of the product. However, regular market forces such as price do not necessarily affect end user demand. Instead, the primary direct sources of "demand" for calsil are the project engineers who choose it based on range of factors including technical ones. Once an engineer specifies calsil for a particular project, the contractor is obligated to obtain it absent some later project plan change. Although an industrial or commercial facility owner may be the "end user" of the product in the sense of owing the property where it is installed, the record establishes that this end user does not directly select calsil; on rare occasion, when calsil has been selected for a project by the engineer, the end user may purchase additional supply for future repair/replacement purposes.

Second, Defendant does not show how Plaintiff's primary focus on the distributor link of the supply chain is artificially too narrow. It is undisputed that distributors play an important role in supplying calsil to projects. While some calsil sales may bypass the distributors, most do not. That implies that the distributor model is overall more efficient than the direct sale alternative. The cases of *McWane, Inc. v. F.T.C.*, 783 F.3d 814 (11th Cir. 2015), *Sterling Merch., Inc. v. Nestle,*

*S.A.*, 724 F. Supp. 2d 245 (D.P.R. 2010), and *U.S. v. Dentsply Int'l, Inc.*, 399 F.3d 181 (3d Cir. 2005) address similar distribution models where the relevant product market properly excluded end customers. In *McWane*, for example, the plaintiff entered the market as a new maker of the product, and the defendant sought to protect its position as the established, predominate seller by coercing distributors to avoid the new entrant. Distributors provided a range of services that coordinated the provision of the product to its end use. *McWane* also involved a marketplace where product demand was inelastic to price. *McWane* affirmed an order directing the established seller not to require exclusivity from distributors. *See McWane*, 783 F.3d at 819. Distributors in the calsil market likewise have a heightened importance. Plaintiff alleges that Defendant focused its anticompetitive acts at the distributor level as its means to defend its position as the primary seller of calsil.

Limiting the "customers" of calsil to distributors (and to a lesser extent, contractors), *i.e.*, all direct purchasers of calsil from a manufacturer, is not artificial or too narrow. Defendant does proffer evidence of some sales of "insulation materials" that bypass distributors and contractors. Defendant also proffers evidence that it communicates with end users. However, Defendant fails to establish a material undisputed fact that such sales activity is a material exception to what is otherwise a distributor-dominated structure. Defendant does not show in this case the kind of broader market that *Westman Comm'n Co. v. Hobart Int'l, Inc.*, 796 F.2d 1216 (10th Cir. 1986) discussed. *Westman* addressed the situation in which different dealer types—in addition to the full-line, or "one-stop shopping," kind of distributor—were active in the market. Given that wide range of dealer types (as well as the presence of many manufacturers selling the product and the substantial elasticity between the different product brands), *Westman* found restricting the relevant product market to just the full-line distributors incorrect. *Id.* at 1221.

As the Court perceives Defendant's argument, it is quite similar to that rejected in *Telecor Commc'ns, Inc. v. Sw. Bell Tel. Co.*, 305 F.3d 1124, 1132 (10th Cir. 2002).   In that case, which involved competitive access to the installation of pay (landline) telephones in storefront locations, the court stated:

> [T]he Plaintiffs argue that Southwestern Bell's interchangeability argument is wrongly directed at showing that cell phones and pay phones are interchangeable for end-users, but that is not the market where the Plaintiffs are complaining of Southwestern Bell's anti-competitive behavior. Rather, it is the location owners who define the market where the anti-competitive behavior took place—that is, the Plaintiffs claim that they compete with Southwestern Bell for locations upon which to place their pay phones, and that is the market Southwestern Bell has monopolized.

*Id.* at 1132-33.   In *Telecor*, as here, plaintiffs complained of defendant's anticompetitive conduct at the intermediate level, while defendant wanted to focus on the ultimate consumer.   Also in *Telecor,* as here, plaintiffs used *United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377 (1956) to justify a focus on the ultimate consumer.   The court stated in *Telecor* that *du Pont* involved an indisputably "consumer market" (cellophane wrap and other flexible wrapping material) and, thus, justified a focus on that end user.   Plaintiff's theory here focuses on the ability to market the product to the distributor (the middleman, of sorts).   Here, as in *Telecor*, the plaintiffs' antitrust theory was that "distributors" (the location owners) were consumers of the "product" (placement of pay phone facilities on their locations), and that ability to sell to distributors (in *Telecor*, the price for such location placements) was affected by defendant's monopolistic conduct.   Of the cases upon which the parties rely, *Telecor*'s analysis is the most persuasive.

Lastly, Defendant fails to establish as an undisputed fact that calsil is reasonably interchangeable with other insulators. Plaintiff proffers evidence that calsil is a product with unique technical characteristics. While there may be some other products similarly usable, the

criteria by which an engineer may choose one over calsil appears on the available record to be a complicated, technical matter. The degree to which the insulation products are interchangeable remains a question of fact. Consequently, Defendant fails to show how limiting the relevant product market to just calsil is erroneous as a matter of law. If the relevant product market is limited to just calsil, then expanding it to include end users has no practical effect. It does not expand the range of sellers. Nor does it expand in any significant way end users' options for obtaining calsil for use in their projects.

## **CONCLUSION**

Defendant fails to show on the undisputed fact record how Plaintiff's definition of the relevant product market is factually and legally inadequate. The facts show that calsil is a product that is used to meet highly technical needs in industrial or equivalent settings, and that the choice to use it is likewise technical in nature. The processes for obtaining and installing it at a project site involve many actors, and distributors play the critical role in providing calsil to contractors and to others who seek it for project needs. Moreover, the record shows that calsil far more often flows through distributors rather than bypasses them, although that is not inevitably the case. There may be times when calsil does bypass the distributors, and the Defendant may attempt to influence those actors further downstream into choosing its brand of calsil. However, Defendant fails to show as an undisputed fact that the exception to the general rule is significant enough to make Plaintiff's focus on the distributor level legally inadequate.

Accordingly, the Court **denies** Defendant's Motion for Partial Summary Judgment [filed August 14, 2020; ECF 76].

Entered this 12th day of November, 2020, at Denver, Colorado.

BY THE COURT:

Michael E. Hegarty
United States Magistrate Judge

# ATTACHMENT 3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-00872-MEH

CHASE MANUFACTURING, INC.,

     Plaintiff,

v.

JOHNS MANVILLE CORPORATION,

     Defendant.

_____

## ORDER
_____

**Michael E. Hegarty, United States Magistrate Judge.**

     Before the Court is Defendant's Motion to Correct. ECF 102. The matter is fully briefed. For the following reasons, the motion is **granted in part**.

## <u>LEGAL STANDARD</u>

     Fed. R. Civ. P. 54(b) permits revision "at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." That rule is read to permit motions for reconsideration. *Price v. Philpot*, 420 F.3d 1158, 1167, n.9 (10th Cir. 2005) (stating that every order short of a final decree is subject to reopening at the judge's discretion). A court otherwise has the "plenary power to revisit and amend interlocutory orders as justice requires." *Beyer Laser Ctr., LLC v. Polomsky*, No. 16-cv-03099-MEH, 2019 WL 5549160, at *2 (D. Colo. Oct. 25, 2019). Motions for reconsideration generally are disfavored, and relief is limited to certain situations such as "the need to correct clear error or prevent manifest injustice." *Id*.

## ANALYSIS

Defendant asks this Court to reconsider the Order (ECF 101) that denied its Motion for Partial Summary Judgment (ECF 76) for the purpose of correcting certain claimed factual and legal errors. It seeks the corrections now in the event Plaintiff relies on the ruling later in the litigation and to preserve the record for appeal.

A.     Project Engineers

Defendant objects to the statement that "the primary direct sources of 'demand' for calsil are the project engineers who choose it based on a range of factors including technical ones." ECF 101 at 8. Defendant sees in that statement an implicit finding that project engineers are separate economic entities. The available record does provide support for finding that engineers play a role in deciding whether to use calsil for a given project. It reasonably can be inferred from the record that choosing the correct insulator for use in an industrial or equivalent commercial setting is a highly technical matter. Defendant itself presents as an undisputed fact that "[t]he engineer is the specifier" in that process. ECF 76 at 8. The statement does not go so far as to say that engineers have *sole* influence over whether calsil is used for a project; the Order recognizes the several different factors that influence the decision, including the facility owner. However, after construing the available record in the non-movant's favor, the engineer plays the "primary" role in terms of both frequency (the actor who most often makes the decision) and expertise (the actor with the technical knowledge).

Defendant argues that the statement is inconsistent with its Undisputed Fact No. 8 that facility owners are the end users of calsil. In substance, Defendant's objection restates its legal argument that the relevant product market should be broad enough to include facility owners.

However, the Court disagreed and found the fact record sufficient to leave open the possibility that the relevant product market may consist of just calsil sales to distributors and contractors.

The Court finds no reason, clear error or otherwise, to change the statement.

B.      Price Inelasticity

Defendant objects to the Court's statement that "regular market forces such as price do not necessarily affect end user demand" for calsil (ECF 101 at 8), and to the statement that "*McWane* also involved a marketplace where product demand was inelastic to price" to the extent it implies calsil price inelasticity (*id*. at 9). Defendant argues that the finding about calsil price inelasticity lacks the support of undisputed facts and that "[i]t is premature for the Court to make any statements about calsil pricing, or price elasticity." ECF 102 at 3.

The finding of price inelasticity is a logical inference that reasonably can be drawn in the non-movant's favor from the available record. As the Court discusses above with respect to the role of an engineer, the decision whether to use calsil for a project entails technical factors unrelated to the market forces of supply and demand, and there was no evidence of "cross-elasticity of demand" from substitutes. That implies at least some degree of price inelasticity with respect to calsil. Moreover, the statement does not say or imply perfect price inelasticity; the Order acknowledges that price may play some role, for example, in the "value engineering" situation.

The Court sees no clear error in the statement or other reason to remove or clarify it.

C.      Five Major Distributors

Defendant objects to the Court's Material Undisputed Fact ¶ 10 that "[t]here are five major distributors of mechanical insulation." Plaintiff's witness is the source for that statement. *See* Shong Decl., ¶ 23, ECF 87-1. In its Reply in support of its summary judgment motion, Defendant submitted a declaration to show Plaintiff's sales to distributors, including what Plaintiff called the

"five largest distributors" and several additional distributors. ECF 89. Defendant did so to respond to Plaintiff's "factual argument . . . concerning the extent to which Plaintiff allegedly lacks the ability to sell calsil and other insulation materials through what it calls the 'five largest distributors' (*see* Paragraph 19 of its First Amended Complaint, ECF 30 at ¶ 19)." *Id*. at ¶ 4(b). Defendant's argument was that Plaintiff did have access to the distribution network and "is currently working with each of what it calls the five 'largest' insulation distributors in the United States." ECF 88 at 18. Defendant thereby appeared to provide indirect support for the existence of five major distributors.

Nevertheless, Plaintiff did not present that fact in its Statement of Additional Material Facts, and consequently, Defendant did not know of the need to dispute it pursuant to Hegarty Practice Standard § III.F. Given that Defendant does dispute that particular fact, the Court will consider Material Undisputed Fact ¶ 10 as disputed.

D.    <u>Cluster Market</u>

Defendant objects to the discussion of the *Westman* case, where the Court stated:

> Defendant does not show in this case the kind of broader market that *Westman Comm'n Co. v. Hobart Int'l, Inc.*, 796 F.2d 1216 (10th Cir. 1986) discussed. *Westman* addressed the situation in which different dealer types—in addition to the full-line, or "one-stop shopping," kind of distributor—were active in the market. Given that wide range of dealer types (as well as the presence of many manufacturers selling the product and the substantial elasticity between the different product brands), *Westman* found restricting the relevant product market to just the full-line distributors incorrect. *Id.* at 1221.

ECF 101 at 9.

Defendant sees in that discussion an implicit finding that the insulation distributors constitute a cluster market. Defendant objects, arguing that the undisputed facts do not support finding a cluster market. However, the Court made no such finding. Nor was a cluster market found to exist in *Westman*. *Id*. at 1221 (rejecting plaintiff's reliance on cluster market case law to

support its relevant market definition). Instead, the Court cited *Westman* as an example of a market structure that was not dominated by distributors, in order to draw the comparison with the calsil market. Defendant's objection suggests that emphasizing the role that distributors play in the calsil market may be clearer without the *Westman* discussion. Therefore, the Court will remove it from the Order.

E.   Submarket

Defendant also objects to the Court's discussion of *McWane, Inc. v. F.T.C.*, 783 F.3d 814 (11th Cir. 2015):

> In *McWane*, for example, the plaintiff entered the market as a new maker of the product, and the defendant sought to protect its position as the established, predominate seller by coercing distributors to avoid the new entrant. Distributors provided a range of services that coordinated the provision of the product to its end use. *McWane* also involved a marketplace where product demand was inelastic to price. *McWane* affirmed an order directing the established seller not to require exclusivity from distributors. *See McWane*, 783 F.3d at 819.

ECF 101 at 9.

Defendant sees in that discussion an implicit finding of a submarket. *McWane* included submarkets in its discussion of how to define the relevant product market. *Id.* at 828–29. However, the Court did not cite *McWane* for the purpose of finding a submarket in this case, but rather for its factual background as an example of a market where distributors have heightened importance. (Notably, Defendant does not object to the *Sterling* and *Denstply* cases that the Court cited for that same purpose.) Nevertheless, given Defendant's objection, the Court will amend the Order to clarify its reliance on *McWane*. The Court will cite *McWane* only for how its fact background shows an example of a supply model that relied heavily on distributors as well as a product that lacked price elasticity or interchangeability.

133

**CONCLUSION**

Regardless whether Defendant shows clear error or manifest injustice, the Court finds good cause to exercise its discretion and grant several of its requests. The changes resolve those points of concern with the goal of bringing greater clarity to the ruling.

Accordingly, the Court **grants in part** Defendant's Motion to Correct [filed November 20, 2020; ECF 102]. The Court will issue an Amended Order on Defendant's Motion for Partial Summary Judgment.

Entered this 6th day of January, 2021, at Denver, Colorado.

BY THE COURT:

Michael E. Hegarty
United States Magistrate Judge

# ATTACHMENT 4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-00872-MEH

CHASE MANUFACTURING, INC.,

     Plaintiff,

v.

JOHNS MANVILLE CORPORATION,

     Defendant.

---

## AMENDED ORDER

---

**Michael E. Hegarty, United States Magistrate Judge.**

     Before the Court is Defendant's Motion for Partial Summary Judgment. ECF 76. The matter is fully briefed, and the Court heard oral argument on November 9, 2020. For the following reasons and based on the submitted record, Defendant's motion is **denied**.

## BACKGROUND

### I.    Procedural History

     In its First Amended Complaint ("FAC") (ECF 30), Plaintiff brings claims for tying and monopolization in violation of the Sherman Act, 15 U.S.C. § 2. The Court discussed Plaintiff's allegations of anticompetitive conduct in its Fed. R. Civ. P. 12(b)(6) ruling at *Chase Mfg., Inc. v. Johns Manville Corp.*, No. 19-cv-00872-MEH, 2020 WL 1433504 (D. Colo. 2020).  In short, Plaintiff alleges that Defendant's conduct in the sale of the insulation product calsil violates the Sherman Act.

     Defendant moves for summary judgment on the issue of how the relevant market for the subject product should be defined for purposes of resolving the antitrust claims. Plaintiff defines the relevant product market as all product sales by the product's manufacturers to the usual direct

purchasers who it contends are distributors and, to a lesser extent, contractors. Plaintiff thereby limits the relevant product market to the first link in the supply chain, *i.e.*, the upstream product market. Defendant argues that the relevant product market is broader and should also include the product's downstream end users, in which case certain substitutes for calsil would be included. Defendant contends that because Plaintiff has not properly defined the valid product market, its Sherman Act claims must be dismissed.

## II.     Material Undisputed Facts

Both parties present statements of material fact to describe the product, how it is used, and how it is bought and obtained. The parties rely primarily on their respective witness's declarations. Defendant relies on the declarations of David C. Skelly. ECF 76-1 and ECF 88-1. Mr. Skelly works for Defendant as its General Manager of Performance Materials and is familiar with its industrial insulation business. Plaintiff relies on the declaration of David Shong. ECF 87-1. Like Mr. Skelly, Mr. Shong has many years of experience with mechanical insulation. Mr. Shong once worked for Defendant. He now serves as Plaintiff's president. Also proffered into evidence is Plaintiff's press releases and marketing materials (ECF 76-4) as well as a document filed under seal (ECF 89). Most of the parties' objections consist of supplementing the other side's statements with additional or clarifying comments.

The Court finds the following material undisputed facts viewed in the light most favorable to the Plaintiff, who is the non-moving party in this matter.

1.      Defendant manufactures calsil. Skelly Decl., ¶ 1, ECF 76-1. Both Plaintiff and Defendant sell calsil in the United States. Shong Decl., ¶ 8, ECF 87-1; Skelly Decl., ¶ 1, ECF 76-1; TPS Calsil News Releases, ECF 76-4. The parties identify no other maker or seller of calsil presently

in the United States. Before Plaintiff began importing calsil from China in 2018, Defendant was the sole supplier of calsil in the United States. Shong Decl., ¶ 8, ECF 87-1.

2.      Calsil is a mechanical insulation material used in industrial or equivalent commercial settings where extreme temperatures are present. Shong Decl., ¶ 5, ECF 87-1; Skelly Decl., ¶ 2, ECF 76-1; Skelly Supplemental Decl., ¶¶ 6-7, ECF 88-1. It has other attributes that may cause it to be chosen for use in a particular setting. Shong Decl., ¶¶ 15-19, ECF 87-1.

3.      Calsil itself is a generic commodity. The type of calsil that is sold in North America must be of a specific grade as set by industry standards. Skelly Decl., ¶¶ 13, 15, ECF 76-1. For purposes of this ruling, the word "calsil" refers to ASTM C533 Type I, which is the kind that Plaintiff sells in the United States. Shong Decl., ¶ 6, ECF 87-1.

4.      There are some other materials that may be used as a mechanical insulator. Skelly Decl., ¶ 13, ECF 76-1. Ultimately, it is the engineer who decides what type of insulation, including calsil, is best suited for a particular function or need. Shong Decl., ¶¶ 12, 38, ECF 87-1; Skelly Decl., ¶ 8, ECF 76-1. Product price may play a role in the "value engineering" situation as an overall cost-saving strategy at the end of a project. Skelly Supplemental Decl., ¶ 13, ECF 88-1

5.      Often the engineer specifies the insulator by reference to its ASTM number. Shong Decl., ¶ 33, ECF 87-1.

6.      The contractor then obtains the specified insulating material from the distributor. Shong Decl., ¶¶ 29, 30, 39-44, ECF 87-1.

7.      The contractor installs the calsil at the project site in compliance with the engineer's specifications. Shong Decl., ¶ 31, ECF 87-1, Skelly Decl., ¶ 8, ECF 76-1.

8.      Distributors provide the primary conduit through which calsil moves from manufacturer to project site. Shong Decl., ¶¶ 9, 12, ECF 87-1.   Both Plaintiff and Defendant sell the majority of

their calsil to distributors, Skelly Decl., ¶ 6, ECF 76-1; ECF 89, although both sell to contractors on occasion. Shong Decl., ¶¶ 7, 10, 11, ECF 87-1. *See* FAC ¶ 17, ECF 30 at 5. Distributors, in turn, sell calsil to contractors. Skelly Decl., ¶ 7, ECF 76-1; Shong Decl., ¶ 11, ECF 87-1.[1]

9.      Distributors serve an important intermediary role in supplying calsil to contractors. Distributors provide warehouse and logistics services. Skelly Decl., ¶¶ 8-9, 14, ECF 76-1. They source the needed product, advise in the decision of which brand to obtain, and provide financing. They provide complementary products and sometimes fabrication services. Shong Decl., ¶¶ 45, 50-55, ECF 87-1; Skelly Decl., ¶¶ 8-9, ECF 76-1. Contractors maintain relationships with multiple distributors by which to hedge product availability and price. That dynamic serves to lower product price. Skelly Supplemental Decl., ¶ 14, ECF 88-1.

10.      Defendant seeks to influence downstream actors' product choices. Shong Decl., ¶ 23, ECF 87-1; Skelly Decl., ¶¶ 4, 10, 12, ECF 76-1. Manufacturers also compete at the distributor level. Skelly Decl., ¶ 12, ECF 76-1.

## **LEGAL STANDARDS**

A motion for summary judgment serves the purpose of testing whether a trial is required. *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1185 (10th Cir. 2003).   A court shall grant summary judgment if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law.   Fed. R. Civ. P. 56(c).   A fact is material if it might affect the outcome of the suit under the governing substantive law.   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

---

[1] The Court notes here that Defendant alleges there are direct sales of "industrial insulation" from a distributor to a facility owner. Skelly Supplemental Decl., ¶ 9, ECF 88-1.  Mr. Skelly does not state that calsil is one such product, nor is this fact undisputed, because it was raised in the reply.

The moving party bears the initial responsibility of providing to the court the factual basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[W]here the moving party has the burden of proof—the plaintiff on a claim for relief or the defendant on an affirmative defense—the showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Leone v. Owsley*, 810 F.3d 1149, 1153 (10th Cir. 2015) (quoting *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986)). "In other words, the evidence in the movant's favor must be so powerful that no reasonable jury would be free to disbelieve it. Anything less should result in denial of summary judgment." *Id.* at 1154 (quoting 11 Moore's Federal Practice, § 56.40[1][c] (Matthew Bender 3d Ed. 2015)). Only evidence for which the content and substance are admissible may be considered when ruling on a motion for summary judgment. *Johnson v. Weld Cty., Colo.*, 594 F.3d 1202, 1210 (10th Cir. 2010).

If the movant properly supports a motion for summary judgment, the non-moving party has the burden of showing there are issues of material fact to be determined. *Celotex*, 477 U.S. at 322. That is, the opposing party may not rest on the allegations contained in its complaint but must respond with specific facts showing a genuine factual issue for trial. Fed. R. Civ. P. 56(e); *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."); *see also Hysten v. Burlington N. & Santa Fe Ry.*, 296 F.3d 1177, 1180 (10th Cir. 2002). These specific facts may be shown "'by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves.'" *Pietrowski v. Town of Dibble*, 134 F.3d 1006, 1008 (10th Cir. 1998) (quoting *Celotex*, 477 U.S. at 324); *see also Mountain Highlands, LLC v. Hendricks*, 616 F.3d 1167, 1170 (10th Cir. 2010) ("On those issues for which it bears the burden of proof at trial, the nonmovant

"must go beyond the pleadings   and designate specific facts so as to make a showing sufficient to establish the existence of an element essential to [its] case in order to survive summary judgment.") (quoting *Cardoso v. Calbone*, 490 F.3d 1194, 1197 (10th Cir. 2007)).   "The court views the record and draws all inferences in the light most favorable to the non-moving party." *Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. Pepsico, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005).

## ANALYSIS

Defining the "relevant product market" is a threshold inquiry in an antitrust case. It helps to identify the framework within which the antitrust claims will be considered. *Auraria Student Hous. at the Regency, LLC v. Campus Village Apartments, LLC*, 843 F.3d 1225, 1244 (10th Cir. 2016);   *Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.*, 311 F. Supp. 2d 1048, 1074-75 (D. Colo. 2004) (citing *Telecor Commc'ns, Inc. v. Sw. Bell Tel. Co.*, 305 F.3d 1124 (10th Cir. 2002)). Product market definition is a question of fact for the factfinder; it also is an issue for which Plaintiff has the burden of proof. *Nobody*, 311 F. Supp. 2d at 1075. *See Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 762 F.3d 1114, 1120 (10th Cir. 2014) ("The differing definitions create a fact question on the product market, precluding summary judgment. "). Plaintiff must propose a relevant product market that comports with the legal standard and is supported by evidence. *Green Country Food Mkt., Inc. v. Bottling Grp., LLC*, 371 F.3d 1275 (10th Cir. 2004) (considering the issue under the Fed. R. Civ. P. 56(c) standard); *Campfield v. State Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111, 1118 (10th Cir. 2008) (considering the issue under the Fed. R. Civ. P. 12(b)(6) standard).

## I.   Concept of the "Relevant Product Market"

The "product market" consists of the full range of products that are reasonably interchangeable for the purpose for which they are produced in terms of price, use, and qualities.

*Auraria*, 843 F.3d at 1245. It includes not only the product at issue in the case but also those products that are its equivalent. It means those products for which "cross-elasticity of demand" exists, that is, those products for which a change in price for one will affect the demand of the other. *Compliance Mktg., Inc. v. Drugtest, Inc.*, No. 09-cv-01241-JLK, 2010 WL 1416823, at *7 (D. Colo. Apr. 7, 2010). The focus of inquiry is on demand and thus the relevant set of customers. *Nobody*, 311 F. Supp. 2d at 1076. An antitrust plaintiff must define a product market that is broad enough to reflect the real economic market at issue. *Auraria*, 843 F.3d at 1245. The "relevant" product market, in turn, is the product market that is relevant to the antitrust claims. It may consist of a sub-market that focuses on the level of commerce where the anticompetitive practices allegedly occur. Therefore, it is possible that the relevant product market may exclude the end user[2] of the product. *Nobody*, 311 F. Supp. 2d at 1076.   Plaintiff does not seek to assert a sub-market here.

## II.     Competing Product Market Definitions

Defendant's motion makes good points.   Its briefing is persuasive but, ultimately in my view, not dispositive at the summary judgment stage.   Plaintiff has moved the needle sufficiently to create a fact issue for the jury, based on the following discussion

At the oral argument in this case, in response to the Court's inquiry, Plaintiff defined the relevant product market as all sales of calsil by calsil manufacturers (which in North America are only Plaintiff and Defendant). Defendant argued that this definition is a modification of the FAC. Construing the record and drawing all inferences in the light most favorable to the non-moving party, here the Plaintiff, this market definition is supported by the FAC and the exhibits to the

---

[2] An "end user" for this ruling is the owner of the industrial or commercial facility where the calsil will be installed. Shong Decl., ¶ 46, ECF 87-1; Skelly Decl., ¶ 8, ECF 76-1.

summary judgment briefing. The buyers in the proposed relevant product market are those who buy calsil from the manufacturers "directly," by which Plaintiff means the distributors (who are the predominate purchasers) and also contractors (to a lesser extent). Defendant argues that Plaintiff's proposed relevant product market is too narrowly defined as a matter of law.   At this summary judgment stage, the Court finds that the defined product market passes muster.

First, Defendant does not demonstrate the product market that is relevant to this case must include calsil's "end users." Defendant is correct that those end users are the ultimate destination of the product. However, regular market forces such as price do not necessarily affect end user demand. Instead, the primary direct sources of "demand" for calsil are the project engineers who choose it based on range of factors including technical ones. Once an engineer specifies calsil for a particular project, the contractor is obligated to obtain it absent some later project plan change. Although an industrial or commercial facility owner may be the "end user" of the product in the sense of owing the property where it is installed, the record establishes that this end user does not directly select calsil; on rare occasion, when calsil has been selected for a project by the engineer, the end user may purchase additional supply for future repair/replacement purposes.

Second, Defendant does not show how Plaintiff's primary focus on the distributor link of the supply chain is artificially too narrow. It is undisputed that distributors play an important role in supplying calsil to projects. While some calsil sales may bypass the distributors, most do not. That implies that the distributor model is overall more efficient than the direct sale alternative. The cases of *McWane, Inc. v. F.T.C.*, 783 F.3d 814 (11th Cir. 2015), *Sterling Merch., Inc. v. Nestle, S.A.*, 724 F. Supp. 2d 245 (D.P.R. 2010), and *U.S. v. Dentsply Int'l, Inc.*, 399 F.3d 181 (3d Cir. 2005) address similar distribution models where the relevant product market properly excluded end customers. In *McWane*, for example, the plaintiff entered the market as a new maker of the

**143**

product, and the defendant sought to protect its position as the established, predominate seller by coercing distributors to avoid the new entrant. Distributors provided a range of services that coordinated the provision of the product to its end use. *McWane* also involved a marketplace where product demand was inelastic to price. *McWane* affirmed an order directing the established seller not to require exclusivity from distributors. *See McWane*, 783 F.3d at 819. In that respect, the fact background of *McWane* shows an example of a supply model that relies heavily on distributors as well as a product that lacked price elasticity or interchangeability. Distributors in the calsil market likewise have a heightened importance. Plaintiff alleges that Defendant focused its anticompetitive acts at the distributor level as its means to defend its position as the primary seller of calsil.

Limiting the "customers" of calsil to distributors (and to a lesser extent, contractors), *i.e.*, all direct purchasers of calsil from a manufacturer, is not artificial or too narrow. Defendant does proffer evidence of some sales of "insulation materials" that bypass distributors and contractors. Defendant also proffers evidence that it communicates with end users. However, Defendant fails to establish a material undisputed fact that such sales activity is a material exception to what is otherwise a distributor-dominated structure.

As the Court perceives Defendant's argument, it is quite similar to that rejected in *Telecor Commc'ns, Inc. v. Sw. Bell Tel. Co.*, 305 F.3d 1124, 1132 (10th Cir. 2002).  In that case, which involved competitive access to the installation of pay (landline) telephones in storefront locations, the court stated:

> [T]he Plaintiffs argue that Southwestern Bell's interchangeability argument is wrongly directed at showing that cell phones and pay phones are interchangeable for end-users, but that is not the market where the Plaintiffs are complaining of Southwestern Bell's anti-competitive behavior. Rather, it is the location owners who define the market where the anti-competitive behavior took place—that is, the Plaintiffs claim that they compete with Southwestern Bell for locations upon which to place their pay phones, and that is the market Southwestern Bell has monopolized.

*Id.* at 1132-33.   In *Telecor*, as here, plaintiffs complained of defendant's anticompetitive conduct at the intermediate level, while defendant wanted to focus on the ultimate consumer.  Also in *Telecor,* as here, plaintiffs used *United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377 (1956) to justify a focus on the ultimate consumer.  The court stated in *Telecor* that *du Pont* involved an indisputably "consumer market" (cellophane wrap and other flexible wrapping material) and, thus, justified a focus on that end user.   Plaintiff's theory here focuses on the ability to market the product to the distributor (the middleman, of sorts).   Here, as in *Telecor*, the plaintiffs' antitrust theory was that "distributors" (the location owners) were consumers of the "product" (placement of pay phone facilities on their locations), and that ability to sell to distributors (in *Telecor*, the price for such location placements) was affected by defendant's monopolistic conduct.   Of the cases upon which the parties rely, *Telecor*'s analysis is the most persuasive.

Lastly, Defendant fails to establish as an undisputed fact that calsil is reasonably interchangeable with other insulators. Plaintiff proffers evidence that calsil is a product with unique technical characteristics. While there may be some other products similarly usable, the criteria by which an engineer may choose one over calsil appears on the available record to be a complicated, technical matter. The degree to which the insulation products are interchangeable remains a question of fact. Consequently, Defendant fails to show how limiting the relevant product market to just calsil is erroneous as a matter of law. If the relevant product market is limited to just calsil, then expanding it to include end users has no practical effect. It does not expand the range of sellers. Nor does it expand in any significant way end users' options for obtaining calsil for use in their projects.

## **CONCLUSION**

Defendant fails to show on the undisputed fact record how Plaintiff's definition of the relevant product market is factually and legally inadequate. The facts show that calsil is a product that is used to meet highly technical needs in industrial or equivalent settings, and that the choice to use it is likewise technical in nature. The processes for obtaining and installing it at a project site involve many actors, and distributors play the critical role in providing calsil to contractors and to others who seek it for project needs. Moreover, the record shows that calsil far more often flows through distributors rather than bypasses them, although that is not inevitably the case. There may be times when calsil does bypass the distributors, and the Defendant may attempt to influence those actors further downstream into choosing its brand of calsil. However, Defendant fails to show as an undisputed fact that the exception to the general rule is significant enough to make Plaintiff's focus on the distributor level legally inadequate.

Accordingly, the Court **denies** Defendant's Motion for Partial Summary Judgment [filed August 14, 2020; ECF 76].

Entered this 6th day of January, 2021, at Denver, Colorado.

BY THE COURT:

*Michael E. Hegarty*

Michael E. Hegarty
United States Magistrate Judge

146

# ATTACHMENT 5

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-00872-MEH

CHASE MANUFACTURING, INC.,

      Plaintiff,

v.

JOHNS MANVILLE CORPORATION,

      Defendant.

---

## ORDER

---

**Michael E. Hegarty, United States Magistrate Judge.**

      Before the Court are the parties' Motions to Exclude Expert Testimony (ECF 134 & 135) and Defendant's Motion to Strike (ECF 176). The Motions are fully briefed, and the Court heard oral argument on February 10, 2022. The Court's ruling is as follows:

## I.     The Updated Report of Dr. Warren-Boulton

      Fed. R. Civ. P. 26(a)(2) obligates Plaintiff to disclose "a complete statement of all opinions the witness will express and the basis and reasons for them." That rule requires an expert witness's report to "be detailed and complete and state the testimony the witness is expected to present during direct examination, together with the reasons therefor." *Cook v. Rockwell Int'l Corp.*, 580 F. Supp. 2d 1071, 1169 (D. Colo. 2006) (citing the 1993 advisory committee's notes to Rule 26). In other words, the expert witness must provide a comprehensive statement of his or her opinions and conclusion as well as the bases therefor. It is critical that the report constitute a final and full disclosure. *Beller v. U.S.*, 221 F.R.D. 689, 695 (D.N.M. 2003).

Plaintiff produced Dr. Warren-Boulton's report on the September 27, 2021 deadline. That initial report is found in the record at ECF 135-1. On November 20, 2021, Defendant timely submitted two rebuttal reports from its expert witnesses. ECF 135-4 & 135-5.

At issue is the Updated Report from Dr. Warren-Boulton that Plaintiff produced on November 29, 2021. ECF 177. As emphasized above, it is important that a litigant make a timely and complete disclosure of an expert witness's opinions. However, that does not mean the Updated Report, which was produced after the deadline, is automatically barred. In certain limited situations, Fed. R. Civ. P. 26(a)(2) permits an expert to supplement a previously submitted report. Supplementation provides the expert the means to correct inaccuracies or to fill "the interstices of an incomplete report based on information that was not available at the time of the initial disclosure." *Cook*, 580 F. Supp. 2d at 1169. Not only is supplementation permitted, but pursuant to Fed. R. Civ. P. 26(e), it is required under certain circumstances.

Plaintiff explains the reason for the Updated Report in its Response (ECF 184). In the weeks preceding Plaintiff's disclosure deadline, both sides produced additional sales data. Plaintiff added the shipping costs that it charges its customers covering the time period of May 2018 to July 2021. On September 22, 2021, Defendant produced its sales data from the first six months of 2021. Dr. Warren-Boulton was unable to include both sets of information into his initial report to meet the September 27, 2021 deadline. However, Defendant's experts did have use of it for purposes of their rebuttal reports which were due later.

It is unclear why it was not until November 29, 2021—nine days after receipt of Defendant's rebuttal reports—that Dr. Warren-Boulton was able to produce his Updated Report that factored in the additional data. Nor does it appear that counsel conferred about the need for him to supplement his report with the new data and to coordinate a date for him to submit it.

Nevertheless, the Court does not find a Rule 26(a) or 26(e) violation that warrants striking the Updated Report.

To begin with, Dr. Warren-Boulton did not use the Updated Report to introduce any new opinions or expand upon those already given. In other words, he does not state "additional opinions or rationales," and he does not seek to "'strengthen' or 'deepen' opinions expressed in the original expert report." *Cook*, 580 F. Supp. 2d at 1169. Consequently, the Updated Report does not exceed "the bounds of permissible supplementation" that would make it subject to exclusion under Fed. R. Civ. P. 37(c). *Id*. This is confirmed by the "red-lined" comparison of the initial and Updated Report that Defendant provides at ECF 177-1. That comparison confirms that the changes made to the Updated Report consisted of either immaterial typographical corrections or new calculations (mostly of damages figures) using the additional sales data. Moreover, the recalculations seem to benefit Defendant by reducing the amount of damages claimed. *See Lenox Maclaren Surgical Corp. v. Medtronic, Inc*., No. 10-cv-02139-MSK-NYW, 2015 WL 6735495, at *3 (D. Colo. Nov. 4, 2015) (finding the expert's supplement to be a proper use of corrected information and noting how the damages recalculation was favorable to the defendant).

Nor does Defendant object to the Updated Report outright. It concedes the need for an update to keep the calculations current as new sales data continues to enter the record. Indeed, Defendant regards the Updated Report as premature, rather than late, in that respect. ECF 176 at 4-5. Rather, the focus of Defendant's objection is on the inclusion of data that Plaintiff should have produced sooner. Perhaps Plaintiff should have been more proactive in gathering all its relevant cost information and making it available to Dr. Warren-Boulton in time for him to include it in his initial report by the deadline. However, this Court discerns no material changes that resulted from the update, and it is unclear what practical reason would be served by striking it. Ultimately, it

would better to have all expert witness reports not only drawing from the same data set but a data set that is as complete and accurate as possible.

The Court denies Defendant's request to strike the Updated Report from Dr. Warren-Boulton dated November 29, 2021. Because it supplants the initial version, the Court will consider Defendant's Rule 702 and *Daubert* objections against the Updated Report.

Defendant also seeks to strike the Declaration from Dr. Warren-Boulton dated January 7, 2022, that Plaintiff submits at ECF 173 in response to Defendant's Rule 702/*Daubert* Motion. The Court does not regard the Declaration (or testimony at the hearing on that Motion) to constitute an improper supplementation. The Court notes that in *Reed Constr. Data, Inc. v. McGraw-Hill Cos., Inc.*, 49 F. Supp. 3d 385, 401 (S.D.N.Y. 2014)—a case relied on by Defendant—Dr. Warren-Boulton testified at a *Daubert* hearing about his challenged analysis and the opinions he derived from it. Similarly, Defendant offers to allow its expert witness, Ronald King, to testify for the purpose of rebutting Plaintiff's "baseless challenge to his qualifications and the 'reliability' of his opinions" in its Response (ECF 150 at 6) to Plaintiff's Motion to Exclude. The Court gives Dr. Warren-Boulton's Declaration and hearing testimony weight only to the extent relevant to deciding the *Daubert* challenge.

Because the Declaration will not be used as evidence at any later stage of litigation, there is no need to strike it. Plaintiff remains bound to the content of Dr. Warren-Boulton's Updated Report (or any further updated report as the parties or the Court permits as new sales data becomes available).

## II. The Admissibility of Dr. Warren-Boulton's Updated Report

Defendant argues that Dr. Warren-Boulton's report (which for present purposes the Court regards as his Updated Report) in no way supports Plaintiff's claims for relief. It asserts that Dr.

Warren-Boulton does not address those matters that Plaintiff needs to develop its antitrust theories, and in any event, his opinions suffer from inadequate data and analysis.

## A. Rule 702

Fed. R. Evid. 702 sets forth the standard for admissibility of an expert witness's testimony: First, the expert witness must be qualified by "knowledge, skill, experience, training, or education." If that predicate is established, then the expert may opine on matters within his or her "scientific, technical, or other specialized knowledge" if it "will help the trier of fact to understand the evidence or to determine a fact in issue." Furthermore, the opinion must be "based on sufficient facts or data" and "the product of reliable principles and methods." Lastly, the expert must have "reliably applied the principles and methods to the facts of the case." "Accordingly, district courts have a 'gatekeeper obligation' to ensure all expert testimony admitted is both relevant and reliable." *Fischer v. BMW of N. Am., LLC*, No. 20-1399, 2021 WL 5458444, at *2 (10th Cir. Nov. 23, 2021) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593-95 (1993)).

There are several factors that a court may consider when assessing reliability. They are: "(1) whether the proffered theory can be and has been tested; (2) whether the theory has been subject to peer review; (3) the known or potential rate of error; and (4) the general acceptance of a methodology in the relevant scientific community." *Richter v. City of Commerce City, Colo.*, 185 F. Supp. 3d 1274, 1277 (D. Colo. 2016) (internal citation omitted). "These considerations are not exhaustive. Rather, the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Id.* (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)). In short, the expert must have "good grounds" to support his or her opinion. The expert may not rely on subjective belief, unsupported speculation, circular reasoning, or *ipse dixit* conclusions. *Beltran v. InterExchange, Inc.*, No. 14-

cv-03074-CMA-KMT, 2018 WL 526907, at *5 (D. Colo. Jan. 24, 2018); *Pertile v. Gen. Motors*, *LLC*, No. 15-cv-00518-WJM-NYW, 2017 WL 4099895, at *5, *7-8 (D. Colo. Sept. 15, 2017). The dispositive issue is reliability, not correctness. Moreover, the party who is proffering the challenged opinion bears the burden of establishing its admissibility under the above standard. *Richter*, 185 F. Supp. 3d at 1277.

Defendant's arguments for excluding the report go to the very heart of Plaintiff's claims for relief. That necessitates establishing first what the elements are to those claims and how an antitrust violation is established before considering the report's reliability.

### B.    The Elements of Plaintiff's Two Antitrust Claims

Plaintiff has a relationship with a factory in China that makes calsil (calcium silicate), a type of high temperature insulating material used mainly in industrial settings. Plaintiff began importing calsil into the United States in 2018. Beforehand, Defendant was the sole seller of calsil in the United States. Generally, the market for insulating products such as calsil can be divided into two sections. An upstream market consists of manufacturers and distributors, and a downstream market has distributors selling to contractors. Plaintiff brought this lawsuit alleging that Defendant took steps to hinder its entry into the calsil market by discouraging distributors from buying its calsil product. Thus, the focus of Plaintiff's antitrust allegations is on the upstream market.

Plaintiff's First Claim for relief in its Amended Complaint is for unlawful antitrust conduct in the form of "tying." ECF 30 at ¶¶ 190-200. Plaintiff alleges that Defendant "repeatedly threatened to refuse to sell fiberglass pipe insulation that customers wanted to buy if they bought calsil from [it] instead of from [Defendant]." *Id*. at ¶ 192. Section 1 of the Sherman Act prohibits unreasonable restraints of trade in the form of a tying arrangement. *Suture Express, Inc. v. Owens*

& *Minor Distribution, Inc.*, 851 F.3d 1029, 1036-37 (10th Cir. 2017) (citing 15 U.S.C. § 1). The elements of a *per se* theory of an unlawful tying arrangement, in which unreasonableness is presumed, are: (1) the involvement of two separate products, (2) defendant conditions the sale of one product on the purchase of another, (3) the defendant has sufficient economic power in the tying product market to enable it to restrain trade in the tied product market; and (4) "a 'not insubstantial' amount of interstate commerce in the tied product is affected." *Id*. at 1037. In addition, Plaintiff "must establish an injury of the type the antitrust laws were intended to prevent." *Id*. at 1044 (internal citation omitted). This means injury to competition generally, not merely to it as a competitor. *Id*.

Plaintiff's Second Claim for relief is for monopolization in violation of Section 2 of the Sherman Act. ECF 30 at ¶¶ 201-217. The elements of this offense are: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power." *Campfield v. State Farm Mut. Auto. Ins. Co*., 532 F.3d 1111, 1117-18 (10th Cir. 2008). "The usual form on monopolistic control" is when "suppliers utilize market power to restrict output and thereby raise prices." *Id*. at 1118. In other words, a monopoly has the power to control prices or exclude competition over a substantial length of time. *Epic Games, Inc. v. Apple, Inc*., — F. Supp. 3d. —, 2021 WL 4128925, at *92 (N.D. Cal. Sept. 10, 2021). To state a *prima facie* case, there also must be the same kind of antitrust injury that a Section 1 claim requires. *Novell, Inc. v. Microsoft Corp*., 731 F.3d 1064, 1070 (10th Cir. 2013); *R.J. Reynolds Tobacco Co. v. Philip Morris, Inc*., 199 F.Supp.2d 362, 395-96 (M.D.N.C. 2002) (citing *Cargill, Inc. v. Monfort of Colo., Inc*., 479 U.S. 104, 110 (1986)).

Plaintiff asserts as its Third Claim for relief a Lanham Act violation. However, as this Court explains below, expert witness opinion is not necessary to support it. Consequently, the instant

154

ruling on the *Daubert* Motions does not concern Plaintiff's ability to substantiate this claim with expert witness opinion evidence.

### C.   The Governing Framework for How Plaintiff Must Prove Its Antitrust Theories

For this section, the Court draws from *Ohio v. Am. Express Co.*, 138 S. Ct. 2274 (2018) and its comprehensive discussion of the governing framework. That Court began by noting that an antitrust violation requires more than just the presence of a restraint on trade or commerce. Rather, it is only a restraint that has an "undue" or "unreasonable" effect that is actionable. *Id*. at 2283.

There are two methods to show the presence of an *unreasonable* restraint. The first method is met if the challenged restraint is the kind that "always or almost always tend[s] to restrict competition and decrease output." *Id*. Case law deems restraints in this category, such as collusion between two competitors, as unreasonable *per se*. They are presumed to cause harm to competition. However, only a "small group of restraints" fall into this category. *Id*. Plaintiff brings only one *per se* claim—tying. Its monopolization claim does not rely on a *per se* theory.

For its monopolization claim, Plaintiff therefore must establish the unreasonableness of the challenged conduct through the second method: the "Rule of Reason." While at first blush a challenged conduct may seem harmful to competition, the Rule of Reason tests whether it actually has such an effect (or whether it has a neutral or even procompetitive impact). In other words, it ensures a causal relationship between a defendant's monopoly power and the anticompetitive effect. It provides a means to show an antitrust violation through "a more thorough examination of the purposes and effects of the practices involved" and a "more real-market analysis." *Suture Express*, 851 F.3d at 1037-38. The conduct about which Plaintiff complains for which unreasonableness may not be presumed is subject to the Rule of Reason. *Suture Express*, 851 F.3d at 1037-38 (noting the "general proposition" that a plaintiff may use the Rule of Reason to prove

that a tying arrangement has an actual negative effect on competition); *Epic Games, Inc. v. Apple, Inc.*, — F. Supp. 3d. —, 2021 WL 4128925, at * 98 (N.D. Cal. Sept. 10, 2021) (explaining that because unilateral anticompetitive conduct is not *per se* violative of Section 2, the Rule of Reason applies); *Bepco, Inc. v. Allied-Signal, Inc.*, 106 F. Supp. 2d 814, 830 (M.D.N.C. 2000) (same).

The Rule of Reason consists of three steps in which the burden of proof shifts between the parties. The first step in this process requires Plaintiff "to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *Am. Express*, 138 S. Ct. at 2285. Because the remaining two steps are not dispositive of this ruling, the Court does not address them here.

Plaintiff can make the Rule of Reason's initial showing with either direct or indirect evidence. "Direct evidence of anticompetitive effects would be proof of actual detrimental effects on competition such as reduced output, increased prices, or decreased quality in the relevant market." *Id.* at 2284 (internal citations omitted). "Indirect evidence would be proof of market power plus some evidence that the challenged restraint harms competition." *Id.*.

Regardless of whether direct or indirect evidence is used, the Rule of Reason inquiry requires an understanding of the relevant market at issue. *Id.* at 2285. *Am. Express* observed that "courts usually cannot properly apply the rule of reason without an accurate definition of the relevant market." *Id.* at 2285. It was needed even though the plaintiffs were relying on actual evidence of adverse effects on competition. *Id.* at 2285, n.7. The Court explained that without knowing the relevant market, it could not determine whether the defendant had the market power to cause competitive harm. *Id.* Before assessing the plaintiffs' direct evidence that the challenged restraint had anticompetitive effect, the Court "must first define the relevant market." *Id.* at 2285. The Court repeated that an accurate definition of the relevant market was "necessary to accurately

assess competition." *Id*. at 2287. Therefore, the Court began its analysis by reviewing the lower court's market definition, finding that it omitted the market's full scope. After correcting that error and redefining the relevant market, the Court found that the challenged conduct lost its anticompetitive effect. *Id*. at 2288-90.

Plaintiff relies on another United States Supreme Court case, *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447 (1986), to support its position that it need not define the relevant market. Indeed, Plaintiff's argument is similar to the *Am. Express* dissenting opinion. Also citing *Ind. Fed'n of Dentists*, the dissent stated that "[s]ometimes, but not always, a court will try to determine the appropriate market (the market that the agreement affects)." *Am. Express*, 138 S. Ct. at 2291. However, proof of actual detrimental effects would obviate the need to consider whether the challenged conduct potentially could impede competition, and consequently, there also would be no need to define the relevant market or measure the defendant's market power. *Id*. at 2291, 2296-97. The dissent regarded "the majority's extensive discussion of market definition [to be] legally unnecessary." *Id*. at 2297. Because the plaintiffs had "strong *direct* evidence of anticompetitive effects flowing from the challenged restraint," it was unnecessary to define the market. *Id*. (emphasis in the original). Moreover, there was no need for the plaintiffs to prove market power either because "proof of actual adverse effects on competition is, *a fortiori*, proof of market power." *Id*. However, the majority opinion distinguished *Ind. Fed'n of Dentists* on which the dissent (and Plaintiff in this case) relied, noting that it concerned a horizontal restraint by which competitors agree not to compete. *Id*. at 2285, n.7. *Am. Express* also was decided after other cases, such as *Buccaneer Energy (USA), Inc. v. Gunnison Energy Corp.*, 846 F.3d 1297 (10th Cir. 2017), that did not require a relevant market definition if there was direct evidence of actual anticompetitive conduct.

**157**

Under *Am. Express*, the Court concludes that Plaintiff must follow the Rule of Reason framework to support its theory of antitrust violations, and in doing so, it must define in an accurate way the market in which the challenged restraints are occurring. Without that market definition, "there is no way to measure the defendant's ability to lessen or destroy competition." 138 S. Ct. at 2285 (quotation marks omitted). Antitrust law, the majority opinion explained, generally favors "actual market realities" over "legal presumptions that rest on formalistic distinctions." *Id*. at 2285. Nor is the need to define the relevant market limited to the Rule of Reason inquiry. It also is an element of the monopolization cause of action itself; as such, Plaintiff still must account for it.

That in turn raises the question of how to define the "relevant market" for an antitrust case. For the Rule of Reason inquiry, it is "the area of effective competition" which typically consists of "the arena within which significant substitution in consumption or production occurs." *Id*. (internal citations omitted). It combines different products or services in a way that reflects commercial reality. *Id*. Defining the relevant market is an intensely fact-based inquiry, and plaintiff must support a proposed definition with specific evidence. *Epic Games*, 2021 WL 4128925 at *82.

The first aspect of the relevant market is what product or products are at issue. It is not necessarily limited to the product that the plaintiff sells but also those products that are its substitute. "Substitutability" in this context means in the economic sense. "Interchangeability" considers the purpose for which the product is made in terms of price, use, and qualities, and "cross-elasticity of demand" asks whether a significant change in one product's price affects demand for another product. The availability of substitutes is a factor that may reduce a seller's pricing power. *Buccaneer*, 846 F.3d at 1313; *Epic Games*, 2021 WL 4128925 at *81; *U.S. v. Engelhard Corp*., 970 F. Supp. 1463 (M.D. Ga. 1997). The relevant market also has a geographic boundary. "The geographic market is the narrowest market which is wide enough so that products

from adjacent areas cannot compete on substantial parity with those included in the market." *Buccaneer*, 846 F.3d at 1314 (internal citation omitted).

As stated above, a plaintiff can show an anticompetitive effect—the second element of a monopoly claim—under the Rule of Reason with either direct or indirect evidence. Generally speaking, "direct" evidence is explicit and requires no inferences to establish the proposition or conclusion being asserted. *Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1083 (10th Cir. 2006). In this context, direct evidence is evidence of actual anti-competitive effects such as control over price or output; in other words, it is the presence of "[a] naked, effective restraint." *Law v. Nat'l Collegiate Athletic Ass'n*, 134 F.3d 1010, 1019 (10th Cir. 1998).

Alternatively, a plaintiff may establish the detrimental effects of a challenged conduct circumstantially through indirect evidence. This option generally involves a deeper analysis of the market and its structure. "Indirect evidence would be proof of market power plus some evidence that the challenged restraint harms competition." *Am. Express*, 138 S. Ct. at 2284.

"Market power" is the ability either to control price or exclude competition. *Buccaneer*, 846 F.3d at 1315. Or, stated more generally, it is the ability to force a buyer to do something the buyer would not do in a competitive market. *Suture Express*, 851 F.3d at 1037. Market power differs from "monopoly power" in its degree. Monopoly power is a substantial or extreme degree of market power. It is sufficient market power to sustain a supracompetitive price and profitability without new competitors entering the market or existing competitors increasing their production in response. *Novell,* 731 F.3d at 1070. Monopoly power may be inferred from evidence of market power. *Id*. at 1071.

"The first requirement in every suit based on the Rule of Reason is market power, without which the practice cannot cause those injuries (lower output and the associated welfare losses) that

matter under the federal antitrust laws." *Menasha Corp. v. News Am. Marketing In-Store, Inc.*, 354 F.3d 661, 663 (7th Cir. 2004). One way to show that a defendant possesses market power is through market share. Indeed, a market share of up to seventy to eighty percent implies not only market power but also monopoly power. *Colo. Interstate Gas Co. v. Natural Gas Pipeline Co.*, 885 F.2d 683, 694, n.18 (10th Cir. 1989). Other relevant factors include the number of competitors in the market, barriers to a new competitor's entry into the market, and market trends. *Buccaneer*, 846 F.3d at 1315. Plaintiff argues that a persistent and significantly high profit margin also is a relevant factor. ECF 153 at 58. Moreover, as *Am. Express* requires, the presence of market power alone is not enough. There also must be some evidence that the defendant used its market power to harm to competition.

### D.     Does Dr. Warren-Boulton Offer Opinions Relevant to the Governing Evidentiary Framework?

With the *prima facie* elements and the Rule of Reason framework in mind, would the expert's report be helpful to the factfinder in determining whether Defendant engaged in unlawful antitrust conduct? The Court first considers the points Dr. Warren-Boulton addresses in his report and whether they are the kind that Plaintiff needs to prove for its antitrust claim. Next, the Court reviews how he reached those opinions.

#### 1.     Relevant Market Definition

Dr. Warren-Boulton does define the relevant market, a matter not only part of the *prima facie* case but also the Rule of Reason inquiry. He describes its purpose as "to aid in the determination of competitive harm," and he refers to it as "a tool . . . to determine the required element of monopoly (or market) power." ECF 177 at 7 & n.8. He concludes that "[t]he sale of calsil in the U.S. is a relevant antitrust market for allegations of exclusionary conduct to maintain monopoly power." *Id*. at 6. He furthers that "[i]n this case, a relevant market can be defined as all

calsil sold in the U.S. (i.e. calsil sold by [Plaintiff] or [Defendant] either to distributors or directly to other customers such as contractors." *Id*. at 10.

He also sees "a narrower provisional relevant market that would consist of sales only to distributors." *Id*. In that context, "the relevant question would be whether [Defendant] had succeeded in raising the price for calsil sold to distributors above the competitive level." *Id*. Dr. Warren-Boulton cites data showing that Defendant sold 82.9 % of its domestic calsil to distributors. Given the range of "functions" they provide and the complements (not substitutes) for supplying calsil, he referred to distributors as "one level in a vertical chain of commerce." *Id*. at 11.

However, his discussion is inconsistent. Citing *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447 (1986), he also asserts that the "[m]arket definition is not a required element of either one of [Plaintiff's] antitrust claims" in light of Defendant's "actual exercise of monopoly power." *." ECF 177 at n.8. Dr. Warren-Boulton thereby leaves uncertain whether this case even warrants defining the relevant market in the first place. Nevertheless, as noted above, he does offer one.

He also leaves unclear its basis. First, he defines the relevant market by reference to the theory of harm. Because Plaintiff is alleging exclusionary conduct, Dr. Warren-Boulton looks to see whether Defendant has an incentive to prevent the calsil sale price from decreasing. Moreover, he says that Defendant's actual ability to charge distributors a supracompetitive price is what defines the relevant market. *Id*. at 11. This is so "regardless of the downstream level where substitution is possible, or even whether the anticompetitive effects are felt by the final consumers." *Id*.. He finds that "[t]he absence of imports, the evidence of lower margins on exports, and the presence of regulatory and other barriers all establish that the U.S. is a relevant geographic market." *Id*. at 12.

###### 2.    Whether Defendant has Market Power

Dr. Warren-Boulton asserts that Defendant "has sufficient economic power over its distributors in the U.S." *Id*. at 6. He does not expressly say whether by "economic power" he means market power as a factor for establishing anticompetitive effects through indirect evidence under the Rule of Reason or whether he uses the term as a synonym for "monopoly power" in the sense of a *prima facie* element. However, he does reach separate conclusions as to Defendant's "economic" and "monopoly" powers, implying that he means them as different concepts.

He notes the rule of thumb that the ability to impose a small but significant and non-transitory increase in price ("SSNIP") of five to ten percent is the minimum for defining a relevant market (ECF 177 at n.9), and he opines that Defendant already was charging a supracompetitive price before Plaintiff's entry. He sees no need to consider product substitution to define the relevant market in this case. This is because as an established monopolist, Defendant already found the most profitable supracompetitive price and has kept it at level where product substitution would be encouraged.

In addition, Defendant has economic power in the form of limiting its greater range of products from distributors. *Id*. at 18-19. Defendant's threat is effective because the cost to them would exceed their savings from buying Plaintiff's cheaper calsil. Moreover, distributors are unable to pass to their customers the extra cost of doing business with Defendant. They create a strong disincentive for distributors to do business with Plaintiff, and Plaintiff has no alternative to bypassing distributors to sell its calsil. *Id*. at 19.

###### 3.    Whether Defendant has Monopoly Power

Dr. Warren-Boulton concludes that Defendant "has monopoly power in the market for the sale of calsil in the U.S." ECF 177 at 6. He bases that conclusion on Defendant's "ability to set

prices for calsil in the U.S. well above the competitive level." *Id.* Because Defendant has such monopoly power, he reasons that it also "has an economic incentive to exclude or hinder [Plaintiff] from selling calsil in the U.S." *Id.* He bases this conclusion on the uncontested fact that Defendant was the sole supplier of calsil in the U.S. before Plaintiff's arrival. Moreover, he sees confirmation of a monopoly by the supracompetitive price it charges for calsil and its acts to exclude Plaintiff.

Dr. Warren-Boulton sees direct evidence of Defendant's ability to charge a supracompetitive price and thus possession of monopoly power. The direct evidence he uses is the fact that Plaintiff sells calsil substantially cheaper than Defendant. Moreover, Defendant makes a substantially greater profit from calsil than from other insulators whether measured on the basis of accounting or economic metrics. It also profits more from domestic calsil sales than from exports to markets where it faces competition.

Because there is direct evidence, he sees no "need to examine indirect (usually structural) evidence." ECF 177 at 10. He explains that the indirect evidence approach is used only for determining whether a *hypothetical* monopolist *could* charge a supracompetitive price. *Id.* at 11-12. Nevertheless, he furthers that "the structural evidence is consistent with that direct evidence." *Id.* at 12. The indirect evidence that he says confirms Defendant's monopoly power is how "sales of calsil are extremely concentrated," calsil demand is highly insensitive to price, and high profit margins. *Id.*

4.     Harm to Competition

Citing *Brunswick Corp. v. Pueblo Bowl-o-Mat, Inc.*, 429 U.S. 44, 488 (1977), Dr. Warren-Boulton states that "harm to competition is a required element of an antitrust violation." ECF 177 at n.3. He concludes that Plaintiff's entry into the market benefits all calsil purchasers because of

the lowered price, and conversely its exclusion would benefit Defendant while harming Plaintiff and calsil purchasers. *Id*. at 6.

     5.     Damages

Dr. Warren-Boulton says that the harm to Plaintiff caused by Defendant's exclusionary acts "can be reasonably estimated or calculated using standard methods." *Id.* at 7. His opinions regarding antitrust conduct rely heavily on general economic and antitrust theory; he does the same for his damages calculation which also stem from various assumptions.

However, there is no dispute over the appropriateness of his basic methodology. He estimates Plaintiff's damages by comparing its hypothetical profit in the absence of the alleged anticompetitive conduct (the but-for world) with the profit is actually earned. He creates two time frames for measuring lost profits. The first span of time runs from May 2018 (when Plaintiff first entered the U.S. calsil market) to the date of trial (when, assuming Plaintiff prevails, Defendant stops its anticompetitive actions). The second time frame runs five years after trial during which the anticompetitive effects dissipate, and the market reaches equilibrium.

Dr. Warren-Boulton establishes the respective costs to Plaintiff and Defendant of supplying calsil to the U.S. marketplace. From there, Dr. Warren-Boulton calculates past and future profits on the basis of a variety of assumptions including how costs and sale price will increase over time, how the difference in costs and sale price will narrower, and how the parties' relative market share will change. Defendant regards these projections as too speculative and too optimistic, and thereby greatly overstating Plaintiff's damages. However, Defendant also implicitly concedes at least some amount of damages, even if as little as six percent of what Plaintiff claims.

6.     Defendant's Arguments

Dr. Warren-Boulton's reliance on direct evidence to support his findings of market power and anticompetitive effect is "legally invalid," Defendant contends. Not only is use of the "direct evidence shortcut" rare, Defendant argues, but it is wholly unavailable in the vertical restraint context. Citing *Am. Express*, 138 S. Ct. at 2284 & n.7, Defendant argues that the Supreme Court "has rejected this alternative approach to proving market power as invalid as a matter of law." ECF 135 at 10. The Court agrees with Defendant that *Am. Express* "confirmed the importance of accurately defining the relevant market." ECF 135 at 30. However, the Court does not read *Am. Express* as dispensing with the direct evidence option altogether.

There may be circumstances when the presence of an unreasonable restraint may be presumed. However, Plaintiff does not bring a *per se* monopolization claim. It is alleging unilateral conduct by Defendant directed towards the distribution level of the calsil market. Plaintiff must establish the anticompetitive effects of the challenged conduct without the benefit of a *per se* presumption. That is the purpose of the Rule of Reason. The Rule of Reason offers two ways to show that a restraint on trade has an unreasonable effect on competition: either through direct evidence of such harm or through indirect evidence from which such harm may be inferred. Plaintiff relies on the direct evidence option. *Am. Express* does not foreclose that approach as a matter of law. Whether Plaintiff can meet its burden of proof to show actual anticompetitive effect is a different question. By comparison, if Plaintiff can establish its *per se* Section 1 tying claim, then presumably it has less needed to show actual anticompetitive effect.

Even if Plaintiff may rely on "direct evidence," Defendant argues next that a supracompetitive price alone is insufficient. There must be evidence of both a supracompetitive price and restricted output, but Plaintiff does not show the latter. Defendant cites to case law that

**165**

requires them in combination. ECF 135 at 38-39. Maybe in certain situations, both are relevant, but this Court does not discern a uniform rule. In addressing this same issue, the Second Circuit explains that direct evidence does not necessarily consist of showing the ability to increase price profitably by restricting output. Rather it can be shown through either a supracompetitive price, reduced output, *or* other harm. *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 63 (2nd Cir. 2019).

As for the damages calculation, Defendant does not object to the methodology used. It concedes that the "actual" and "but for" world comparison "can be valid." ECF 135 at 50. However, it does say it is legal error for Dr. Warren-Boulton not to apportion damages between Plaintiff's different antitrust theories. The Supreme Court has stated that "at the class-certification stage (as at trial), any model supporting a plaintiff's damages case must be consistent with its liability case, particularly with respect to the alleged anticompetitive effect of the violation." *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013) (internal citations omitted). That case concerned two million Comcast subscribers who proposed four theories of how Comcast's "clustering" strategy had the effect of increasing the cost of cable services. Plaintiffs' damages model was based on all four theories, but only one theory later was accepted as capable of class-wide proof. The Court held that plaintiffs must rely on a model that shows damages attributable to the remaining theory. *Id.*.

This Court disagrees that *Comcast* compels excluding Dr. Warren-Boulton's damages opinion. For one, although Plaintiff advances different ways in which Defendant allegedly harmed competition, they are not necessarily so distinct nor the overall situation so complex that the lack of apportionment is fatal to its ability to establish its case. More importantly, none of Plaintiff's theories have been rejected yet. As *Comcast* furthers, "[t]his methodology might have been sound,

and might have produced commonality of damages, if all four of those alleged distortions remained in the case." *Id*. at 37. Potentially, if Plaintiff is able to show that Defendant harmed competition by all of the forms of challenged conduct, then there is less imperative to apportion damages between them.

Citing *In re Indep. Serv. Orgs. Antitrust Litig.*, 85 F. Supp. 2d 1130, 1153 (D. Kan. 2000), Defendant argues that Plaintiff also must disaggregate damages caused by its lawful conduct. What conduct by it that was lawful and harmed Plaintiff, Defendant does not specify, and it otherwise is unclear whether the particular circumstances of this case necessitate this type of apportionment.

Defendant faults Dr. Warren-Boulton for not accounting for potential harms to Plaintiff's business that are wholly independent of it. This includes problems internal to Plaintiff's own business or outside forces. How that runs afoul of *Comcast* and *Indep. Servs.* is unclear because it does not concern *conduct by Defendant*. At some point, if it is able to show unlawful antitrust conduct by Defendant, Plaintiff also will be required to prove damages that have a causal relationship with it. The Court leaves for later determination whether it can meet its burden of proof on that element.

Lastly, Defendant challenges the extent to which the report supports Plaintiff's Lanham Act claim. However, expert witness opinion is not needed to establish damages for it. *Skydive Arizona, Inc. v. Quattrocchi*, 673 F.3d 1105, 1113 (9th Cir. 2012). Nor does this Court consider at this juncture whether Plaintiff is entitled to pre-judgment interest.

7.   Summation

There is no dispute over Dr. Warren-Boulton's qualifications as an expert witness to opine about economic and antitrust matters. Moreover, he addresses factors that are generally relevant to establishing an antitrust violation. The Court cannot conclude that his chosen methodology is

so deficient as to warrant excluding his opinion on that basis. Nor does the Court find any opinion that should be excluded as a matter of law.

### E.   Are Dr. Warren-Boulton's Opinions on Matters Within that Framework Reliable?

Defendant also challenges the sufficiency of his underlying analysis and supporting data (or lack thereof). The report reasonably could be construed as relying to a significant degree on theory and assumptions although some data is incorporated into it. In a somewhat circular fashion, Dr. Warren-Boulton assumes certain key factors (the scope of the relevant market) based on others (the existence of a monopoly). He does not regard product substitution as a hedge on Defendant's monopoly power because he assumes customers already have adjusted their demand choices in response to the supracompetitive price. Many of his conclusions stem from his finding that Defendant sells calsil at a supracompetitive price. In making that foundational determination, he seems to assume that Plaintiff's calsil price is the proper benchmark competitive price. He does not go so far as to undertake a comprehensive data analysis to establish or confirm all his various assumptions or stated opinions. For example, he does little to control for other possible causes for Defendant's selling price and profit margins and thereby exclude legitimate, non-competitive reasons for the existing market structure. Nevertheless, he does at least address the point, saying that he sees no other factors that could explain the much lower profit Defendant earns on its other products. It seems obvious that any seller has the incentive to maximize profits and to maintain them, but Dr. Warren-Boulton also seems to assume that Defendant in fact acted on that incentive when it allegedly hindered Plaintiff's entry as a competitor.

Of course, a fuller analysis of the data and a clearer explanation of how the data establishes the elements and evidentiary framework of an antitrust claim under the current state of the case law would be *more* helpful to a factfinder. However, that absence of a deeper analysis does not

necessarily mean his opinions lack reliability. This may be a situation in which the direct evidence "short cut" to establishing monopoly power and anticompetitive effect is available. Indeed, that is Plaintiff's position. Plaintiff defends the bases by which Dr. Warren-Boulton reached his conclusions, arguing that they do enjoy adequate support under the circumstances of this case. It is undisputed that for a long time Defendant was the sole supplier of calsil in the U.S.; charges substantially more for it than Plaintiff; and earns its highest profit margin from it. Moreover, calsil is a relatively specialized product for which just a few other substitutes are potentially available. The relevant market may be simple enough to analyze with sales and cost data alone. It may be more straight-forward and easier to establish than the question of "whether at-shelf coupon dispensers are an economic market," *Menasha*, 354 F.3d at 661, for example.

Defendant cites *Reed Constr. Data, Inc. v. McGraw-Hill Cos., Inc*., 49 F. Supp. 3d 385 (S.D.N.Y. 2014) as an instance in which Dr. Warren-Boulton's opinion was excluded on Rule 702 grounds. That case involved the only two competing databases in the U.S. of construction projects open for bids. Plaintiff complained that the defendant engaged in various surreptitious acts to impair the quality of its database. To compensate, Plaintiff said it was forced to lower the price of its service. At issue was Dr. Warren-Boulton's methods for showing harm to plaintiff's business that was attributable to defendant's alleged wrongdoing. The Court heard from both Dr. Warren-Boulton and a rebuttal expert witness, and in a lengthy decision, it went through the many flaws it found with his methodology, data, and conclusions reached therefrom. Whether Dr. Warren-Boulton's analysis of the particular facts and circumstances in this case is flawed to the same extent is not readily apparent. The Court does not find *Reed* to compel excluding his present opinions.

Likewise, the unpublished decision of *Material Tech., Inc. v. Carpenter Tech. Corp*., No. 01-2965 (SRC), Slip Op. (D.N.J. June 28, 2005), which Defendant provides at ECF 135-2, does

not persuade this Court to exclude Dr. Warren-Boulton's opinion. That court rejected his damages opinion but not necessarily because of flaws with his own analysis. Rather, he assumed as true the (excluded) opinions of other experts that plaintiff's newly developed product was a viable substitute for the traditionally made version. He also assumed as true that plaintiff had the legal right to enter a particular joint venture to sell the product, a scenario which the court rejected in a subsequent summary judgment ruling.

Defendant's objections are better suited for challenging the report's persuasiveness. It may be that as in *Menasha*, Dr. Warren-Boulton's opinions fall short of what Plaintiff needs to survive summary judgment. *See also R.J. Reynolds Tobacco Co. v. Philip Morris, Inc.*, 199 F. Supp. 2d 362 (M.D.N.C. 2002); *Bepco, Inc. v. Allied-Signal, Inc.*, 106 F. Supp. 2d 814 (M.D.N.C. 2000). Likewise, his report may lack the kind of data-driven analysis that is most helpful to an antitrust theory. Whether the evidence suffices to prove Plaintiff's claims will have to be judged in the context of the merits. *Ward v. Apple, Inc.*, No. 12-cv-05404-YGR, 2018 WL 934544, at *3 (N.D. Cal. Feb. 16, 2018) (finding that because Dr. Warren-Boulton relied too heavily on generalities and theories, his report did not support a motion to certify an antitrust class), *aff'd*, 784 F. App'x 539 (9th Cir. 2019); *In re Auction Houses Antitrust Litigation*, No. 00 Civ. 0648 (LAK), 2001 WL 170792, at *14-15 (S.D.N.Y. Feb. 22, 2001) (overruling an objection to a proposed settlement of a price-fixing case that was based on Dr. Warren-Boulton's opinion because it lacked persuasive support and was contrary to the approach that case law prefers); *Engelhard*, 970 F. Supp. at 1483-85 (finding that the several shortcomings in Dr. Warren-Boulton's opinion left the plaintiff unable to establish the relevant market and thus unable "to meet its ultimate burden of persuasion as to an essential element of its case."). For present purposes, Defendant does not show the basis of the report to be so defective that it calls its very reliability and usefulness into doubt.

Defendant's objection to Dr. Warren-Boulton's opinion as being too speculative includes the damages calculation. Estimating profits in the absence of the challenged conduct and forecasting future profits both are inherently speculative endeavors, and case law permits "a degree of uncertainty," *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 566-67 (1981). If, as Defendant contends, his damages calculation lacks sufficient foundation, then it will be unpersuasive. However, the Court cannot conclude that it is so inherently unreliable that it should be excluded from consideration altogether. As Defendant states in the defense of its expert witness, Ronald King, "exclusion of expert testimony is the exception, not the rule," citing *Prima Partners, LLC v. Waterhouse*, 16-cv-02875-MEH, 2018 WL 2091075, at *3 (D. Colo. May 3, 2018).

Plaintiff still must prove all the required elements of its antitrust theories under the correct framework and the current state of the law. In reference to Defendant's pending summary judgment motion, Plaintiff also must show how genuine disputes of material fact warrant sending its claims to the factfinder for resolution. Plaintiff must do so on the basis of the current evidentiary record and explain how the report of its expert witness supports its position.

### III.   The Admissibility of Ronald King's Opinions

Defendant challenges Plaintiff's ability to use the report of Dr. Warren-Boulton on both procedural and admissibility grounds. In denying both of Defendant's Motions, the Court resolved many points in Plaintiff's favor. The Court allows the entry of the Updated Report, and even though his report is not a model of clarity or comprehensiveness, the Court found it nonetheless sufficiently reliable to survive Rule 702/*Daubert* review. Plaintiff now attacks the admissibility of Ronald King's report which Defendant submits to explain aspects of the mechanical insulation industry. Plaintiff argues that "most of Mr. King's opinions are not admissible." ECF 134 at 6.

The Court begins with Plaintiff's argument that they are:

> unsupported, not reliable, and so hopelessly vague and misleading that they will be of no use to the trier of fact. Mr. King offers no basis for any of his offered opinions—indeed, he did not review any materials from this case—and they are not based on any subjective methodology but, rather, his subjective thoughts about the industry.

*Id*. at 7. "*Daubert* and the Federal Rules of Evidence demand more," Plaintiff asserts. *Id*. Unlike Dr. Warren-Boulton, an economist whose expert testimony is needed to explain how the science of economics supports Plaintiff's antitrust theories, Defendant does not ask Mr. King to explain a scientific, mathematical, or technical matter. The challenges that Plaintiff makes to Mr. King's reliability do not transfer to this context. Mr. King's expertise comes from experience, rather than scientific training. Consequently, the *Daubert* pre-screening factors do not apply to him in the same way they do to Dr. Warren-Boulton. *U.S. v. Foust*, 989 F.3d 842, 845-46 (10th Cir. 2021).

Moreover, Mr. King has the professional experience to explain how the mechanical insulation industry generally works. Indeed, that experience is so extensive, it does not require repeating here. The Court incorporates the explanation for why Mr. King is knowledge about such matters that Defendant provides in his Response (ECF 150).

Lastly, Plaintiff contends that the law of the case forecloses the need for an explanation of the mechanical insulation industry. Plaintiff refers to the Court's ruling on Defendant's Motion for Partial Summary Judgment at *Chase Mfg., Inc. v. Johns Manville Corp.*, No. 19-cv-00872-MEH, 2021 WL 50871 (D. Colo. Jan. 6, 2021). In it and preceding rulings, the Court declined to define the relevant market to necessarily include calsil's end users within its scope or to exclude the possibility that factors other than price may influence calsil demand. The Court did not enter summary judgment in Defendant's favor. Moreover, that ruling was limited to the record then available. Plaintiff itself regards Defendant's endeavor as "premature," (ECF 178 at 5), and at the time, Plaintiff complained that Defendant was ignoring the "highly fact-intensive" task of

"defining a relevant product market." ECF 87 at 7. The undisputed material facts that the Court drew from the then record were measured and limited in scope. Neither they nor other aspects of that ruling prevents a fuller inquiry into whether Plaintiff can prove an antitrust violation.

The Court finds no basis to exclude the challenged opinions of Mr. King on Rule 702 or *Daubert* grounds.

## CONCLUSION

The question of whether Plaintiff can prove the merits of its claims for relief remains unanswered. It will be Plaintiff's burden to explain how it must prove its case and what evidence supports its theories. It must do so on the full record. This Court sees no reason to strike or otherwise exclude the challenged expert witness reports.

Accordingly, Defendant's Motion to Strike [filed January 14, 2022; ECF 176], Defendant's Motion to Exclude [filed December 6, 2021; ECF 135], and Plaintiff's Motion to Exclude [filed December 6, 2021; ECF 134] are **denied**.

Entered this 22nd day of February, 2022, at Denver, Colorado.

BY THE COURT:

*Michael E. Hegarty*

Michael E. Hegarty
United States Magistrate Judge

# ATTACHMENT 6

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-00872-MEH

CHASE MANUFACTURING, INC.,

      Plaintiff,

v.

JOHNS MANVILLE CORPORATION,

      Defendant.

---

## ORDER

---

**Michael E. Hegarty, United States Magistrate Judge.**

      Before the Court is Defendant's Motion for Summary Judgment (ECF 193) and Motion to Strike (ECF 221). Both Motions are fully briefed, and the Court heard oral argument on April 18, 2022. For the following reasons, the Motion for Summary Judgment is granted and the Motion to Strike is denied.

## <u>BACKGROUND</u>

**I.    Claims for Relief**

      Before addressing Plaintiff's claims for relief, it is helpful to establish the surrounding context. The parties do not provide such information in their statements of fact, but there is no dispute about them either. The Court draws them from previous filings and rulings, and summarizes them as such:

      Defendant manufactures and sells mechanical insulation materials for use in industrial settings to insulate pipes, tanks, or equipment at very high temperatures. There are several

materials that can be used for that purpose. One such product is hydrous calcium silicate thermal insulation ("calsil"). At issue here is the kind of calsil that complies with the ASTM C533 Type I industry standard regarding quality and performance characteristics.

Defendant manufactures calsil in the United States. For many years before Plaintiff's entry into the calsil market, Defendant also was the sole seller in the U.S. A factory in China is another source of calsil. In March 2018, Plaintiff began importing calsil made at the Chinese factory into the U.S., thereby entering the U.S. market as Defendant's sole competitor.

Both Defendant and Plaintiff sell their respective calsil products primarily to distributors. Roughly speaking, the manufacturer-to-distributor step in the greater supply chain constitutes the upstream market. It is the focus of Plaintiff's antitrust claims. Distributors, in turn, sell calsil to those who need it for particular construction projects. Many of these downstream sales are to contractors.

The Court denied Defendant's first summary judgment motion, finding the record insufficient to grant judgment on "how Plaintiff's definition of the relevant product market is factually and legally inadequate." *Chase Mfg., Inc. v. Johns Manville Corp.*, No. 19-cv-00872-MEH, 2021 WL 50871, at *6 (D. Colo. Jan. 6, 2021). Summarizing the then-available record, the Court observed how:

> calsil is a product that is used to meet highly technical needs in industrial or equivalent settings, and that the choice to use it is likewise technical in nature. The processes for obtaining and installing it at a project site involve many actors, and distributors play the critical role in providing calsil to contractors and to others who seek it for project needs.

*Id*. The Court disagreed with Defendant that "Plaintiff's focus on the distributor level [was] legally inadequate." *Id*. Nor does the current record show how the technical aspects of the industrial insulation material market should be ignored or why the upstream, distributor-level of the supply

**176**

chain should not be the focus of inquiry. A distributorship network can play an important role and benefit both the manufacturer and the end user. *U.S. v. Dentsply Int'l, Inc.*, 399 F.3d 181, 192-93 (3rd Cir. 2005).

Within that context, Plaintiff raises two theories for why Defendant's reaction to Plaintiff's entry into the U.S. calsil market violated antitrust law. Its first theory rests on the allegation that Defendant conditioned the sale of its other insulator products on distributors' calsil purchases. That requirement, Plaintiff contends, represents an unlawful tying arrangement in violation of Section 1 of the Sherman Act (15 U.S.C. § 1). The second theory is that Defendant engaged in various exclusionary acts that constitute unlawful monopolization under Section 2 of the Sherman Act (15 U.S.C. § 2).

Plaintiff had asserted a third claim for relief based on a violation of the Lanham Act. Because Plaintiff now withdraws that claim (ECF 204 at 10, n.1), the Court need not address it here. However, the Court still reviews evidence related to it to the extent it overlaps with Plaintiff's claim of disparagement as a form of exclusionary conduct.

## II.    Scope of the Record

The disputes over the record itself are nearly as extensive as those concerning the claims' merits. One issue concerns the adequacy of Plaintiff's answers to Contention Interrogatory Nos. 9 and 10 (found in the record at ECF 193-1) in which Defendant asked, in effect, for Plaintiff to identify the evidence that supports two particular allegations of wrongdoing. As Plaintiff explains in its Opposition (ECF 204 at 73-76), it limited its interrogatory answers to those materials over which it had direct access, *i.e.*, the information "which [is] reflected in documents within [Plaintiff's] possession, custody, and control and which [Plaintiff] produced to [Defendant] in the course of this litigation." *Id.* at 73. In other words, Plaintiff excluded from its answers the evidence

that came from Defendant–even though Plaintiff regards Defendant as the primary source of relevant, admissible evidence (*id*. at 74). Plaintiff uses its Opposition to provide just "a brief preview of the evidence that supports its claims," and prefers to wait until trial to "prove its case affirmatively." *Id*. at 75.

Defendant did not object to the sufficiency of the interrogatory answers during the discovery phase of litigation. Instead, Defendant says the answers should restrict the scope of the evidentiary record for purposes of the present summary judgment analysis. For the sake of thoroughness and the policy favoring rulings on the merits, the Court takes into consideration all evidence which Plaintiff submits as part of the current briefing. Defendant already knew of that evidence, even if Plaintiff omitted some of it from its answers to those specific interrogatories.

Defendant also complains about admissibility and authentication defects with the evidence upon which Plaintiff relies for its Opposition and Sur-Reply. As a general rule, a court only may consider admissible evidence when ruling on a summary judgment motion. *Strepka v. Jonsgaard*, No. 10-cv-00320-PAB-KMT, 2011 WL 2883375, at *6 (D. Colo. July 18, 2011) (citing *Johnson v. Weld Cnty., Colo*., 594 F.3d 1202, 1209-10 (10th Cir. 2010)). Fed. R. Civ. P. 56(c)(1)(B) permits as a summary judgment argument that the "adverse party [here, Plaintiff] cannot produce admissible evidence to support the fact" at issue. Rule 56(c)(2) permits the objection "that the material cited to support or dispute a fact *cannot* be presented in a form that *would* be admissible in evidence." (emphasis added). In other words, a court may not consider an exhibit if it could not be presented in some admissible form later at trial. *SEC v. Mahabub*, No. 15-cv-2118-WJM-MLC, 2017 WL 6555039, at *2 (D. Colo. Dec. 22, 2017). Moreover, case law construes a Rule 56 admissibility objection to concern the content or substance of the evidence, not its form. *Johnson v. Salt Lake City Sch. Dist*., No. 19-cv-743-JNP-DAO, 2021 WL 4895241, at *3 (D. Utah Oct. 20,

**178**

2021); *Strepka*, 2011 WL 2883375, at *6 ("As the nonmoving party, Plaintiff is not required to produce evidence 'in a *form* that would be admissible at trial, but the content or substance of the evidence must be admissible.'") (quoting *Thomas v. Int'l Bus. Mach*., 48 F.3d 478, 485 (10th Cir. 1995)). The burden is on the proponent of the exhibit to show how it could be admissible. *Royal Pacific Ltd. v. Faith Elec. Manuf. Co., Ltd*., No. 17-357-MIS/JFR, 2022 WL 228218, at *5 (D.N.M. Jan. 26, 2022). At the same time, the Court enjoys "broad discretion to determine at the summary judgment stage what evidence it will consider pursuant to Rule 56(c)(2)." *Id*.

Defendant objects to various emails as hearsay. However, Plaintiff may have potential hearsay exceptions which it could raise at a trial. One possibility is the emails constituting records of regularly conducted activity under Fed. R. Evid. 803(b). *Johnson*, 2021 WL 4895241 at *5. In addition, under Fed. R. Evid. 801(d), if the emails contain statements made by an agent or employee of Defendant which Plaintiff offers against the Defendant, they are not hearsay. *Id*. The focus of Defendant's argument concerns more the failure of Plaintiff to depose the emails' authors. However, that objection seems better placed if Plaintiff was submitting a declaration or affidavit to introduce new, undisclosed testimony that could have been developed by deposing the declarant. Moreover, Plaintiff may be able to call a witness to the stand to testify at the trial even if Plaintiff did not depose the witness, and in doing that, lay the necessary foundation for emails.

An example of Defendant's hearsay objection is the email exchange between Russell Huff and Mark Duppler (presumably both of the third-party distributor, Bay), about Defendant taking a hard line against anyone buying Plaintiff's calsil. ECF 204-3. Defendant argues that Plaintiff should have deposed Mr. Duppler or another Bay representative. However, as the Court explains above, there is the possibility that Plaintiff still may be able to admit the email at a trial. The Court also notes that Defendant itself relies on the email to support its position. ECF 211 at 63.

**179**

Defendant's stronger hearsay argument concerns emails that contain second-hand information. One such email is between Plaintiff's employees on October 22, 2019 in which Mr. Revesz relays others' reports of threats they heard Defendant make. ECF 204-2 at 3. How Plaintiff would admit the multiple layers of hearsay in those emails is less apparent.

Rule 56(c)(2) applies the same with respect to authentication.[1] Rule 56 no longer requires strict authentication of all exhibits. *Houston Cas. Co. v. Swinerton Builders*, No. 20-cv-03558-NYW, 2022 WL 523434, at *3 (D. Colo. Feb. 22, 2022) (accepting for consideration the insurer's submission of the underlying policy insurance contract over the insured's authenticity objections). A court may exclude a document from consideration if there is no way to authenticate it. *Mahabub*, 2017 WL 6555039 at *2. That permits a party to resolve an authentication objection by explaining how it will do so at trial. *Alfonso v. SSC Pueblo Belmont Operating Co*., LLC, No. 11-cv-01186-PAB-KLM, 2012 WL 2863128, at *2 (D. Colo. July 11, 2012). At issue is the PowerPoint slideshow (found in the record at ECF 204-1 beginning at page 128) that Defendant presented at its Industrial Product Information Workshop and which various contractors, distributors, engineers, and facility owners (that is, all those involved in the use of Defendant's products) attended. Plaintiff authenticates it through the deposition testimony of Defendant's witness, Jack Bittner, which it attaches to its Sur-Reply at ECF 219-3. Further ameliorating Defendant's concern is the fact that it is Defendant's own document, produced to Plaintiff during discovery. *Johnson*, 2021 WL 4895241 at n.2 (citing *U.S. v. Doe*, 465 U.S. 605, n.13 (1984)).

---

[1] "The issue of authentication of exhibits in summary judgment briefing is not the same as admissibility at trial." *VanderLaan v. Ameriprise Auto & Home Ins*., No. 20-cv-00191-PAB-STV, 2021 WL 4439875 at n.6 (D. Colo. Sept. 27, 2021). Consequently, accepting a document as capable of being authenticated for summary judgment purposes does not necessarily mean it will be admissible at trial.

The Motion to Strike (ECF 221) concerns the exhibits that Plaintiff attaches to its Sur-Reply which Defendant regards as untimely. Why Plaintiff did not include them as part of its Opposition is unclear. Moreover, despite the body of the Sur-Reply being sixty-two pages long, little of it is responsive to the Court's *Daubert* ruling (ECF 205), the reason why the Court permitted the additional briefing. Because of those procedural defects, Defendant asks the Court to strike the exhibits, or alternatively, to give it leave to file a sur-surreply. In order to bring finality to the briefing—and because Defendant's Motion to Strike in substance doubles as a sur-surreply, the Court declines to strike the exhibits and will let the record stand as is. *Mahabub*, 2017 WL 6555039 at *2 (observing "no blanket procedural exclusion" of evidence attached to a reply brief and permitting its use to fill "in the purported gaps asserted by" the nonmovant and to authenticate documents with additional deposition excerpts).

## III.    Statement of Material Undisputed Facts

In opposing summary judgment, most of the evidentiary record upon which Plaintiff relies is filed under restricted access, and Plaintiff redacts its Opposition and Sur-Reply briefs heavily. That of course makes it difficult to write a summary judgment ruling that will be publicly available. The Court endeavors to the greatest extent possible to avoid discussing obviously sensitive details such as specific sales figures. However, much of relevant record draws from deposition testimony and emails from third party distributors, and it appears that Plaintiff and Defendant endeavor to be sensitive to those third parties' discussions of their own business operations. Because of the difficulty in discerning what fact details the parties intend to be redacted and in discussing the fact background without losing context or clarity necessary for the legal analysis, the Court dockets the below Statement of Material Undisputed Facts section separately under restricted access. The

Court does so out of sensitivity to the distributors who are not parties to this lawsuit and who are in competition with each other.

## **LEGAL STANDARDS**

### I.     **Fed. R. Civ. P. 56(c)**

A motion for summary judgment serves the purpose of testing whether a trial is required. *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1185 (10th Cir. 2003). A court shall grant summary judgment if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The moving party bears the initial responsibility of providing to the court the factual basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "The moving party may carry its initial burden either by producing affirmative evidence negating an essential element of the nonmoving party's claim, or by showing that the nonmoving party does not have enough evidence to carry its burden of persuasion at trial." *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002).

If the movant properly supports a motion for summary judgment, the non-moving party has the burden of showing there are issues of material fact to be determined. *Celotex*, 477 U.S. at 322. That is, the opposing party may not rest on the allegations contained in the complaint, but must respond with specific facts showing a genuine factual issue for trial. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 247–48 ("[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."). These specific facts may be shown

"by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves." *Pietrowski v. Town of Dibble*, 134 F.3d 1006, 1008 (10th Cir. 1998) (quoting *Celotex*, 477 U.S. at 324).

"[T]he content of summary judgment evidence must be generally admissible and . . . if that evidence is presented in the form of an affidavit, the Rules of Civil Procedure specifically require a certain type of admissibility, *i.e.*, the evidence must be based on personal knowledge." *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1122 (10th Cir. 2005). "The court views the record and draws all inferences in the light most favorable to the non-moving party." *Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. Pepsico, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005).

## ANALYSIS

Despite the lengthy summary judgment briefing and the benefit of the Court's many rulings already rendered in this case, Plaintiff's theories about how an antitrust violation occurred continue to rely on inference and speculation. The essential thrust of Plaintiff's Opposition is that its claims should be given to the jury for resolution. However, Defendant's Motion for Summary Judgment obliges Plaintiff to come forward now and define precisely what constitutes an unlawful antitrust act, submit all relevant evidence, and explain how that record could support a finding of such an antitrust violation. As the Court explains below, Plaintiff does not do so.

## I.    Monopolization

The Court's previous ruling on the parties' *Daubert* motions, *Chase Mfg., Inc. v. Johns Manville Corp.*, No. 19-cv-00872-MEH, 2022 WL 522345 (D. Colo. Feb. 22, 2022), provides a detailed discussion of how the law defines unlawful monopolization. That ruling stated the basic elements of: (1) Defendant's possession of monopoly power in the relevant market, (2) Defendant's willful maintenance of that power, and (3) antitrust injury. *Id*. at *4. The Court also

keeps in mind the proper focus of antitrust law: it is meant to protect competition itself, not the competitor. *Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns, Inc.*, 108 F.3d 1147, 1151 (9th Cir. 1997).

### A.    Monopoly Power

Broadly stated, a monopolist has the power to control prices or exclude competition over a substantial length of time. *Chase Mfg.*, 2022 WL 522345 at *4. There is no dispute that Defendant was the sole maker and supplier of calsil in the U.S. and had a *de facto* monopoly in the practical sense. There is evidence that of all its products, calsil earned Defendant its highest profit margin, and that Defendant charged twenty to twenty-five percent more for calsil than Plaintiff did despite a possibly inferior quality product. From this, Plaintiff's expert witness, Dr. Warren-Boulton, infers not only that Defendant had a monopoly on calsil but that it charged a supracompetitive price for it as well. *Id*. at *8. Whether the price Defendant was charging was in fact a supracompetitive price, this Court need not answer definitively at this stage. Theoretically, there is the potential of legitimate causes for the price difference. Compare for the sake of argument if Defendant manufactured calsil at a U.S. factory paying union wages and under strict environmental regulations but Plaintiff made calsil at an Asian factory that enjoyed generous subsidies. Of course, there is no evidence of such in this record. Dr. Warren-Boulton does not endeavor to exclude legitimate factors affecting price, and if there are any, Defendant does not identify them.

For present purposes, the Court assumes that Defendant had a monopoly over U.S. calsil sales *before* Plaintiff's entry. To prevail on its claim, Plaintiff must show that Defendant's monopoly power continued afterwards as well.

### B.   Relevant Market

A monopolist's power cannot be measured without knowing the market in which it operates, and several factors go into defining what that relevant market is. *Id*. at *6. Dr. Warren-Boulton says it is calsil sold by manufacturers (only Plaintiff and Defendant) to distributors (or other direct buyers) within the U.S. *Id*. at *7. Defendant disagrees and says it should be (1) expanded to include other insulator materials and downstream buyers but (2) reduced geographically from the national to region level. With regard to just the various insulating products, the degree of substitution remains unclear. Nevertheless, because the record contains evidence that reasonably supports Plaintiff's definition, the Court accepts it for present purposes. The Court gives Plaintiff the benefit of the doubt and considers its monopolization claim in the context of a market that consists of upstream sales to distributors of calsil at the national level.

### C.   Willful Maintenance of Monopoly Power

Simply being a monopoly or having monopoly power is not necessarily unlawful. The present lawsuit is not based on the allegation that Defendant unlawfully had *acquired* such a favorable position before Plaintiff entered the calsil market. Dr. Warren-Boulton opines that Defendant's monopoly position gives it motivation to preserve it. For present purposes, the Court assumes that Defendant did have such an incentive, but in any event, a desire to maintain a monopoly's benefit is not the dispositive point. What is dispositive is if Defendant willfully acted on that motivation and took affirmative steps to defend its monopoly upon Plaintiff's entry. In other words, there must be anticompetitive conduct.

Plaintiff advances several forms of exclusionary conduct that it says Defendant employed to protect its calsil monopoly. To encourage distributors to continue to buy its product, Defendant either threatened to *withhold* from them its calsil and other products or *tied* calsil to their purchases

**185**

of other products. To discourage distributors from buying its calsil, Plaintiff contends that Defendant also disparaged it and its product. Thirdly, Plaintiff claims that Defendant used exclusive dealing arrangements to block it from accessing distributors.

### D. Unreasonable Restraint on Trade

More is needed than just any act of exclusionary conduct. To be actionable, the restraint on trade or commerce must be of an undue or unreasonable degree. *Id*. at *4. The Court already has held that Plaintiff must use the "Rule of Reason" method to establish the unreasonableness of a challenged conduct. *Id*. at *4. In other words, there is no *per se* restraint[2] at issue in this case to permit the inference of competitive harm. The Rule of Reason's first step requires Plaintiff to prove how the particular restraint has a substantial anticompetitive effect that harms the consumers in the relevant market. *Id*. at *5.

The simpler way for Plaintiff to satisfy the Rule of Reason is with direct evidence of actual anticompetitive effect. Plaintiff's expert witness, Dr. Warren-Boulton, primarily relies on the direct evidence option. However, there is no evidence of an obvious restraint. Assuming Plaintiff's claims as true, Defendant only endeavored to dissuade distributors from buying Plaintiff's calsil. It is not readily apparent on the face of the evidence that its efforts were effective in achieving that goal to a significant degree. Consequently, the Court does not see in the record the kind of evidence that this approach requires. *Id*. at *6 (providing a definition of direct evidence for Rule of Reason purposes). Indirect evidence, which entails a deeper analysis, is the other option. To prevail on it,

---

[2] A *per se* restraint is one that almost always tends to restrict competition. In other words, it has a manifest anticompetitive effect and lacks any procompetitive redeeming value. Case law conveys *per se* status to a type of restraint only after significant experience considering it and when it can predict confidently that application of the Rule of Reason would invalidate it. *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 885-87 (2007).

Plaintiff must have proof of market power and evidence of how the challenged restraint harms competition. *Id*. at *6.

### E.       Exclusionary Conduct

The focus of Defendant's summary judgment motion is on the alleged exclusionary acts which concern the second *prima facie* element. To prove monopolization, Plaintiff must demonstrate conduct whose only rational benefit is to harm competition, *Novell, Inc. v. Microsoft Corp*., 731 F.3d 1064, 1072 (10th Cir. 2013), for example, by excluding competition or harming a competitor. That stands in contrast with legitimate factors such as a superior product, business acumen, or even historic accident that creates success consistent with competition on the merits. *U.S. v. Grinnell Corp*., 384 U.S. 563, 571 (1966). In other words, the inquiry asks whether Defendant's conduct constituted coercion or competition. The Court defines the respective alleged acts in turn below and considers whether the record contains supportive evidence.

### 1.       Refusal to Supply

The Court begins by noting the general rule that "unilateral conduct cannot be considered anticompetitive." *New Mexico Oncology & Hematology Consultants, Ltd. v. Presbyterian Healthcare Servs*., 994 F.3d 1166, 1172 (10th Cir. 2021). A firm is free to choose with whom it does business and to set an optimal sale price for its product. *Novell*, 731 F.3d at 1072. Nor is a firm required to *help* its competitor. *Id*. Nevertheless, case law recognizes the potential for many different forms of anticompetitive conduct and thus the possibility that a unilateral refusal to deal may have an unlawful effect. *New Mexico Oncology*, 994 F.3d at 1172. That potential exists when (1) the monopolist had a preexisting voluntary and presumably profitable course of dealing (2) which the monopolist willingly discontinued and gave up short-term profit from it in order to achieve an anticompetitive end. *Id*. While case law allows for such a claim, it remains a limited

exception, only available if the unilateral conduct is irrational but for the anticompetitive benefit. *Solidfx, LLC v. Jeppesen Sanderson, Inc.*, 841 F.3d 827, 843 (10th Cir. 2016).

The above case law considers this exception in the context of the refusal to supply a *rival or competitor*. That is not the situation presented here. Plaintiff does not complain about Defendant's refusal to do business with it but rather third-party customers. Plaintiff couches Defendant's refusal to supply in terms of a leverage to discourage distributors from leaving it. Although the context may be different, the same general principles apply: Defendant's right to exercise its own independent discretion with whom it will deal does not go so far as to permit it to maintain a monopoly. *Lorain Journal*, 342 U.S. at 155.

The Court already has permitted Plaintiff to frame this theory in terms of the refusal to sell or supply calsil to third-party distributors, and the Court borrowed as the claim's *prima facie* elements those from the refusal-to-deal context. *Chase Mfg., Inc. v. Johns Manville Corp.*, No. 19-cv-00872-MEH, 2020 WL 1433504, at *11 (D. Colo. Mar. 23, 2020). However, the question no longer is whether "Plaintiff's allegations provide a plausible basis to infer Defendant's refusal to sell to customers runs afoul of Section 2 of the Sherman Act," *id.*, as it was at the time of that ruling, but rather whether the claim "lacks significantly probative evidence," *New Mexico Oncology*, 994 F.3d at 1172 (citing *Anderson*, 477 U.S. at 249-50).

The Court does not doubt Plaintiff's ability to establish at trial the first element regarding a preexisting profitable relationship. What is lacking is probative evidence that Defendant willingly inflicted upon itself harm in the short run in order to thwart Plaintiff's entry into the U.S. calsil market. To begin with, there is no evidence of *systemic* refusal by Defendant to sell calsil.

Plaintiff's claim rests on Defendant's threats not to support those distributors who bought from it. The evidence would support finding that Defendant had taken such a stance, monitoring

shipments of imported calsil and making its displeasure known to offenders. The next point of inquiry is whether Defendant articulated its general displeasure and the threat of non-support to distributors. As the Court notes at ¶¶ 9-10 of the above fact statements, there is evidence that two distributors, SPI and MacArthur, assured Defendant that they were not buying from Plaintiff. That evidence permits the inference that they perceived the need to keep Defendant happy.

There also is evidence of Defendant making more direct threats, such as with DI. Defendant once orally communicated the threat to DI (¶ 16); once on March 23, 2018 emailed the threat to it; and later expressed its displeasure to it (¶ 33). In October 2018, 4-State perceived such a threat if it bought from Plaintiff. ¶ 23. Defendant warned APi that continued purchases from Plaintiff would cause a change in the relationship. ¶ 20. However, Plaintiff does not explain how mere threats (whether as vague changes to the business relationship generally or refusals to supply calsil or other products specifically) prove its antitrust claim, even if Defendant made them with the intent to preserve its calsil monopoly.

The next question is whether Defendant followed through on those threats. In other words, Plaintiff must show that a distributor suffered actual negative repercussions and harm as a result of a purchase of Plaintiff's calsil. DI did not necessarily perceived Defendant's threat as substantial or improper. It both doubted the wisdom of the threat (¶ 18) and conceded that shifting support to a competing distributor is a legitimate competitive response should it not fully support Defendant's product (¶ 16). Moreover, Defendant apologized for its aggressive tone. ¶ 17. Where Defendant did stop supplying particular DI branches, it was in regional markets where Defendant had commitments to other distributors (which Plaintiff exploited). ¶ 18. By the fall of 2019, DI felt comfortable entering a formal relationship with Plaintiff. ¶ 35. There is no evidence that Defendant actually cut APi off, although apparently APi ceased buying from Plaintiff anyway from which it

could be inferred that Defendant's threat was effective. ¶¶ 14, 20-21. The only change in Defendant's relationship with the 4-State distributor was to cease shipments to its Wichita, Kansas branch. However, the adverse impact of that change was minimized by Defendant's continued shipments to another Kansas location at a discounted price. ¶ 23. Defendant never actually declined to supply Bay, although it did hold up one particular order while it investigated the amount of business it was doing with Plaintiff. ¶¶ 25-26. Moreover, Bay was dismissive towards Defendant's expressions of displeasure. ¶ 25. Overall, there were few instances of concrete threats articulated to distributors, and little, if any, harm suffered by any them. Plaintiff does not demonstrate how such isolated and insignificant coercive acts rise to the level of an antitrust violation.

More importantly, however, the focus of this theory of antitrust conduct is on Defendant. There is no evidence that Defendant suffered self-inflicted harm upon itself. This is a consequence of the upstream nature of the calsil supply chain. Defendant is selling to distributors, not end users. There are some regional markets where distributors are in competition with each other. When Defendant did threaten to (or actually did) stop selling calsil to a distributor, it occurred in those markets where Defendant could shift that business to another local distributor. Consequently, the complained-of conduct did not require Defendant to lose calsil sales, and neither did it deprive end users of calsil.

The present record provides a fuller understanding of Defendant's threats and how the upstream market works. Those facts show how this situation is distinguishable from the one in *Lorain Journal*. The "product" at issue there was the ability to advertise for which area businesses were the customers. Until the victim-radio station commenced operations, the defendant-newspaper possessed "a commanding and overpowering" control over the product's supply. *Lorain Journal*, 342 U.S. at 146. In a "bold, relentless, and predatory" way, the newspaper refused

to sell the product to those customers who also bought the same from the radio station. *Id*. at 149. The scheme effectively discouraged customers from buying the product from the radio station, and that harmed the radio station because it primarily relied on that product's sales to stay in business. *Id*. There is no evidence that Defendant's alleged scheme went so far or was as effective. It is true, construing the record in Plaintiff's favor, that Defendant tried to leverage distributors' dependence on it to discourage them from doing business with Plaintiff. However, there is no evidence that Defendant went so far as to fully withhold the product being sold. In actuality, it was the threat to sell to a distributor's competitor that Defendant leveraged. The law recognizes how the development of a favored relationship or imposing certain restrictions can have procompetitive effects at the distributor level. *See, e.g., Leegin Creative*, 551 U.S. at 889-92 (observing the "procompetitive justifications for a manufacturer's use of resale price maintenance" and other forms of vertical restraint). In sum, Defendant pursued a rational course of action.

Case law permits an antitrust claim on the basis of a unilateral decision not to deal or supply, but as an exception to the rule. On this record, with few instances of threatened or actual refusals to supply and no evidence of resulting adverse effects, the Court sees insufficient evidence by which Plaintiff could establish such an exceptional situation. Establishing the monopolization claim is made more difficult still given the manufacturer-distributor context for which the case law has greater tolerance of vertical restraints.

### 2.      Exclusive Dealing

Plaintiff argues that Defendant used exclusive dealing agreements with multiple distributors to cordon off a substantial share of the calsil market for itself, thereby blocking Plaintiff from accessing it. Plaintiff asserts it as another form of exclusionary conduct for its Section 2 monopolization claim.

"An exclusive dealing arrangement is an agreement in which a buyer agrees to purchase certain goods only from a particular seller for a certain period of time." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 270 (3rd Cir. 2012). Such an agreement can be in the form of an express written contract, but if in forming the contract the buyer received consideration for the exclusivity requirement, there is less potential of anticompetitive harm. *McWane v. F.T.C.*, 783 F.3d 814, 834 (11th Cir. 2015). Alternatively, such an agreement can be *de facto* in nature if practical realities compel the buyer into an exclusive buying relationship. Comparatively speaking, a *de facto* arrangement can a pose a more problematic effect on competition. *Id*.

Case law does not regard exclusive dealing arrangements as *per se* harmful to competition. *ZF Meritor*, 696 F.3d at 270. They can have many procompetitive benefits. However, they can be anticompetitive if they unreasonably deny (or slow) a competitor's access to the market, and they are of special concern when imposed by an already existing monopolist. *Id*. at 270-71. Therefore, case law applies the Rule of Reason to determine whether a subject exclusivity arrangement is indeed harmful. *Id*. at 271. The starting point to such a determination is whether the agreement forecloses a competitor's access to a substantial share of the relevant market. A total bar is unnecessary, *McWane,* 783 F.3d at 838, but the effect must be enough "to bar a substantial number of rivals or severely restrict the market's ambit." *Eisai, Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394, 403 (3rd Cir. 2016) (internal citation omitted). The degree of foreclosure that courts regard as unlawful varies, and there is no "fixed percentage at which foreclosure become 'substantial'." *Id*.

The market foreclosure inquiry entails consideration of a variety of factors. These factors include the percentage of the market foreclosed; the arrangement's restrictiveness, coerciveness, and duration; the parties' relative strength (such as the degree of the defendant's market power and

its customers' ability to resist); and direct evidence of anticompetitive harm such as a resulting increase in price or decline in output of the product. *McWane,* 783 F.3d at 835; *ZF Meritor*, 696 F.3d at 271-72. The ultimate focus of inquiry is not disadvantage to the incoming rival but rather the lessening of competition. *McWane,* 783 F.3d at 835; *ZF Meritor*, 696 F.3d at 272.

The nature of the exclusive dealing arrangement may vary as well. It involves not just prohibitions against a customer's ability to buy from a competitor, but also incentives such as bundled rebates. *Eisai*, 821 F.3d at 405. Common to them all, however, is the concern whether they "break the competitive mechanism" by "depriv[ing] customers of the ability to make a meaningful choice." *Eisai*, 821 F.3d at 404 (internal citation omitted). For example, for a rebate scheme to constitute an unlawful exclusive dealing arrangement, it must make the cost of switching to the new competitor prohibitively expensive. *Suture Express, Inc. v. Owens & Minor Distrib., Inc.*, 851 F.3d 1029, 1041 (10th Cir. 2017).

Plaintiff stresses how Defendant was the sole seller of calsil when it entered the market, after which Defendant added a rebate term that bundled calsil with the purchase of products that Plaintiff does not sell. That way of calculating a rebate reward was added to the 2019 Annual Incentive Agreements with the biggest distributor (DI) and several others (including Bay and SPI). However, even after giving the arrangement closer scrutiny in light of Defendant's dominance in the calsil market and the involvement of significant volume buyers, Plaintiff fails to show a resulting anticompetitive effect of sufficient degree. The Annual Incentive Agreements do not appear to be mandatory; they were something each distributor chose to accept. Even if the agreements were *de facto* mandatory, the size of the rebate reward did not create an insurmountable burden. Plaintiff fails to show how the resulting discount offered by the rebates (assuming a distributor met all criteria for the maximum benefit) was enough to offset the savings from its

cheaper calsil price. In other words, Plaintiff does not demonstrate how the rebate scheme goes beyond permissible price competition to unlawful coercion.

There is no evidence of some other exclusive dealing arrangement whereby Defendant expressly prohibited distributors from doing business with Plaintiff. Plaintiff may contend such an arrangement consists on a *de facto* or implied basis, but even construing the record in Plaintiff's favor on this particular point, it still shows insufficient coercive effect. Comparison with *McWane v. F.T.C.* illustrates the shortcomings of Plaintiff's theory. As concentrated as the calsil market is, the product market at issue in *McWane* was more so. Like Defendant here, McWane was the sole domestic manufacturer. However, McWane's market dominance only increased due to a new procurement regulation that favored the use of American-made products; in practical effect, that regulation weakened buyers' ability to switch to product substitutes. *McWane*, 783 F.3d at 819-20, 829. The upstream level of the supply chain also was more concentrated, with just two distributors controlling up to sixty percent of all distribution, *id*. at 820, with less ability to circumvent through direct sales, *id*. at 840. McWane's exclusive dealing arrangement was far more developed. It fully executed its threat to cut off all supply (of the American-made products needed to secure contracts) and cease all rebates. *Id*. at 821. Moreover, McWane imposed its terms unilaterally on the distributors. *Id*. at 834. McWane's scheme was far more effective than Defendant's, both at securing distributors' compliance by rendering it infeasible to switch to the entrant despite a cheaper price, *id*. at 821, 837-38, and at hindering the entrant, which was unable to increase its sales enough to undertake the kind of capital investment needed to achieve critical operational mass, *id*. at 822, 838-39. Moreover, McWane directly benefitted from its scheme which enabled it to increase both the price charged and the profit margin earned on its products.

*Id*. at 822, 839. Helping the FTC to prove its antitrust case was evidence of McWane's deliberate, purposeful intent to use the scheme to harm the new entrant. *Id*. at 821, 841.

Nothing in the record before the Court shows any of the attributes discussed in *McWane*. There is one *similarity* between *McWane* and the instant case, but it also favors Defendant. In *McWane*, there was "evidence that some distributors started to ignore [McWane's exclusive dealing scheme] after they learned of the FTC's investigation into McWane's practices." *Id*. at 822. The record suggest that the filing of this lawsuit favored Plaintiff in a similar way. On this record, Plaintiff is unable to establish how Defendant can be held liable under antitrust law for "exclusive dealing" conduct.

### 3.    Disparagement

Plaintiff gathers from the record critical statements that Defendant made about its product. The two main sources of the statements are the talking points that Defendant prepared for its sales force to use and from comments made by Defendant's managers directly to distributors. The subjects of the claimed disparaging statements range from highlighting the Chinese origin of Plaintiff's calsil (and various disadvantages related thereto), questioning its quality (namely, whether it contains asbestos or free silica), and doubting its compliance with industry standards.

At this juncture, the Court notes that Defendant's comments about practical disadvantages of relying on an overseas supply of a product, such as supply time, tariffs, sanctions, or disaster scenarios, seem to be legitimate selling points. Nor does Plaintiff indicate how they are factually false. They only cast a negative light of Plaintiff's product (such as Plaintiff does when it says Defendant's calsil is of inferior quality). These particular comments therefore do not appear to implicate the concern about defamation that "plainly is not competition on the merits." *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices & Antitrust Litig*., 507 F. Supp. 3d

1289, 1359 (D. Kan. 2020) (citing *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 109 n.14 (3rd Cir. 2010)).

The Tenth Circuit permits an antitrust claim to be based on exclusionary conduct in the form of trade disparagement aimed at third party customers in the marketplace. However, the mere utterance of a false statement is not enough. Antitrust liability only attaches if the misleading statements are "so widespread and longstanding and practically incapable of refutation that they are capable of injuring both consumers and competitors." *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1079-80 (10th Cir. 2013). In other words, the false speech "must have a significant and enduring adverse impact on competition itself." *Harcourt*, 108 F.3d at 152. Otherwise, the Tenth Circuit presumes that the false statement has only a *de minimis* effect on competition. *Lenox MacLaren Surgical Corp. v. Medtronic, Inc*., 762 F.3d 1114, 1127 (10th Cir. 2014).

To overcome that presumption and to show how an act of trade disparagement rises to the level of an antitrust violation, Plaintiff must satisfy a six-factor test. This test requires a showing that the disparagement was: (1) clearly false, (2) clearly material, (3) clearly likely to induce reasonable reliance, (4) made to buyers without knowledge of the subject, (5) continued for prolonged periods, and (6) not readily susceptible to neutralization or other offset. *In re EpiPen*, 507 F. Supp. 3d at 1359. As to whether a plaintiff must satisfy every factor, the Tenth Circuit does not expressly address. *Lenox*, 762 F.3d at 1128 n.9.

To begin with, the Court assumes that the complained-of criticisms of the content and standards of Plaintiff's calsil are clearly material and clearly likely to induce reliance. Presumably they are matters important to the decision whether to buy Plaintiff's calsil either in its own right or in comparison with Defendant's competing product. The Court likewise construes in Plaintiff's

favor that the accusations of testing and standards non-compliance are clearly false. According to Plaintiff, Defendant knew its calsil was fully compliant.

The record does not go so far as to permit the finding that the statements about asbestos and free silica content likewise were clearly false. Although they are matters of obvious concern, especially in regards to asbestos, these statements still were measured. The asbestos comment was made in the context of a story about an experience at one particular project in which Chinese-made calsil (from an unidentified supplier) may have contained asbestos (among other problems). Plaintiff does not regard the story itself, which presumably is verifiable, as made up. Further minimizing its adverse impact, the story was that the particular shipment "may" have contained just a "trace amount" of asbestos. The conditional nature about how the silica content of the Chinese-made product "*could* be a huge issue" has a similarly limiting effect. Neither statement was definitive.

Establishing the degree of the complained-of statements' falsity is just one hurdle. Plaintiff also must address the context in which Defendant made them and their audience. Assuming that all of them, including the otherwise internally suggested sales talking points, were actually expressed to them, the distributors are sophisticated buyers who are independently knowledgeable about calsil. Indeed, the person to whom the silica comment was made knew to retort that Defendant had used that same factory itself. Defendant's comments did not go so far as to create the kind of safety doubts that occurred in *Lenox*, 762 F.3d at 1127. Relatedly, Plaintiff can easily rebut any criticism about the content or quality of its calsil through laboratory test results. Plaintiff implicitly concedes the ability to neutralize a disparaging statement when it complains that it only has the opportunity to do so when it learns of one. However, the standard asks whether a

misleading statement is "readily susceptible to neutralization," not whether it actually was able to do so.

Even if Plaintiff need not refute all six factors, there still is insufficient evidence by which it could overcome the general presumption that the complained-of statements had only a minor effect on competition. Overall, the subject statements were isolated and conditional, and on their face, invited the distributors' own inquiry and verification. Nor does the evidence support Plaintiff's assertion that the disparagement occurred over a prolonged period of time. Plaintiff points to a sales talking-point document, but it was created in March 2018 (contemporaneous with its entry into the U.S. calsil market). Plaintiff also relies on a PowerPoint slideshow, but its date is unknown. Overcoming the *de minimus* presumption is not the only component of the claim. Plaintiff also must establish a causal relationship between the disparagement and harm to itself and to competition. *Novell*, 731 F.3d at 1080. However, there is no evidence that the subject statements played a significant role in dissuading a distributor from buying Plaintiff's calsil.

Although case law recognizes the potential of antitrust liability for disparagement, there still is a high standard to prevail. Indeed, in *Harcourt*, the court of appeals affirmed the district court's entry of judgment in the defendant's favor after a jury found for the plaintiff on the matter. 108 F.3d at 1151-52. That court regarded as insufficient the defendant's act of anonymously distributed fliers that created doubt about the plaintiff's ability to provide the offered service (because of a regulatory investigation and a bankruptcy proceeding which were unrelated to plaintiff's operational ability) and plaintiff's contemporaneous and otherwise unexplainable drop in business. *Id.* at 1150. The instant case, by comparison, involves sophisticated participants in a more contained environment that permits Plaintiff the opportunity to address customer concerns.

There is an additional point worth noting. This type of antitrust claim more likely will succeed when combined with other anticompetitive acts. *In re EpiPen*, 507 F. Supp. 3d at 1362. Here, however, there is insufficient evidence to establish the other forms of antitrust behavior that Plaintiff raises. That makes it more difficult for Plaintiff to prevail on its disparagement antitrust theory.

## II.    Tying

The Court discusses above Plaintiff's theory of refusal to supply as a means by which Defendant encouraged distributors to buy from it. However, Defendant's refusal to sell a product—whether calsil or another type of insulator–was just one aspect of Plaintiff's exclusionary conduct theory. Plaintiff also complains that Defendant incentivized distributors to buy its calsil by tying it to their purchases of its other products. Not only does Plaintiff raise tying as a form of exclusionary conduct in support of its monopolization claim, but it also raises it as a free-standing antitrust violation. As it did for the dismissal ruling, *Chase Mfg.*, 2020 WL 1433504 at *10, the Court discusses both versions of that tying argument together.

The Court draws the general concept of a tying arrangement from *Unijax, Inc. v. Champion Int'l, Inc.*, 683 F.2d 678 (2nd Cir. 1982) and *Suture Express*, 851 F.3d at 1037-44, but recasts it in terms of the parties and products at issue in this case. The first aspect of a tying arrangement is a seller's possession of market power over the "tying" product. (As applied here, that would involve the Defendant having market power over the other insulating materials.) These are products that a buyer (here, a distributor) wants from Defendant. The other aspect is the "tied" product (here, calsil) which a distributor may prefer to buy elsewhere (such as from Plaintiff because the distributor perceives its calsil as cheaper or better quality). The tying arrangement is unlawful if Defendant uses its market power over the other materials to force distributors to buy its calsil as

**199**

well. In other words, Defendant refuses to sell the two products separately which thereby coerces distributors into buying its calsil when they otherwise would prefer to buy it from Plaintiff. If a distributor rejects the tie-in, then Defendant will not sell the other desired product to it.

The next matter is the means by which Plaintiff must prove unlawful tying. As the Court observed in its prior ruling, Plaintiff brings a *per se* version of the claim. *Chase Mfg.*, 2022 WL 522345 at *4. The Tenth Circuit defines a tying arrangement that is *per se* unlawful by four elements: (1) the involvement of two separate products, (2) conditioning the sale of one product on the purchase of the other, (3) the seller's possession of economic power in the tying product market sufficient to enable it to restrain trade in the tied product market, and (4) a "not insubstantial" affect on interstate commerce in the tied product market. *Chase Mfg.*, 2022 WL 522345 at *4; *Chase Mfg.*, 2020 WL 1433504 at *3 (citing case law). The Court assumes for present purposes that Plaintiff could prove the fourth element about the involvement of interstate commerce.

Should a plaintiff be unable to establish the *per se* version of the claim, the Tenth Circuit permits the Rule of Reason alternative, *Chase Mfg.*, 2020 WL 1433504 at *3 (citing case law), which Plaintiff includes in its Opposition. The Rule of Reason entails "a more thorough examination of the purposes and effects of the practices involved" and "an inquiry into the actual effect of the tying arrangement on competition" based on a "real-market analysis." *Suture Express*, 851 F.3d at 1037-38. The Rule of Reason also has a shifting burden of persuasion, with the first step requiring Plaintiff to show a substantially adverse effect on competition. *Id*. at 1038. The two approaches–*per se* or Rule of Reason–are for practical purposes the same, with the Rule of Reason "mainly different in degree, not necessarily in kind." *Id*. at 1038 & n.4. As the Second Circuit likewise observed, "[t]he factual elements that must be proven for a [*per se*] tying claim capture

much of what must be demonstrated in a rule of reason case." *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 468 (2nd Cir. 2020). Because proving an unlawful tying arrangement under the Rule of Reason implies a *per se* violation as well, the Court simplifies the discussion by limiting its consideration to whether Plaintiff submits sufficient evidence by which it could prevail under the Rule of Reason approach.

As noted above, the Rule of Reason method entails consideration of the four defining elements of a tying arrangement, and consequently, the Court begins the analysis with them. The first element requires the involvement of two separate products. Here, the tied product–what Defendant allegedly wants to force distributors to buy–is clear. It is calsil. Broadly speaking, the tying product–what distributors do want to buy from Defendant and what Defendant allegedly is leveraging to compel calsil sales–is clear as well. It is a range of alternative high temperature insulating materials. For present purposes, the Court assumes that calsil and the other products are distinct. The issue is whether Plaintiff may rely on such a broad range as the "tying product" or, as Defendant contends, if Plaintiff must identify a specific product. Defendant also complains about the shifting nature of Plaintiff's claim, initially pleading it in terms of fiberglass and perlite specifically but now taking a more expansive approach. Whether the law requires Plaintiff to identify a specific tying product the Court need not answer because the third element renders that matter moot. Plaintiff only may rely on those tying product(s) for which it can show Defendant possess market power.

Plaintiff points out how the non-calsil products comprise seventy-seven percent of Defendant's high temperature insulating material sales (with calsil being the remaining twenty-three percent). ECF 204 at 65. The flaw with that argument is that it ignores the presence of established competing sellers of the non-calsil products. Defendant's dominance (if any) over the

supply of those other products is less than it is over calsil. Plaintiff also addresses Defendant's market share in comparison to competing sellers, but in that context, it limits its argument to Defendant's forty percent share of the overall perlite and fiberglass markets. *Id*. at 66. In other words, Plaintiff implicitly limits the tying products to just perlite and fiberglass (as it originally pleaded the claim). While important, market share alone does not establish market power.

The Court notes evidence of how distributors generally preferred maintaining their relationship with Defendant and even felt dependent upon it, but in the overall context, the inference of market power that can be drawn from that evidence is weak (as the below coercion discussion shows). The overall market structure for fiberglass and perlite is different than it is for calsil, sufficiently so to necessitate the kind of thorough analysis that the Rule of Reason requires. Plaintiff must demonstrate how Defendant wielded market power over these other materials. In other words, Plaintiff must show how Defendant could have raised those products' prices or restrict their output as an alternative to using them for a tie-in. *Chase Mfg*., 2020 WL 1433504 at *7. Plaintiff leaves unclear how the evidence, even with the inclusion of Dr. Warren-Boulton's report, reveals such power in the tying product market.

The other dispositive point is whether Plaintiff can prove some sort of arrangement to tie sales of different insulating materials together. Plaintiff's argument is limited to how Defendant had "threatened multiple distributors–including DI, 4-State, API, and Bay–that it would stop making the tying products available if they purchased or stocked [its] calsil." ECF 204 at 64. A tying arrangement need not be in the form of an express contract; the condition can be tacit or implied. *Viamedia*, 951 F.3d at 471. However, without further explanation or development, Plaintiff leaves this claim "blurry," as Defendant puts it. Underlying this element is the ability to actually coerce a buyer to purchase the tied product. *Id*. at 470-71. However, the evidence does

not show how Defendant was able to force a distributor to buy its calsil as part of a fiberglass or perlite purchase. While evidence shows Defendant was able to influence distributors to act favorably toward it, there is insufficient evidence that it went so far as to create an actually tied purchase.

Whether under the *per se* or Rule of Reason approach, Plaintiff provides insufficient evidence by which it could prove the existence of an unlawful tying arrangement, as the law defines that form of anticompetitive conduct. Rather than meet the added elements that define tying, Plaintiff simply reargues its refusal-to-supply claim. The inferences and speculation upon which Plaintiff relies are too vague to warrant sending it to trial for the factfinder to resolve.

## III.    Injury

Plaintiff's antitrust claims–whether as a Section 2 monopolization or Section 1 tying theory–both require the occurrence of "an injury of the type the antitrust laws were intended to prevent" and that bears a relationship with the alleged antitrust act. *Cohlmia v. St. John Med. Ctr.*, 693 F.3d 1269, 1280 (10th Cir. 2012) (discussing antitrust injury as defined by the Sherman Act). It is not enough that Defendant was motivated to preserve its dominance in the calsil market or acted toward that end. Its effort also must have resulted in an actual anticompetitive effect and restrained trade to an unreasonable degree.

The typical markers of competition harm–higher price, reduced output, reduced innovation, or inferior product quality–are not evident here. There is evidence to suggest a supracompetitive calsil price *before* Plaintiff entered the market, but Plaintiff leaves unclear how the price remained supracompetitive afterwards (and if so, how Defendant's efforts to thwart its entry was the cause). Plaintiff submits the report of its expert witness, Dr. Warren-Boulton, but as the Court explained in its prior ruling, he falls short of presenting a compelling argument. From

what the Court can discern of his opinion, Dr. Warren-Boulton relies heavily on assumptions such as about lingering effects of Defendant's previous monopoly position. His report's lack of clarity limits its evidentiary value.

More importantly, however, is what the evidence shows about the actual dynamics and interplay between Defendant and the distributors after Plaintiff's entry. There is little evidence of how Defendant successfully interfered with distributors' ability to buy calsil from Plaintiff. Of what evidence there is or may be inferred from it, there is no indication that the effect was either substantial in degree or prolonged in duration. There is no evidence that end users were adversely affected.

The focus of antitrust injury is on competition, itself, but even if the Court were to consider harm to Plaintiff, evidence is lacking. Plaintiff was able to pursue opportunities at the distribution level where they arose and develop its own infrastructure base. Defendant's monitoring of imports indicates that Plaintiff's calsil was making it to projects despite the threats to distributors. Dr. Warren-Boulton opines that Plaintiff should have grown faster or should have sold more calsil than it did. However, given the complex dynamics involved, his report and its reliance on assumptions are too tenuous to create a genuine dispute of material fact on the matter.

## CONCLUSION

"[T]he line between anticompetitive conduct and aggressive competition can be indistinguishable." *New Mexico Oncology*, 994 F.3d at 1173 (internal citation omitted). Construing the evidence in Plaintiff's favor shows that Defendant reacted to its entry into the calsil market by aggressively trying to protect its market share. Simply put, it preferred that distributors continued to rely solely on it for their calsil needs. That alone is not an anticompetitive act. Any seller prefers to sell as much as possible, and every sale it makes is at the expense of its competitor. What is

lacking here is how Defendant crossed the line into antitrust behavior. Defendant's conduct did not go so far as to harm competition, itself. To the contrary, Defendant's response to Plaintiff's entry into the market–to test its relationships with distributors and to tout the advantages of its product–was both legitimate and *pro*competitive in nature.

Accordingly, Defendant's Motion to Strike [filed March 31, 2022; ECF 21] is **denied**, and Defendant's Motion for Summary Judgment [filed February 1, 2022; ECF 193] is **granted** as to all claims.

The Clerk of Court shall enter Final Judgment in Defendant's favor and close this case.

Entered this 26th day of April, 2022, at Denver, Colorado.

BY THE COURT:

Michael E. Hegarty
United States Magistrate Judge

205

# ATTACHMENT 7
Provisionally Sealed

# ATTACHMENT 8

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.  1:19-cv-00872-MEH

CHASE MANUFACTURING, INC.,

        Plaintiff,

vs.

JOHNS MANVILLE CORPORATION,

        Defendant.

## JUDGMENT

PURSUANT to and in accordance with Fed. R. Civ. P. 58(a) and the orders entered in this case, FINAL JUDGMENT is entered.

Pursuant to the Order [ECF 225, issued on April 26, 2022] of Magistrate Judge Michael E. Hegarty GRANTING the Defendant's Motion for Summary Judgment [ECF 193, filed February 1, 2022] which order is incorporated by reference, it is

ORDERED judgment shall be entered IN FAVOR of the Defendant Johns Manville Corporation, and, AGAINST the Plaintiff, Chase Manufacturing, Inc., on all claims for relief and causes of action asserted in this case.

Dated at Denver, Colorado, this 26th day of April 2022.

FOR THE COURT:
Jeffrey P. Colwell, Clerk

By *s/ C. Thompson*
   C. Thompson
   Deputy Clerk

**220**