# In the United States Court of Appeals for the Tenth Circuit

CHASE MANUFACTURING INC. D/B/A THERMAL PIPE SHIELDS,

*Plaintiff-Appellant*,

v.

JOHNS MANVILLE CORPORATION,

*Defendant-Appellee*.

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
NO. 1:19-CV-00872-MEH
The Honorable Michael E. Hegarty

## APPELLANT'S REPLY BRIEF

## PROVISIONALLY SEALED VERSION

ALEXANDRA SHEAR
LUKE HASSKAMP
JAROD M. BONA
BONA LAW PC
4275 Executive Square, Suite 200
La Jolla, CA 92037
858-964-4589
*Counsel for Appellant*
  *Chase Manufacturing Inc.*
  *d/b/a Thermal Pipe Shields*
ORAL ARGUMENT REQUESTED

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

GLOSSARY ............................................................................... vi

INTRODUCTION .......................................................................... 1

PROCEDURAL HISTORY ................................................................... 3

FACTUAL BACKGROUND ................................................................... 3

ARGUMENT ............................................................................. 11

I.  APPLYING INAPPLICABLE, UNDULY STRINGENT LEGAL STANDARDS WAS PREJUDICIAL ERROR ............................... 12

    A.  The Court Evaluated JM's Threats Using a Standard that Governs a Different Sort of Conduct ... 13

    B.  The Court Erroneously Required Monopoly Power for TPS's Tying Claim ................................... 14

        1.  TPS Presented Evidence of a Tying Arrangement ....................................... 15

        2.  TPS Correctly Defines the Tying Product Market as JM's Line of Non-Calsil Products ..... 20

        3.  Sufficient Economic Power, not More, Is Required in the Tying Product Market .............. 21

        4.  TPS Demonstrated JM's Sufficient Economic Power in the Tying Product Market ................... 22

II. JM HARMED COMPETITION IN THE MARKET FOR DOMESTIC CALSIL SALES BY MANUFACTURERS ................ 24

    A.  Relevant Market Definition and Antitrust Injury ...... 25

        1.  Although Unnecessary, TPS Showed that JM Enforced Its Threats ..................... 27

       2.      Characterizing Its Behavior as Benign Does Not Save JM .......................................................29

III.  JM CANNOT RELITIGATE ARGUMENTS IT LOST BUT DID NOT APPEAL TO PREVENT REVERSAL ...........................30

IV.  JM'S NONSENSICAL PRESERVATION ARGUMENTS AND SEMANTIC DISTINCTIONS DO NOT MERIT SERIOUS CONSIDERATION ..........................................................................31

       A.      JM, Not TPS, Advocates for a "New Framework" for Refusal to Supply ...................................................32

       B.      TPS Argued that JM's Rebate Agreements Constitute Exclusive Dealing and Tying .....................33

       C.      JM's Semantic Arguments Are Meritless ...................34

CONCLUSION ..............................................................................36

CERTIFICATE OF COMPLIANCE ........................................37

CERTIFICATE OF DIGITAL SUBMISSION ........................38

CERTIFICATE OF SERVICE ..................................................39

# TABLE OF AUTHORITIES

**Cases**                                                    **Page(s)**

*In re Cox Enters.*,
871 F.3d 1093 (10th Cir. 2017)......................................21, 22

*Detroit City Dairy, Inc. v. Kowalski Sausage Co.*,
393 F. Supp. 453 (E.D. Mich. 1975)...........................15, 23

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
504 U.S. 451 (1992)..........................................................24

*In re EpiPen Mktg., Sales Practices & Antitrust Litig.*,
44 F.4th 959 (10th Cir. 2022) ..........................26-28, 34-36

*Fortner Enterprises, Inc. v. U.S. Steel Corp.*,
394 U.S. 495 (1969)..........................................................22

*Int'l Salt Co. v. United States*,
332 U.S. 392 (1947)..........................................................28

*Jefferson Par. Hosp. Dist. No. 2 v. Hyde*,
466 U.S. 2 (1984)...............................................................21

*Leegin Creative Leather Prod. v. PSKS, Inc.*,
551 U.S. 877 (2007)..........................................................28

*Lorain Journal Co. v. United States*,
342 U.S. 143 (1951)..........................................................32

*McWane, Inc. v. FTC*,
783 F.3d 814 (11th Cir. 2015)..........................................33

*Monument Builders of Greater Kan. City, Inc. v. Am.
Cemetery Ass'n*,
891 F.2d 1473 (10th Cir. 1989)........................................22

*Multistate Legal Studies, Inc. v. Harcourt Brace Jovanovich
Legal & Pro. Publ'ns, Inc.*,
63 F.3d 1540 (10th Cir. 1995)..........................................19

*NCAA v. Bd. of Regents*,
  468 U.S. 85 (1984) ............................................................. 27

*N.M. Oncology & Hematology Consultants, Ltd. v.*
  *Presbyterian Healthcare Servs.*,
  994 F.3d 1166 (10th Cir. 2021) ........................................ 32

*Novell, Inc. v. Microsoft Corp.*,
  731 F.3d 1064, 1076 (10th Cir. 2013) ...................... 13-14, 26-27, 30, 32

*N. Pac. Ry. v. United States*,
  356 U.S. 1 (1958) ...................................................... 15, 21, 28

*Ohio v. Am. Express Co.*,
  138 S. Ct. 2274 (2018) ....................................................... 20

*OJ Com., LLC v. KidKraft, Inc.*,
  34 F.4th 1232 (11th Cir. 2022) ........................................ 33

*SolidFX, LLC v. Jeppesen Sanderson, Inc.*,
  935 F. Supp. 2d 1069 (D. Colo. 2013), *aff'd*, 841 F.3d 827
  (10th Cir. 2016) ............................................................. 15

*Sports Racing Servs., Inc. v. Sports Car Club of Am., Inc.*,
  131 F.3d 874 (10th Cir. 1997) ........................................ 22

*Suture Express, Inc. v. Owens & Minor Distrib.*,
  851 F.3d 1029 (10th Cir. 2017) ............................. 14, 20, 22, 24

*Tampa Elec. Co. v. Nashville Coal Co.*,
  365 U.S. 320 (1961) ........................................................... 33

*United States v. Colgate & Co.*,
  250 U.S. 300 (1919) ...................................................... 26, 27

*United States v. E.I. du Pont de Nemours & Co.*,
  351 U.S. 377 (1956) ...................................................... 25, 26

*United States v. Grinnell Corp.*,
  384 U.S. 563 (1966) ...................................................... 8, 25

*ZF Meritor, LLC v. Eaton Corp.*,
    696 F.3d 254 (3d Cir. 2012) ............................................................. 15

**Other Authorities**

Phillip E. Areeda (late) & Herbert Hovenkamp,
    *Antitrust Law: An Analysis of Antitrust Principles
    and Their Application* (5th ed. 2022 Cum. Supp. 2015-
    2021) ................................................................................. 20, 21, 24

Herbert Hovenkamp, *Antitrust and Platform Monopoly*,
    130 Yale L.J. 1952 (2021) ................................................................. 21

# GLOSSARY

TPS incorporates by reference the glossary included at page x of Appellant's Opening Brief, filed on October 4, 2022. TPS also incorporates by reference the glossary included at page x of the Answer Brief of Defendant-Appellee Johns Manville Corporation, filed on November 3, 2022, insofar as that glossary provides a neutral definition of terms, acronyms, or abbreviations for this Court's convenience. TPS does not incorporate any subjective argument from JM's glossary and, where JM defines a term that TPS had previously defined, all references here incorporate TPS's definition, rather than JM's. Under Tenth Circuit Rule 28.2(C)(4), these acronyms and abbreviations are used in this brief:

| Acronym or Abbreviation | Full Term |
|---|---|
| **DOJ and DOJ Br.** | The Antitrust Division of the United States of America's Department of Justice, referred to here as DOJ, filed a brief as Amicus Curiae, referred to here as DOJ Br., arguing that the district court erred in treating TPS's claim that JM refused to supply calsil to its customers as a claim that JM unilaterally refused to deal with its rivals.<br><br>Although JM states, "Amicus admits it lacks access to the sealed portions of the record and merely ***assumes*** that distributors complied |

| | |
|---|---|
| **DOJ AND DOJ Br.** (Continued) | with conditions imposed by Johns Manville and suffered competitive harm," JMAB at 65, DOJ explains, "This brief is based on the information in publicly available filings." DOJ Br. at 3, n.1. |
| **FAC** | TPS's First Amended Complaint. App.Vol.I, 26-76. |
| **JMAB** | Answer Brief of Defendant-Appellee Johns Manville Corporation, filed on November 3, 2022. |
| **Refusal to Supply** | TPS, DOJ, and various courts have adopted different terminology for the type of conduct in which JM engaged: withholding its calsil from any customer who bought TPS calsil. This behavior has been described as "refusal to supply," "conditional dealing," "the imposition of anticompetitive conditions on customers," and perhaps in other ways as well. Here, to be consistent and avoid confusion, TPS uses the term "refusal to supply" in all instances (except quotations). |
| **TPSOB** | Appellant's Opening Brief, filed on October 4, 2022 (with reduced redactions). Citations to Appendix Volumes 1 through 9 are to the revised appendices that were also filed on October 4, 2022. |

# INTRODUCTION

TPS presented evidence raising genuine disputes of material fact on all elements of its claims. The district court evaluated only some of that evidence, applied incorrect legal standards, and improperly granted summary judgment to JM.

JM argues nothing that dictates otherwise. It has no substantive response to TPS's arguments. Rather, JM urges this Court to ignore certain relevant facts, consider extraneous purported facts, and misapply the law—either by collapsing the refusal to supply[1] doctrine into another or by requiring monopoly power for tying. JM depends on regurgitated, failed arguments and creates factual disputes, highlighting the weakness of its response.

Notably, JM does not say, even once, that the district court applied the correct law. Nor does JM say, even once, that no genuine dispute of material fact exists. Applying the correct law to all the facts, this Court will see that each of JM's types of anticompetitive behavior, on its own, constitutes exclusionary conduct.

---

1. Whether to call JM's threats "refusal to supply," "conditional dealing," "imposing anticompetitive conditions," or "coercion," is semantics. Regardless of the label, the conduct is anticompetitive.

The evidence showed that JM's conduct enabled it to maintain control of the domestic calsil market, depriving customers of the benefits of competition from TPS. JM told distributors that it would stop selling its calsil and non-calsil products to them if they bought TPS calsil. Two distributors testified: ███████████████████████ ████████████████████████████████████████████ ███████████████████████████████ Others took notice.

At summary judgment, the court disregarded evidence of antitrust injury and applied the wrong standards to TPS's claims—elevating the thresholds for them to clear, then holding that TPS failed to carry the burden those demanding requirements imposed. Without these errors, the court should have held that: (1) JM had sufficient economic power over its non-calsil products to, and did, force distributors to buy its calsil; (2) JM used threats to coerce exclusivity; and (3) JM maintained its monopoly power in the calsil market, preempting competition from TPS, to customers' detriment.

Accordingly, this Court should reverse the grant of summary judgment and order a jury trial on TPS's claims.

# PROCEDURAL HISTORY

TPS filed a notice of appeal on May 20, 2022, and its opening brief (with appendices) on September 9. On October 4, TPS filed revised versions, making public certain information that had been kept confidential previously. On October 12, DOJ, as an *Amicus Curiae*, filed a brief arguing that the district court applied the wrong standard to evaluate JM's refusals to supply its customers. On November 3, JM filed its answer brief. TPS now replies.

TPS's appeal constitutes the full scope of what is before this Court to decide. JM cannot now relitigate any denied motions which it chose not to appeal.

# FACTUAL BACKGROUND

JM omits relevant facts and misrepresents others, providing a distorted picture of the evidence presented. These constitute genuine disputes of material fact that preclude summary judgment.

## **Omissions**

1. In arguing that TPS successfully penetrated the calsil market, JM fails to mention that it retained a ███ (or greater) share *after* TPS's entry. *See* App.Vol.VI, 146-47; App.Vol.VIII, 58. In arguing

that "TPS sold more than \$2.3 million of calsil from 2018 through 2020," JMAB at 14-15, JM does not acknowledge its own sales for the same period: more than ███████████ making TPS's share a meager ██████ compared to JM's █████ App.Vol.VI, 211.

2. JM omits that, in a market where TPS and JM are the only two suppliers, JM accounts for all sales not made by TPS. Any requirement that a customer not buy from TPS requires the customer to buy calsil from JM exclusively.

3. JM says that TPS's unrealistically estimates its "would-be" market share, without acknowledging that JM made similar predictions. *See* App.Vol.VII, 94-95, 109 (projecting approximately █████ share loss).

4. JM's suggestion that Dr. Warren-Boulton's analysis of JM's monopoly power consists of no more than comparing TPS's domestic calsil prices to JM's omits the nature of this analysis. Dr. Warren-Boulton explains, ██████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████ " App.Vol.VI, 136. Dr. Warren-Boulton used ████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

███████████████████████ *Id*. But JM ignores Dr. Warren-Boulton's other analyses, which compared: (1) JM's accounting margins (both contribution and gross) on calsil to those on other JM insulation products; (2) econometric estimates of JM's incremental margin (Lerner Index) on calsil to those on other JM insulation products; and (3) JM's contribution and gross margins on domestic calsil sales to those on export sales. App.Vol.VI, 126, 137-40; 182-85; 196-97; 209-10.

     5.    In arguing that JM routinely tracks information about its competitors, JMAB at 10 (citing App.Vol.III, 228), JM omits that it

█████████████████████████████████████████

███████████████████████. *See* App.Vol.IX, 40 ███████████

█████████████████████████████████████████████;

App.Vol.VII, 120-21 ████████████████████████████

██████████████████████ JM asked, ██████████████████

███████████████████████ Nor does JM admit that it sometimes

█████████████████████████████████████████

██████████████████ *See* App.Vol.IX, 27-28; App.Vol.IX, 5-8; *see also* App.Vol.VII, 125, 132, 135, 167; App.Vol.IX, 22, 35-36.

6.     Nor does JM acknowledge evidence that it threatened customers—sometimes successfully deterring purchases from TPS, and other times less so, prompting retaliation.

- DI:
  -  App.Vol.VII, 161-62.

  App.Vol.VIII, 130-31.

- 4State:
  -  App.Vol.VIII, 104.

- APi:

    - ████████████████████████████████████

      ████████████████████████████████████

      App.Vol.VII, 114; *accord* App.Vol.VIII, 70-72 (JM testimony about this email).

    - ████████████████████████████████████

      ████████████████████████████████████

      █████████████████████████ App.Vol.VII, 167.

- Bay:

    - █████████████████████████████ App.Vol.VII, 139.

7. JM fails to acknowledge that its threats determined customers' purchasing behaviors, contradicting JM's unsupported notion that the threats were universally "ignored." JMAB at 18, 59.

- "████████████████████████████████████

  ████████████████████████████████████

  ████████████████████████████████████

  ████████████████████████████████████

  █████████ App.Vol.IX, 38, quoting App.Vol.VII, 114 ████

8. Finally, JM ignores distributor testimony that TPS has a quality and price advantage over JM, and that these are important factors that influence purchasing decisions. App.Vol.II, 171; App.Vol.VIII, 88, 110-112, 132; App.Vol.II, 165; App.Vol.VI, 14, 22; App.Vol.VIII, 132; *see also,* App.Vol.VII, 123 ███████████

███████████████████████████████████

██████████████████████████████

JM tries to conceal these facts because they alter the story it tells. No reasonable juror could conclude that this typifies vigorous competition. Instead, JM used coercion, rather than "superior product, business acumen, or historic accident," to foreclose the competition it desperately feared would eviscerate its longstanding monopoly profits. *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966).

## Misrepresentations

1. In arguing that TPS successfully sold calsil to several distributors, JM elides the distinction between one-time and stocking purchases. Almost all of TPS's sales were one-time, ad hoc purchases.

Other than DI, none of the five largest distributors has stocked TPS calsil in its warehouses nationwide. Keeping TPS calsil in stock—rather than ordering as needed—would obviate concerns about delivery timelines, making TPS calsil more appealing to distributors' downstream customers and thus to distributors themselves.

2. JM ignores that individual locations (branches) of national distributors buy calsil independently (although, to varying extents, those purchasing decisions reflect corporate directives). While TPS sold calsil to each of the five largest distributors, *see* JMAB at 13-15, TPS was foreclosed from most of their locations. It is more precise to say that, a year after TPS's entry, only two of a combined 218 branches of the five largest distributors stocked TPS calsil. App.Vol.I, 41; 58.

3. These misrepresentations minimize JM's causal role in creating the only advantage it claims: lead times. JM suggests that: (1) all TPS calsil ships from China; (2) all JM calsil ships from domestic distributor warehouses or manufacturing plants; and (3) an order that ships from China necessarily takes longer to fulfill than one shipping from the U.S. These suggestions are untrue. JM's lead times equal, or exceed, TPS's for many common calsil sizes. This neutralizes JM's

claims of advantage and creates a factual dispute on whether lead times account for distributors' decisions not to buy TPS calsil. *See* App.Vol.II, 177-79 (4State was unworried about TPS lead times because JM calsil took longer to arrive from the U.S. than TPS calsil did from China); App.Vol.VII, 265-66 ███ ███ ███ ███ ███ ██████ ███████████████████████████████████████████

4. JM refers to the closure[2] of BEC's factory in China, *see, e.g.*, JMAB at 22, neglecting to mention that, anticipating this planned closure, TPS stockpiled calsil in the U.S. App.Vol.II, 265-66; 274-80. Thus, TPS's supply of calsil was uninterrupted and TPS's lead times **improved**, given that much of its calsil shipped from the U.S., rather than China. App.Vol.II, 279-80.

5. JM misrepresents the "exclusivity" component of TPS's "go-to-market" strategy. The word "exclusive" is a misnomer insofar as it suggests the opportunity to be the sole distributor of TPS calsil in any area. Rather, TPS offered the opportunity to gain "exclusive" access to

---

2. Referring to the closure of BEC's factory as "permanent[]" is misleading. JMAB at 2; 22. BEC built a new, state-of-the-art facility to replace the one that closed. This factory enables BEC to produce calsil of an even higher quality, more quickly, and to streamline the storage and shipping processes. App.Vol.III, 245.

preferential pricing. App.Vol.IV, 147, 232 ("exclusive territories" meant "the ability exclusively to buy at the stocking distributor price," "[a] preferential price"). To qualify, a distributor had to sign a regional stocking agreement—unconnected either to whether that distributor also stocks JM calsil or whether any other distributor stocks TPS calsil. App.Vol.IV, 137 ("[TPS] has always been willing to sell to every insulation distributor who wants to order it."); 147 ("We were willing to sell everyone, it's just at a different price.").

## ARGUMENT

TPS presented evidence of that JM delivered three types of messages to distributors. JM warned, "If you buy TPS calsil . . .":

(1) "You will not be able to buy JM calsil;" or

(2) "You will not be able to by JM's other, non-calsil products, or at least not on as advantageous terms as those which currently apply to such purchases;" or

(3) "You will not be able to buy any of JM's products—encompassing calsil and non-calsil products."

Conduct in the first category constitutes refusal to supply. Conduct in the second constitutes tying. Conduct in the third—telling

distributors, explicitly or implicitly, that, if they bought TPS calsil, they could not expect continued access to *any* JM products—constitutes two offenses simultaneously: (1) for calsil—where the requirement of two distinct products *is not* met—refusal to supply; and (2) for all other JM products—where that requirement *is* met—tying.

The threat to ████████ distributors is no different than if JM had made two separate threats: one to withhold calsil, and another to withhold all non-calsil products. Instead, JM combined them in a single threat: to withhold all of its products.

## I.  APPLYING INAPPLICABLE, UNDULY STRINGENT LEGAL STANDARDS WAS PREJUDICIAL ERROR

By requiring TPS to meet the requirements for an unlawful unilateral refusal to deal with a rival, the district court demanded that TPS make showings it did not need to make. Likewise, by requiring TPS to show market or monopoly power in the tying product market, rather than sufficient economic power to be able to effectuate a tie-in, the court demanded too much. Applying the correct standards, genuine disputes of material fact exist about antitrust injury and every element of TPS's claims.

## A. The Court Evaluated JM's Threats Using a Standard that Governs a Different Sort of Conduct

"Johns Manville agrees [] that *Novell*'s refusal to deal doctrine should not govern TPS's claims here." JMAB at 34. JM nonetheless argues that this Court should not reverse—offering only one reason: "If this was error, TPS invited it." *Id*. at 33. Even if that were true, it would not support this Court's repeating the acknowledged "error."

TPS has consistently disclaimed the contention that JM refused to deal with a rival and has always advocated against applying that incorrect standard.

- [TPS] is not alleging that [JM] refused to deal with [TPS], which could invoke the refusal to deal with a rival antitrust doctrine. Instead, [TPS] . . . is alleging that [JM] . . . is refusing to supply calsil to any distributors (large and small) that also purchase calsil from [TPS].

FAC, App.Vol.I, 51.

- "JM continues to argue against an argument that TPS does not make: that JM has violated the law on unilateral refusals to deal with its rivals."

App.Vol.VII, 43-45.

- "Imposing anticompetitive conditions on a customer . . . is a classic strategy reflecting a 'purpose to create or maintain a monopoly.' . . . By contrast, a refusal to sell to a rival or competitor is rarely anticompetitive . . . and a higher standard governs."

TPSOB at 59-60 (citations omitted).

The district court never explained its assertion that "[a]lthough the context may be different, the same general principles apply." App.Vol.V, 16. "Refusal to deal doctrine targets only a discrete category of section 2 cases attacking a firm's unilateral decisions about with whom it will deal and on what terms." *Novell, Inc. v. Microsoft Corp.,* 731 F.3d 1064, 1076 (10th Cir. 2013). To repeat the district court's error would be to "displace doctrines that address a monopolist's more direct interference with rivals," exactly what this Court warned against. *Id.*

## B. The Court Erroneously Required Monopoly Power for TPS's Tying Claim

Tying requires a showing of "sufficient economic power" to leverage its influence over the tying market in the tied market. This concept is substantively distinct from "monopoly" or "market power." JM correctly states the requirement as: "sufficient economic power in the tying product market to enable it to restrain trade in the tied product market." JMAB at 42 (quoting *Suture Express, Inc. v. Owens & Minor Distrib.,* 851 F.3d 1029, 1037 (10th Cir. 2017)). Applying *this* standard, genuine disputes exist on whether JM forced a tying

arrangement on customers and whether JM had sufficient economic power to effectively tie calsil to other products.

### 1. TPS Presented Evidence of a Tying Arrangement

Tying is "an agreement by a party to sell one product but only on the condition that the buyer . . . at least agrees that he will not purchase that product from any other supplier." *N. Pac. Ry. v. United States*, 356 U.S. 1, 5-6 (1958); *SolidFX, LLC v. Jeppesen Sanderson, Inc.*, 935 F. Supp. 2d 1069, 1078 (D. Colo. 2013), *aff'd*, 841 F.3d 827 (10th Cir. 2016) (same). Courts have long emphasized that requirements not to patronize a defendant's competitor in the tied market are treated the same as requirements to patronize the defendant in that market. *See, e.g.*, *Detroit City Dairy, Inc. v. Kowalski Sausage Co.*, 393 F. Supp. 453, 461 (E.D. Mich. 1975).

JM agreed to sell its non-calsil products only to distributors who did not to buy TPS calsil. Even where the condition was implied, its anticompetitive effect is the same. *Cf. ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 270 (3d Cir. 2012) (for exclusive dealing, an express exclusivity requirement is unnecessary).

### a) Threats

JM warned distributors that buying TPS calsil would bring consequences.

- JM threatened DI: █████████████████████████ ████████████████████████████████████ ███████████████ App.Vol.VII, 162.

- JM █████████████████████████████████ ████████████████████████████ App.Vol.VIII, 123-24 ███████████████████████████ █████████████████████████████████████ App.Vol.VIII, 130 31 ████████████████████████ █████████████████████████████████████ █████████████████████

When JM learned that distributors had bought TPS calsil, it threatened withholding future sales of non-calsil products[3] if they continued.

---

3.  JM's withholding its calsil *as well as* its other products compounds one offense (tying) by adding another (refusal to supply); it does not negate the tie-in.

- Upon learning that 4State had bought TPS calsil, JM vowed:

  ██████████████████████████████ App.Vol.VII, 168.

- JM threatened 4State: ██████████████████████████████

  ██████████████████████████████████████████████

  ██████████████████████ App.Vol.VIII, 89-90.

- Upon learning that APi had bought TPS calsil, JM discussed:

  ██████████████████████████████████████████████

  ██████████████████████████████████████████████

  App.Vol.VII, 120.

- JM reported internally that ████████████████████████

  ██████████████████████████████████████████████

  ██████████████████████████████████████████████

  ██████████████████████████████████████████████

  ██████████████████████████████████████ App.Vol.VII,

  114.

- Describing 4State and APi as ████████████████████████

  ██████████████████████ App.Vol.VII, 116.

- JM noting ████████████████████████████████████████

  ████████: ████████████████████████████████████████

███████████████████████████████████████

████ App.Vol.VII, 262.

This reflects JM's retaliatory withholding of its non-calsil products from distributors who defied JM's condition not to buy TPS calsil. Moreover, JM's salespeople were told:



App.Vol.VII, 277. JM ████████████████████████████████

████████████████████████████████████████████

which distributors purchase in substantial volumes; and (2) ██████

████████████████████████████████

This undermines the argument that the fact that JM does not sell "to every geographic location of every distributor" is what JM's stated intention to █████ certain distributors reflects. JMAB at 32. Common sense requires concluding that JM debated whether to terminate distributors that it **had been** supplying. What support is there to "████" from locations it had never supported? Similarly, the argument that JM contemplated whether to stop selling to customers who had,

independently, stopped buying is illogical. And the veracity of these explanations is a factual question precluding summary judgment.

### b) Rebates

JM's rebate agreements also reflect its tying calsil to its other products. *See* App.Vol.IX, 33 ██████████████



██████████████ *see also* App.Vol.VIII, 119-21.

Dr. Warren-Boulton concluded that ██████████████

██. App.Vol.VI, 141-44 (JM's discount structure operates as ██████ ██████████████ Distributors' relatively small calsil requirements also limits TPS's ability to discount its calsil further to make up the difference. *Id*.

Finally, the existence of a tying arrangement is a question of fact. *Multistate Legal Studies, Inc. v. Harcourt Brace Jovanovich Legal & Pro. Publ'ns, Inc.*, 63 F.3d 1540, 1548 (10th Cir. 1995). JM's denial that one exists highlights a factual dispute requiring a jury's resolution.

### 2. TPS Correctly Defines the Tying Product Market as JM's Line of Non-Calsil Products

Because there are no substitutes for calsil at a competitive price, calsil is the only product in the tied product market. App.Vol.VI, 132-33. Any other product is a "separate" one, for which tying could be shown. *See Suture Express,* 851 F.3d at 1037 (requiring "two separate products").

Here, the tying product is JM's non-calsil insulation products—any and all of them. The full set of insulation products that only JM sells is something without which distributors cannot survive and which JM used to compel compliance with its conditions. *See, e.g.*, App.Vol.VI, 141-42 (noting JM's "control over its 'must-have' products").

Courts determine whether tying harms competition in the ***tied*** product market: in this case, the domestic calsil market, which Dr. Warren-Boulton defined.[4] App.Vol.VI, 132-33.

---

4. The excerpt from *Ohio v. American Express Co.*, 138 S. Ct. 2274, 2285 (2018), which JM cites to argue that a precise tying market definition is required, JMAB at 44, 51, actually addresses the tied market. *Accord* Phillip E. Areeda (late) & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 1736c3 (5th ed. 2022 Cum. Supp. 2015-2021) ("Areeda &

### 3. Sufficient Economic Power, not More, Is Required in the Tying Product Market

The inquiry for tying is whether the defendant's control over the supply of the tying product(s) forces customers to make purchases in the tied product market that they would not otherwise make. *See Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 13-14 (1984) (citations omitted); *In re Cox Enters.*, 871 F.3d 1093, 1099 (10th Cir. 2017).

To prove that a defendant can force customers to buy its tied product, a plaintiff need only show that it has enough influence in the tying market to be able to do so. No greater degree of power is necessary. *See N. Pac. Ry.*, 356 U.S. at 11 (rejecting contention that "monopoly power" or "dominance" over the "tying product" is required; only "sufficient economic power to impose an appreciable restraint on free competition in the tied product" is necessary); *see also* Herbert Hovenkamp, *Antitrust and Platform Monopoly*, 130 Yale L.J. 1952, 1965, n.47 (2021) (for tying and exclusive dealing, "the defendant need not be dominant"). This Court's tying cases have consistently held the

---

Hovenkamp") ("[I]f legality is to depend on prospective effects in the tied market, they can be measured directly.").

same. *See Suture Express,* 851 F.3d at 1037; *Sports Racing Servs., Inc. v. Sports Car Club of Am., Inc.*, 131 F.3d 874, 886 (10th Cir. 1997); *Monument Builders of Greater Kan. City, Inc. v. Am. Cemetery Ass'n*, 891 F.2d 1473, 1482-83 (10th Cir. 1989).[5]

The holding that "Plaintiff must show how Defendant could have ***raised those products' prices or restrict their output***" contradicts this body of law. App.Vol.V, 30 (citation omitted). Applying this standard imposed an erroneous requirement that a defendant be a monopolist.

### 4. TPS Demonstrated JM's Sufficient Economic Power in the Tying Product Market

Evidence showed distributors' dependence on JM's supply of its non-calsil products–which is more than "customer interest or loyalty." JMAB at 53. More accurately, distributors said they depend on JM for their survival.

---

5.    In *Cox Enterprises*, which JM cites, this Court indicates that *Fortner Enterprises, Inc. v. U.S. Steel Corp.*, 394 U.S. 495 (1969), remains good law for the propositions for which TPS cites it. Neither case requires more than sufficient economic power in the tying product market for a tying claim.

DI testified that it █████████████████████████████
███████████████████ App.Vol.VIII, 118, 129. DI also called ████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
App.Vol.VIII, 116-18; App.Vol.III, 162. Most significantly, DI said ██
████████████████████████████████████████████████████████
███████████████████ App.Vol.VIII, 129 ██████████████████████
████████████████████████████

Similarly, 4State testified that it could not ██████████████████
██████████████████████████ App.Vol.VIII, 91-94 ██████████████
████████████████████████████████████████████████████████
██████████████ The court noted distributors' dependence on JM's non-
calsil materials as an undisputed fact: "██████████████████████
████████████████████████████████████████████████████████
██████████████████████████████████ App.Vol.IX, 33.
This dependence confers sufficient economic power on JM to enable it to
force distributors to buy its calsil, despite a preference for TPS's. *Detroit
City Dairy,* 393 F. Supp. at 462, 466-67 (tying market customers were
"economically dependent" on defendant, conferring "sufficient economic

power"). JM's characterization, that distributors had a preference, raises a factual dispute that precludes summary judgment.

That distributors bought JM calsil constitutes additional evidence of JM's ability to force distributors to buy its calsil. "[T]ied market effects can be appropriate evidence of tying market power in a rule of reason case." *Suture Express,* 851 F.3d at 1040 (citing *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 477 (1992)); *see* Areeda & Hovenkamp ¶ 1756b3 ("[W]e can presume that a rational customer would not take an overpriced or inferior product B [(tied product)] unless it must in order to get the defendant's product A [(tying product)]—that is, unless there was a tying condition.") (citations omitted). Because JM's calsil is overpriced *and* inferior, the presumption is doubly warranted.

## II.   JM HARMED COMPETITION IN THE MARKET FOR DOMESTIC CALSIL SALES BY MANUFACTURERS

TPS showed that calsil sales by manufacturers in the U.S. is a relevant market and that JM maintained pricing in that market of roughly ████ percent above the competitive level. *See* App.Vol.IV, 188-89 ("Dr. Warren-Boulton does define the relevant market . . . [as] 'the sale of calsil in the U.S.'"); App.Vol.VI, 131 █████████████

*see also* App.Vol.VI, 204-05. JM's only response is that this Court should assume a different market. JMAB at 56, 61-63. As discussed below, such an assumption is not warranted. *See* § III, *infra*.

## A. Relevant Market Definition and Antitrust Injury

The district court properly adopted TPS's proposed market definition, noting "the record contains evidence that reasonably supports" it. App.Vol.V, 13 (the relevant market for monopolization, and the tied product, is "upstream sales to distributors of calsil at the national level"). It is undisputed that JM had a monopoly in this market before TPS's entry. App.Vol.VI, 131 ███████████████

██████████████████████████████████████

TPS showed that JM unlawfully maintained that monopoly through exclusionary conduct, which harms competition by supplanting "superior product, business acumen, or historic accident," as the means of a supplier's success, replacing it with something toxic to competition. *Grinnell*, 384 U.S. at 571. JM harmed competition in the calsil market by foreclosing its only competitor, depriving customers of a lower priced, higher quality product and leaving JM free to "control prices or exclude

competition." *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956).

JM did so through coercive means, which harm consumers, rather than competitive means, which benefit them. *See Novell,* 731 F.3d at 1073-76 (condemning "a monopolist's more direct interference with rivals"); *In re EpiPen Mktg., Sales Practices & Antitrust Litig.*, 44 F.4th 959, 985-86 (10th Cir. 2022) (conduct "is anticompetitive under the consumer welfare standard if it harms consumers by excluding rivals").

JM suggests no procompetitive benefits from its conduct, and the court acknowledged harm to JM's customers. App.Vol.IX, 33



The court also noted that DI

*Id.* Because

App.Vol.VIII, 111, 132; App.Vol.II, 165.

Although JM contends that *United States v. Colgate & Co.*, 250 U.S. 300 (1919), is "irrelevant," JMAB at 36, n.19, that decision

explains why JM's conduct fundamentally harms competition: suppliers can choose to whom they sell, but only if the choice is made "[i]n the absence of any purpose to create or maintain a monopoly." *Colgate*, 250 U.S. at 307. JM acted with precisely such a purpose.

Exclusionary conduct "has little or no value beyond the capacity to protect the monopolist's market power." *Novell,* 731 F.3d at 1072. JM suggests no value to its conduct beyond general assertions that some vertical restrictions can be procompetitive. Moreover, TPS demonstrated that JM's coercive conduct engendered both "hallmarks of anticompetitive behavior": reduced output and supracompetitive pricing. *NCAA v. Bd. of Regents*, 468 U.S. 85, 113 (1984); *see EpiPen,* 44 F.4th at 985-87.

### 1. Although Unnecessary, TPS Showed that JM Enforced Its Threats

Even if "TPS fail[ed] to explain [] why the factual record proves any actual refusal to supply distributors," it would not matter. JMAB at 31. The relevant question is how JM's threats influenced customers' purchasing behavior. JM caused distributors to stop buying TPS calsil and to abstain from, or delay, doing so in the first place. App.Vol.II, 167 (DI explained that the "risk" of a stocking agreement with TPS was

"low," except for "how it was going to affect our relationship with JM.").

Once distributors complied, damage was done. This is how JM harmed competition.

DOJ agreed: "[B]y communicating an anticompetitive condition to distributors and dissuading them from buying [] TPS's product[,] [t]he harm to competition would arise when the distributors comply with the condition (in which case those distributors are not terminated)." DOJ Br. at 17.

The Supreme Court, too, has confirmed that following through on anticompetitive threats is unnecessary for liability. *Int'l Salt Co. v. United States*, 332 U.S. 392, 398 (1947) (rejecting the argument that enforcement is necessary for tying); *N. Pac. Ry.*, 356 U.S. at 11-12 (same). Neither case JM cites holds to the contrary. JMAB at 31-33 (citing *Leegin Creative Leather Prod. v. PSKS, Inc.*, 551 U.S. 877, 901 (2007) and *EpiPen,* 44 F.4th at 983) (each acknowledges, unremarkably, that vertical restraints can be procompetitive).

Moreover, TPS ***did*** show JM's actual refusal to supply customers, disciplining not only the targeted customers, but others too. Pursuant to JM's threat, 4State ███████████████████████████████

█████████████ App.Vol.VI, 228. JM offered a discount, ostensibly to "offset" resulting costs. *See* JMAB at 19 (citing App.Vol.VI, 228-29, 234). But the arrangement ███████████████████████████████ ████████████████████████████████████████ ███████████████████████████ App.Vol.VI, 228-29. Bay noticed JM's treatment of other distributors and feared the same: "They are taking a hard line against selling anyone who is stocking a 'different' brand' . . . . They can't cut us off, but they can make it pretty hard to do business with them." App.Vol.IV, 130.

### 2. Characterizing Its Behavior as Benign Does Not Save JM

However JM describes its conduct now, its contemporaneous language exposes the truth. JM suggests no legitimate business justification for its threats. Instead, JM argues it was "strategiz[ing] how best to get its products to market, including reevaluating relationships with distributors based on how much product they buy and whether they carry or promote competing products," reflecting "discussions about how to adapt its relationships with distributors to take account of competition from TPS." JMAB at 31-32; 38.

But JM described its conduct differently in private, using unambiguously punitive terms to describe the sanctions it would impose on distributors who bought TPS calsil.

-  App.Vol.VII, 139.

- App.Vol.VII, 167.

- App.Vol.VII, 168.

- App.Vol.VII, 114.

Even if it were plausible that this is vigorous competition, not coercion, how to characterize JM's conduct is a disputed factual question that precludes summary judgment. *Cf. Novell*, 731 F.3d at 1075 (describing a seller's "seeking to drive a rival from the market or discipline it for daring to compete on price" as examples of "a larger anticompetitive enterprise").

## III. JM CANNOT RELITIGATE ARGUMENTS IT LOST BUT DID NOT APPEAL TO PREVENT REVERSAL

JM's arguments depend on revived contentions—about factual issues—that the district court properly rejected. *See* App.Vol.I, 99 (the

FAC states a "monopolization claim based on Defendant's refusal to sell or supply its calsil to customers"); App.Vol.I, 254-64 (denying partial summary judgment seeking to define an artificially broad market); App.Vol.IV, 176-201 (all of Dr. Warren-Boulton's opinions will help the trier of fact). JM has not appealed its denied motions, which advanced meritless arguments that provide no basis to affirm the grant of summary judgment.

Because JM failed to show that its proffered product market definition is correct as a matter of law, and did not revive that contention in its second motion for summary judgment, the district court correctly disregarded it. Accordingly, that argument has no place in this appeal. Even if JM's proposed market definition were before the Court, that would preclude summary judgment. App.Vol.I, 259 ("Product market definition is a question of fact for the factfinder.").

## IV. JM'S NONSENSICAL PRESERVATION ARGUMENTS AND SEMANTIC DISTINCTIONS DO NOT MERIT SERIOUS CONSIDERATION

Underscoring the lack of substance to its legal and factual positions, JM argues preservation failure. But even a cursory review of

the record reveals that TPS preserved each argument, at every opportunity.

## A. JM, Not TPS, Advocates for a "New Framework" for Refusal to Supply

As shown above, TPS repeatedly explained the distinction between JM's refusal to supply disloyal customers and a refusal to deal with a rival and why different standards govern those types of conduct. TPS waived no right to cite any relevant authority.

TPS does not advocate for a "new framework" for this analysis. TPS seeks the same treatment it has always sought and this Circuit has always applied to "some assay by the monopolist into the marketplace." *Novell,* 731 F.3d at 1072. In *New Mexico Oncology & Hematology Consultants, Ltd. v. Presbyterian Healthcare Servs.*, 994 F.3d 1166, 1174 (10th Cir. 2021), this Court held that the "refusal to sell [] 'even if compensated at retail price' [] makes the conduct in *Lorain Journal* [*Co. v. United States*, 342 U.S. 143 (1951)] anticompetitive." Because JM *did* refuse to sell calsil, "even if compensated at a retail price," absent a demonstration of distributors' loyalty, *Lorain Journal* is on point. *N.M. Oncology*, 994 F.3d at 1174.

JM, by contrast, ***does*** seek a new framework, arguing that this Circuit should follow the Eleventh Circuit to hold that a refusal to supply "is indistinguishable from the range of conduct traditionally addressed by the exclusive-dealing rubric." *See* JMAB at 34-35 (citing *OJ Com., LLC v. KidKraft, Inc.*, 34 F.4th 1232, 1244-47 (11th Cir. 2022)).

Even if this Court were to consider refusal to supply as exclusive dealing, a dispute of fact exists on all required elements. *See* AOB at 62-66. Exclusive dealing is unlawful where "the practical effect" is to foreclose customers from patronizing a competitor. *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 326 (1961). Foreclosure occurs when "the opportunities for other traders to enter into or remain in the market are significantly limited by the exclusive deal[s]." *McWane, Inc. v. FTC*, 783 F.3d 814, 837 (11th Cir. 2015). TPS showed that JM's conduct had the practical effect of excluding TPS from the calsil market.

## B.   TPS Argued that JM's Rebate Agreements Constitute Exclusive Dealing and Tying

TPS did not "abandon[] the argument it made below characterizing Johns Manville's rebate agreements . . . as exclusive dealing." JMAB at 27. Nor did TPS fail to "preserve the argument . . .

that characterizes Johns Manville's rebate agreements as tying arrangements." *Id*. at 28. As JM acknowledges, TPS's summary judgment opposition cites JM's rebate agreements in response to JM's purported facts one through three (tying) and twenty-two through twenty-four (exclusive dealing). App.Vol.VII, 17-19; 35-38. And TPS cites them now. TPSOB at 19; 40-42. TPS showed that the rebate agreements require exclusivity in the same way they constitute tying: JM leveraged its economic power in the tying products to coerce its customers to buy JM calsil exclusively.

## C.     JM's Semantic Arguments Are Meritless

Even if TPS had adopted the language of "coercion" following the recent decision in *EpiPen*, *see* JMAB at 38-39, that would not matter. And this suggestion ignores reality.

- "JM coerced customers." App.Vol.VII, 51.

- "JM engaged in significant coercive activity." App.Vol.VII, 53.

- Exclusive dealing is unlawful when "coercion [is] present." App.Vol.VII, 54.

- "[G]iven the other indicia of coercion;" "JM's broad coercion;" and "JM secured this substantial foreclosure through coercion." App.Vol.VII, 58.

- "JM's coercive tactics." App.Vol.VII, 59.

- "[C]ustomers were coerced into purchasing." App.Vol.VII, 67.

- "JM used its economic power . . . to coerce distributors." App.Vol.VII, 71.

- "JM's coercive actions." App.Vol.VII, 76.

- "[C]ompetition on the basis of coercion." App.Vol.VIII, 260.

- "JM's coercion." App.Vol.VIII, 266.

This language, all pre-dating *EpiPen,* demonstrates that TPS repeatedly discussed coercion. TPS's post-*EpiPen* briefing introduces no new concepts. TPS just shows that *EpiPen* confirms the correctness of its arguments.

Nor are the *EpiPen* factors "irrelevant." JMAB at 41-42. "Consumer welfare" is the fundamental value that antitrust law protects—and that JM's conduct impaired. And "[w]ho initiated exclusivity" is a factual indication of coercion. *EpiPen*, 44 F.4th at 996

("the presence of coercion [] casts doubt on the assumption that the exclusive deals are naturally procompetitive") (citation omitted).

## CONCLUSION

For these reasons and those in TPS's opening brief, this Court should reverse the order granting summary judgment and remand the case for trial.

Date:    November 23, 2022        Respectfully submitted,

BONA LAW PC

*s/ Alexandra Shear*
Alexandra Shear

*Counsel for Appellant*
*Chase Manufacturing Inc. d/b/a*
*Thermal Pipe Shields*

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), I certify that:

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 6,494 words (based on the Microsoft Word word-count function), excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and 10th Cir. R. 32(B).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and 10th Cir. R. 32(A) and the type and style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Word 2016, Century Schoolbook 14-point font.

Date:    November 23, 2022

> BONA LAW PC
>
> *s/ Alexandra Shear*
> Alexandra Shear
>
> *Counsel for Appellant*
> *Chase Manufacturing Inc. d/b/a*
> *Thermal Pipe Shields*

# CERTIFICATE OF DIGITAL SUBMISSION

For this brief, I certify that:

(1) all required privacy redactions have been made per 10th Circuit Rule 25.5;

(2) the version of this brief submitted electronically to this Court via its CM/ECF system is an exact copy of the hard copies of this brief to be submitted to the Court; and

(3) the version of this brief submitted electronically to this Court via its CM/ECF system was scanned for viruses with the most recent version of a commercial virus scanning program, and is free of viruses.

Date:    November 23, 2022

> BONA LAW PC
>
> *s/ Alexandra Shear*
> Alexandra Shear
>
> *Counsel for Appellant*
> *Chase Manufacturing Inc. d/b/a*
> *Thermal Pipe Shields*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 23, 2022, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Date:     November 23, 2022

<div style="margin-left:40%">

BONA LAW PC

*s/ Alexandra Shear*
Alexandra Shear

*Counsel for Appellant*
*Chase Manufacturing Inc. d/b/a*
*Thermal Pipe Shields*

</div>