# In the United States Court of Appeals for the Tenth Circuit

CHASE MANUFACTURING INC. D/B/A THERMAL PIPE SHIELDS,
*Plaintiff-Appellant*,

v.

JOHNS MANVILLE CORPORATION,
*Defendant-Appellee*.

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
NO. 1:19-CV-00872-MEH
The Honorable Michael E. Hegarty

**APPELLANT THERMAL PIPE SHIELDS'S RESPONSE TO APPELLEE JOHNS MANVILLE'S PETITION FOR PANEL REHEARING AND REHEARING EN BANC**

ALEXANDRA SHEAR
LUKE HASSKAMP
JAROD M. BONA
BONA LAW PC
4275 Executive Square, Suite 200
La Jolla, CA 92037
858-964-4589
*Counsel for Plaintiff-Appellant*
  *Chase Manufacturing Inc.*
  *d/b/a Thermal Pipe Shields*
ORAL ARGUMENT REQUESTED

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.......................................................................ii

INTRODUCTION................................................................................1

ARGUMENT .....................................................................................2

I.    This Case Does Not Meet the Standard for Rehearing....................2

      A.    The Opinion Aligns with Established Tenth Circuit Law, Including the Recent Decision in *EpiPen* .............4

      B.    The Opinion Aligns with Decisions of Other Circuits...8

      C.    Even if the Court Were to Accept JM's Urging to Conflate the Concepts of Coercion and Exclusive Dealing, the Outcome Would Not Change...................11

      D.    In Any Event, There Is No Reason to Apply the Wrong Standard............................................14

II.    The Opinion Provides Clear Guidance for Remand ......................15

III.    JM's Other Argument Do Not Support Rehearing........................17

CONCLUSION .................................................................................20

CERTIFICATE OF COMPLIANCE..........................................................22

CERTIFICATE OF DIGITAL SUBMISSION ........................................23

CERTIFICATE OF SERVICE..............................................................24

# TABLE OF AUTHORITIES

| Cases | Page(s) |
|---|---|

*BRHH Shreveport v. Willis Knighton Med. Ctr.*,
    49 F.4th 520 (5th Cir. 2022) ........................................................ 9–10

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
    504 U.S. 451 (1992) ........................................................................ 2, 4

*In re EpiPen Mktg., Sales Pracs. & Antitrust Litig.*,
    44 F.4th 959 (10th Cir. 2022) ..................................... 2, 4–7, 12, 16–17

*Lorain J. Co. v. United States*,
    342 U.S. 143 (1951) ........................................................... 3, 8, 14–15

*McWane, Inc. v. FTC*,
    783 F.3d 814 (11th Cir. 2015) ...................................................... 3, 12

*N.M. Oncology & Hematology Consultants, Ltd. v. Presbyterian
    Healthcare Servs.*,
    994 F.3d 1166 (10th Cir. 2021) ............................................................ 5

*N.Y. v. Meta Platforms, Inc.*,
    66 F.4th 288 (D.C. Cir. 2023)............................................................... 8

*Novell, Inc. v. Microsoft Corp.*,
    731 F.3d 1064 (10th Cir. 2013) .............................................. 2, 4–6, 17

*Ohio v. Am. Express Co.*,
    138 S. Ct. 2274 (2018)............................................................... 18–20

*OJ Com., LLC v. KidKraft, Inc.*,
    34 F.4th 1232 (11th Cir. 2022) ..................................................... 9–11

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
    555 U.S. 438 (2009)............................................................................. 2

*Tampa Elec. Co. v. Nashville Coal Co.*,
    365 U.S. 320 (1961)............................................................... 5, 12–13

*United States v. Dentsply Int'l, Inc.,*
   399 F.3d 181 (3d Cir. 2005) .......................................................... 3, 12

*United States v. Microsoft Corp.,*
   253 F.3d 34 (D.C. Cir. 2001) ................................................................. 3

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP,*
   540 U.S. 398 (2004) ................................................................................ 2

*ZF Meritor, LLC v. Eaton Corp.,*
   696 F.3d 254 (3d Cir. 2012) ........................................................ 12–13

**RULES**

10th Cir. R. 35.1 ....................................................................................... 17

10th Cir. R. 40.1 ....................................................................................... 18

**INTRODUCTION**

The evidence showed that Johns Manville ("JM")—a monopolist with 98% market share—engaged in coercive conduct to protect its monopoly. JM threatened to retaliate against customers if they bought Thermal Pipe Shields's ("TPS") competing product, even though it was higher quality and lower priced. Thus, after a thorough review of the parties' briefing and the record, and after argument by the parties and the United States as amicus curiae, the Panel issued a well-reasoned, well-supported opinion reversing the district court's grant of summary judgment on TPS's monopolization claim ("Opinion"). Because JM offers no sensible reason to disturb that decision, this Court should deny the request for rehearing, either by the Panel or en banc.

JM's Petition for Panel Rehearing and Rehearing En Banc ("Petition") reflects the soundness of the Opinion: JM's complaints about tone, so-called dicta, and factual findings (all supported by record citations) highlight the absence of any legitimate challenge to this Court's legal determinations. Ultimately, JM has not shown, nor could it, that the Panel was incorrect in holding that the district court applied the wrong legal standard to evaluate JM's anticompetitive conduct—

indeed, JM conceded that the district court had applied the wrong standard. Nor has JM shown that TPS failed to raise a triable issue of fact on the required elements of its monopolization claim when that claim is properly analyzed.

For these reasons, the Court should deny the Petition and allow the Opinion to stand.

## ARGUMENT

### I. This Case Does Not Meet the Standard for Rehearing

JM argues that "it is important to limit exclusionary conduct liability to existing frameworks." Pet. at 4. Yet the Opinion did precisely that. Op. at 18–33. In its fifteen-page section, titled "Exclusionary Conduct," the Opinion cited heavily to hornbook antitrust cases from the Supreme Court and several Courts of Appeals, including this one, to determine that JM's conduct harmed competition. These cases include:

- *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992);
- *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004);
- *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438 (2009);
- *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064 (10th Cir. 2013);
- *In re EpiPen Mktg., Sales Pracs. & Antitrust Litig.*, 44 F.4th 959 (10th Cir. 2022);

- *United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001);
- *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181 (3d Cir. 2005); and
- *McWane, Inc. v. FTC*, 783 F.3d 814 (11th Cir. 2015).

*Id.* at 18–33.

Along with these cases, the Opinion relied heavily on the Supreme Court's seminal decision in *Lorain Journal Co. v. United States*, 342 U.S. 143 (1951). Op. at 23–25. This Court correctly noted that "[t]he newspaper's conduct in *Lorain Journal* parallels JM's exclusionary conduct here." *Id.* at 24. That case is controlling precedent and on point, as the Opinion thoroughly demonstrated. *Id.* at 23–25. For the same reasons that the Supreme Court found that the newspaper's conduct harmed competition in that case, the Panel correctly held that JM's conduct harmed competition in this one.

It is hard to imagine how this bounty of established precedent does not satisfy JM's demand for "existing frameworks." Pet. at 4. Nor does JM suggest any reason why these frameworks may be incorrect. Rather, it is JM that seeks to have this Court abandon its own precedent and, instead, "apply[] the exclusive dealing rubric like those circuits" that have done so—but which this Circuit has not. Pet. at 1,

13. But the Panel correctly applied the existing body of law to analyze JM's threats and to conclude that they amount to exclusionary conduct.

## A. The Opinion Aligns with Established Tenth Circuit Law, Including the Recent Decision in *EpiPen*

The Opinion does not merely address the Tenth Circuit cases that are relevant to this one. It relies heavily on their teachings to apply the appropriate law to the instant facts.

For example, citing *Novell*, the Panel noted that, "[t]he question is 'whether, based on the evidence derived from past cases, the conduct at issue before us has little or no value beyond the capacity to protect the monopolist's power.'" Op. at 19 (quoting *Novell,* 731 F.3d at 1072). Because the "conduct at issue" always presents a new set of facts, the Panel also noted that the Supreme Court instructs to "approach § 2 claims on a 'case-by-case basis.'" Op. at 19 (quoting *Eastman Kodak*, 504 U.S. at 467).

This does not, however, amount to what JM calls "evaluation by ad hoc, case-by-case principles." Pet. at 2, 12–13. Rather, it is a uniform application of principles to consistently analyze varied factual circumstances that raise similar concerns. In all cases, the task is the same: to "distinguish between exclusionary acts, which reduce social

welfare, and competitive acts, which increase it." Op. at 19 (citing *EpiPen*, 44 F.4th at 981–82). The Panel applied this analysis to the evidence of JM's coercive conduct and concluded, correctly, that "JM has not rebutted the sensible inference that its threats were anticompetitive . . . ." Op. at 23. This was proper, and the Panel was correct that the district court likewise "should have adopted an approach that looked to the reality of the calsil market and the practical effect of JM's conduct." *Id*. at 26 (citing *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 326–28 (1961)).

This approach also adhered to the concerns expressed in *New Mexico Oncology & Hematology Consultants, Ltd. v. Presbyterian Healthcare Servs.*, 994 F.3d 1166 (10th Cir. 2021) and *Novell* about the repercussions of incorrectly parsing vigorous competition and conduct that crosses the line. Indeed, it recognized that appreciation of nuance is necessary to distinguish correctly. And even though "[c]ourts have fashioned rules of presumptive legality for certain forms of conduct that experience teaches almost never harm consumers," no case holds that coercion—threatening to retaliate against customers who do business

with a competitor—is one such form of conduct. Pet. at 4 (citing *Novell*, 731 F.3d at 1073).

The Opinion also relied heavily on this Court's decision from a year earlier in *EpiPen*, which the Panel noted "supports our ruling that JM's threats raise a genuine issue of material fact for the exclusionary-conduct element." Op. at 29. *EpiPen* rejected the idea that coercion and procompetitive benefit can coexist. *Id*. at 20, 23, 28–29 (citing *EpiPen*, 44 F.4th at 996–97); *see also EpiPen*, 44 F.4th at 996 ("We can therefore generally presume exclusive deals are procompetitive. **But this assumption is thrown out the window when record evidence suggests coercion by the monopolist**.") (emphasis added).

Additionally, *EpiPen* discussed several factual indicia of coercion—and thus anticompetitiveness—which help distinguish those restraints which have neutral or salutary effects on competition from those which reduce competition and thus social welfare. 44 F.4th at 996–97.

The Panel considered these factors and how they apply to the evidence presented, correctly concluding that the factual dissimilarities between *EpiPen* and this case warrant different determinations about

the lawfulness of the conduct at issue. Op. at 30–31 (examining the extent of foreclosure, relative price and quality, who initiated exclusivity, whether coercion was present). This detailed analysis belies JM's contention that the Opinion noted the "'significant evidence of JM's coercive behavior toward its distributors' [without] analyzing coercion under the *EpiPen* criteria." Pet. at 7. To the contrary, the Panel's detailed application of those criteria showed that the *EpiPen* factors, when applied to JM's conduct, require the conclusion that JM reduced competition by coercing customers to choose "JM's more expensive and inferior calsil." Op. at 29–31 ("Though an exclusive-dealing case, *EpiPen* still helps in reaching our outcome here").

Finally, the Tenth Circuit Rules provide that rehearing is generally reserved for when a decision of this Circuit conflicts with other decisions **by the Circuit or by the Supreme Court**. *See* 10th Cir. R. 35.1(A) (en banc review is "intended to focus the entire court . . . on a panel decision that conflicts with a decision of the United States Supreme Court or of this court").

The Opinion does neither. It relies on, and is consistent with, every one of this Circuit's previous examinations or discussions of the

type of conduct at issue, as well as those of the Supreme Court. The only supposed "conflicts" to which JM points are with respect to decisions by other Circuits. And even those conflicts are specious.

## B. The Opinion Aligns with Decisions of Other Circuits

JM fails to explain why a purported conflict with one or more other Circuits justifies invoking en banc review. But it does not matter because no meaningful Circuit split exists.

JM cites *New York v. Meta Platforms, Inc.*, which distinguishes between conditional dealing and traditional exclusive dealing, noting that substantial foreclosure is a required element of the latter but not the former. 66 F.4th 288, 304 (D.C. Cir. 2023). For this reason, the conduct at issue there—which the plaintiffs characterized as conditional dealing, but the court recognized as exclusive dealing—was correctly analyzed as exclusive dealing. Thus, the court correctly required allegations of substantial foreclosure to state an exclusive dealing claim. *Id.* But that case is not analogous. There, the court specifically noted that, "the [conduct at issue] is nothing like the exclusive dealing from *Lorain Journal*, the case on which [plaintiffs] rely." *Id*. (citations omitted). Here, *Lorain Journal* **is** on point.

By contrast, the Eleventh Circuit has noted that its "precedent treats 'conditional refusals to deal' . . . and exclusive dealing as synonymous." *OJ Com., LLC v. KidKraft, Inc.*, 34 F.4th 1232, 1247 (11th Cir. 2022). Yet its language shows that the issue is merely one of nomenclature. And consistent with this distinction being one of form, rather than substance, JM does not identify any material way in which the Panel would have ruled differently had it applied the Eleventh Circuit's approach. This is likely true for two reasons: (1) mere application of the label would not have affected the substance of the Panel's analysis; and (2) the Panel **did** apply exclusive dealing precedent in that analysis.

Similarly, the Fifth Circuit's decision in *BRHH Shreveport v. Willis Knighton Medical Center*, notes that the distinction between conditional dealing and exclusive dealing is one of pure semantics. 49 F.4th 520, 529 (5th Cir. 2022) ("[C]onditional refusals to deal are functionally equivalent to exclusive-dealing arrangements . . . . An exclusive-dealing arrangement is a conditional refusal to deal where the condition is exclusivity.") (citing *OJ Commerce*, 34 F.4th at 1247). Thus, the court required substantial foreclosure—a necessary element of

exclusive dealing—and found it lacking. *Shreveport*, 49 F.4th at 530. It did not, however, hold that conditional dealing is permissible when market foreclosure occurs.

Also, *OJ Commerce* noted the burden-shifting analysis it employs "to evaluate an exclusive dealing monopoly maintenance theory of harm. First, the plaintiff must show that the monopolist's conduct had the anticompetitive effect of harming competition, not just a competitor. If the plaintiff succeeds in demonstrating this anticompetitive harm, the burden then shifts to the defendant to present procompetitive justifications for the exclusive conduct." 34 F.4th at 1247 (cleaned up).

The Panel conducted this same analysis here. First, it noted that JM's threats "harm[ed] distributors and end customers alike: with less distribution of TPS's calsil, the supply chain had little choice but JM's more expensive and inferior calsil." Op. at 31. Second, it noted that, notwithstanding JM's protestations that vertical restraints generally— and even exclusive dealing specifically—are often procompetitive, JM did not suggest any actual procompetitive benefits of its conduct. *Id.* at 23 ("[JM] has not explained how its conduct fostered competition."). Nor

could it because coercing customers through threats of economic retaliation perverted the competitive process.

Finally, *OJ Commerce* ultimately held that the plaintiff failed to establish how the defendant's conduct resulted in substantial foreclosure. 34 F.4th at 1249–50. By contrast, the Panel found that TPS presented evidence that JM's conduct substantially foreclosed TPS from gaining traction in the calsil market. Op. at 30–31 ("the summary-judgment record (as well as common sense) tells us that when the sole domestic manufacturer of a product in a two-firm market threatens to withhold that product from distributors, distributors will be wary to engage with the monopolist's competitor").

Thus, regardless of the "test" applied here, the outcome would be the same.

### C. Even if the Court Were to Accept JM's Urging to Conflate the Concepts of Coercion and Exclusive Dealing, the Outcome Would Not Change

The Panel considered and rejected JM's attempt to conflate coercion with exclusive dealing, holding that, "even if we adopted an exclusive-dealing framework, many of the exclusive-dealing cases relied on by JM *support* our ruling that JM's conduct was exclusionary." Op.

at 27. This was correct, as was the holding that "none of [JM's counterarguments] refute that TPS has raised a genuine issue of material fact on whether JM's threats were exclusionary." *Id.*

Moreover, the Panel functionally ***did*** what "JM contends [it] should" do: "use an exclusive-dealing framework to evaluate the effects of its threats." *Id.* at 27–31 (citing *EpiPen*, 44 F.4th at 996–97; *Dentsply*, 399 F.3d 184, 191–94; *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 283 (3d Cir. 2012); and *McWane*, 783 F.3d at 820–22, 838—all exclusive dealing cases); *see also* Op. at 26 (citing *Tampa Elec.*, 365 U.S. 320, another exclusive dealing case). In considering these cases, the Panel correctly found that exclusive dealing precedents "support a holding that a monopolist engages in exclusionary conduct by threatening distributors." Op. at 28 (citation omitted).

The Panel's holding that the presence of coercion necessarily undermines the possibility of any procompetitive effects—because coercion of consumers clashes with those consumers' exercise of judgment about what best promotes their own well-being—is correct and consistent with *EpiPen*. And exclusive dealing cases have always held that coercion need not be explicit to constitute exclusive dealing.

*ZF Meritor*, 696 F.3d at 270 ("An express exclusivity requirement . . . is not necessary, . . . because we look . . . to ascertain the relationship between the parties and the effect of the agreement in the real world. Thus, *de facto* exclusive dealing claims are cognizable under the antitrust laws.") (cleaned up). Consequently, JM's new argument that, for exclusive dealing, TPS could only raise a genuine issue of material fact about exclusionary conduct pertaining to JM's rebates (and that TPS did not do so), is incorrect. *See* Pet. at 3, 12.

Rather than focusing on the form of a restriction, the key question for exclusive dealing is whether "the practical effect" of the challenged conduct is to coerce a customer from using the products of a competitor. *Tampa Elec.*, 365 U.S. at 326. As for JM's threats, the Panel correctly held that TPS offered evidence from which a jury could answer this question in the affirmative. Op. at 30 ("the record shows that the monopolist JM pressured its distributors into ***practical market exclusion*** to slow TPS's growth") (emphasis added); *id.* at 29 n.20 ("triable issues persist as to whether JM's threats worked a market exclusion").

The Panel was also correct that foreclosure need not be total to harm competition. *Id*. at 30–31 (correctly applying the "substantial[] foreclosure[]" standard to determine whether TPS had raised a triable issue and noting that "what matters is not whether JM succeeded in totally excluding TPS from the calsil market but whether JM's actions substantially foreclosed TPS from the market and impeded TPS's market growth") (citation omitted).

Thus, the Panel correctly found that the record supports triable issues of material fact as to all required elements of an exclusive dealing claim.

### D.   In Any Event, There Is No Reason to Apply the Wrong Standard

Even had the Panel failed to analyze both conditional dealing and exclusive dealing, there is no reason to analyze JM's conduct as if it were a refusal to deal with a rival. The Panel correctly noted that, "[we] have never extended the refusal-to-deal-with rivals analysis outside that situation." *Id*. at 25 (citations omitted). And there is no reason to do so now: the conduct at issue in a refusal to help one's rival compete against oneself is fundamentally unlike the conduct at issue in *Lorain Journal* and here, "threats [which] would force [customers] to get in

line." Op. at 24 (citing *Lorain Journal*, 342 U.S. at 152–53). These two types of conduct raise different concerns and thus warrant application of different analyses to evaluate their effects on competition.

And as the Panel noted, "TPS, JM, and the United States (as amicus) all agree that the [district] court applied the wrong legal standard. And so do we." Op. at 25. This unanimity makes it all the more absurd for JM to now argue that this Court should revisit the Opinion.

## II. The Opinion Provides Clear Guidance for Remand

It is simply incorrect that the Opinion fails to provide guidance for remand. Pet. at 12–13. The Opinion is clear: consider, under *Lorain Journal* and this Circuit's exclusive dealing cases, and those from other Circuits and the Supreme Court, whether JM's threats to customers resulted in any form of competitive harm. That is, the jury should consider whether such harm is evidenced by the foreclosure of TPS from the market thereby denying customers access to TPS's superior, less expensive product, or by some other indication. Op. at 20, 23–26, 30–31. Indeed, the district court should do on remand what the Panel said it

should have done: "adopt[] an approach that look[s] to the reality of the calsil market and the practical effect of JM's conduct." *Id*. at 26.

The record is rife with evidence to conclude that a triable issue of fact exists about whether JM's conduct harmed competition. Thus, the jury will need to consider whether JM has advanced procompetitive justification for its threats, notwithstanding the Panel's holding that the presence of coercion precludes a demonstration of procompetitiveness and that, even if this were not so, JM has not identified one, anyway. *Id*. at 22–23.

Moreover, the Panel was clear that the consumer welfare standard must be the yardstick by which anticompetitive effect is evaluated, as this Circuit has repeatedly recognized. *Id*. at 19–20, 28–29, 31 (conduct like JM's "harms distributors and end customers alike: with less distribution of TPS's calsil, the supply chain had little choice by JM's more expensive and inferior calsil"). As this Court's decisions have shown, application of this standard permits effective evaluation of the competitive effects of a challenged restraint. *EpiPen*, 44 F.4th at 984 ("To delineate between permissive and prohibited exclusionary contracts, we need some guiding principle—some standard that allows

us to quickly and easily resolve whether exclusive contracts harm competition. In our Circuit, this is the consumer welfare standard.") (citing *Novell*, 731 F.3d 1064). The Opinion does not create a scenario in which "any conduct can be adjudicated as unlawful exclusionary conduct because jurors decide in hindsight that the conduct lacks 'value' or is 'coercive' based on *ad hoc* case-by-case analysis," nor does it "deprive[] parties of clear guidance to avoid antitrust liability." Pet. at 8. Nor does JM explain how it might do so.

## III.   JM's Other Argument Do Not Support Rehearing

The Petition advances additional arguments which, even if they were correct, do not warrant rehearing. For example, it is untrue that the Opinion "lacks a neutral tone" and "reads like ***this*** Court prejudged fact disputes." Pet. at 2, 9. To the contrary, the Opinion made clear that it was simply concluding that factual disputes existed.

And even if that suggestion had any validity, it is not necessary to address either one to secure or maintain uniformity of the circuit's decisions, or to comply with a U.S. Supreme Court ruling in conflict. *See* 10th Cir. R. 35.1 (en banc review is "intended to focus the entire court on an issue of exceptional public importance").

Similarly, JM's quibbles about the Opinion's factual determinations—all derived from the summary judgment record and supported with citations to evidence—also fail to justify rehearing. *See* 10th Cir. R. 40.1(A) ("Rehearing will be granted only if a significant issue has been overlooked or misconstrued by the court."). Rather, these arguments either underscore the existence of factual disputes that preclude summary judgment or pertain to facts that are simply not material. Pet. at 13–17.

Likewise, JM's perfunctory references to "whether the Circuit should go back to discouraging the use of summary judgment for antitrust claims" neither adequately raise an issue of exceptional public importance nor require the Court to reconcile an inconsistency with any controlling precedent. *Id*. at 2, 6.

Finally, whether direct evidence may be used to prove monopoly power or anticompetitive effect is not an "unsettled legal issue[]." *Id*. at 9–12. Only JM appears to believe that this is an open question, and that belief requires a contorted interpretation of the Supreme Court's decision in *Ohio v. American Express Co.*, which affirmatively states that a "plaintiff[] can make this showing directly or indirectly." 138 S.

Ct. 2274, 2284 (2018). JM's novel interpretation of this case as *prohibiting* the use of direct evidence defies common sense—why would only circumstantial evidence be allowed?—and has never been endorsed by any court. There is simply no need for this Court to consider this frivolous argument and then to consider the secondary question of whether the Opinion presumes a contradictory understanding of the Supreme Court's holding in *American Express*.

Nor is it accurate to say that this issue was "not briefed here." Pet. at 9. JM's Answer Brief repeatedly criticized the use of "direct evidence." *See* JM Answer Br. 24, 52 n.24, 61–63. Plus, this issue was thoroughly addressed in the parties' *Daubert* and summary judgment briefs, which were part of the record. Indeed, JM's argument is essentially verbatim to its district court briefing on this point.

And the district court considered this precise argument and soundly rejected it. *See* App.Vol.IV, 184 ("Plaintiff can make the Rule of Reason's initial showing [of anticompetitive effect] with either direct or indirect evidence."); *id.* at 187 ("[A] plaintiff can show an anticompetitive effect—the second element of a monopoly claim—under the Rule of Reason with either direct or indirect evidence."); *id.* at 193

("The Rule of Reason offers two ways to show that a restraint on trade has an unreasonable effect on competition: either through direct evidence of such harm or through indirect evidence from which harm may be inferred. Plaintiff relies on the direct evidence option. *American Express* does not foreclose that approach as a matter of law" and "the Court does not read *Am. Express* as dispensing with the direct evidence option . . . ."). Indeed, to decide otherwise would upset deeply settled antitrust law and create a bizarre precedent in which the most persuasive available evidence is inadmissible. In any event, the Panel had the benefit of the parties' briefing and district court ruling of this issue.

Ultimately, none of these arguments offers persuasive support for the contention that rehearing is justified. To the contrary, they each, individually, and all, cumulatively, highlight the desperate nature of the Petition—based solely on dissatisfaction with the result—rather than genuine identification of legal error requiring correction.

## CONCLUSION

The Court should deny rehearing, either by the Panel or en banc.

Date:    October 6, 2023          Respectfully submitted,

                                  BONA LAW PC

                                  *s/ Alexandra Shear*
                                  Alexandra Shear

                                  *Counsel for Plaintiff-Appellant*
                                  *Chase Manufacturing Inc. d/b/a*
                                  *Thermal Pipe Shields*

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), I certify that:

This brief complies with the type-volume limitation of Fed. R. App. P. 35(b)(2) because this brief contains 3,896 words (based on the Microsoft Word word-count function), excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and 10th Cir. R. 32(B).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and 10th Cir. R. 32(A) and the type and style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Word 2016, Century Schoolbook 14-point font.

Date:    October 6, 2023

BONA LAW PC

*s/ Alexandra Shear*
Alexandra Shear

*Counsel for Appellant*
*Chase Manufacturing Inc. d/b/a*
*Thermal Pipe Shields*

## CERTIFICATE OF DIGITAL SUBMISSION

For this brief, I certify that:

(1) all required privacy redactions have been made per 10th Circuit Rule 25.5;

(2) the version of this brief submitted electronically to this Court via its CM/ECF system is an exact copy of the hard copies of this brief to be submitted to the Court; and

(3) the version of this brief submitted electronically to this Court via its CM/ECF system was scanned for viruses with the most recent version of a commercial virus scanning program, and is free of viruses.

Date: October 6, 2023

BONA LAW PC

*s/ Alexandra Shear*
Alexandra Shear

*Counsel for Plaintiff-Appellant*
*Chase Manufacturing Inc. d/b/a*
*Thermal Pipe Shields*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 6, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Date:    October 6, 2023

> BONA LAW PC
>
> *s/ Alexandra Shear*
> Alexandra Shear
>
> *Counsel for Plaintiff-Appellant*
> *Chase Manufacturing Inc. d/b/a*
> *Thermal Pipe Shields*